# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.

Reporter of Decisions:
Kathryn L. Loomis

PEOPLE v POSEY

Docket No. 162373. Argued on application for leave to appeal January 11, 2023. Decided July 31, 2023.

Dametrius B. Posey and a codefendant were tried jointly before a jury in the Wayne Circuit Court on multiple counts of assault with intent to murder, MCL 750.83; assault with intent to commit great bodily harm less than murder, MCL 750.84; carrying a weapon with unlawful intent, MCL 750.226; being a felon in possession of a firearm, MCL 750.224f; and possessing a firearm during the commission of a felony, MCL 750.227b. The witnesses, Terrence Byrd and Dwayne Scott, were approached by two men while standing outside a market in Detroit. One of the men showed the witnesses a gun, and Byrd exchanged gunfire with the men. Scott was shot during the incident, and Byrd testified that both of the men who had approached them were also shot. The day after the shooting, Byrd and Scott gave statements to the police. Byrd described one of the men as 6'3" and dark-skinned and the other as light-skinned with reddish-blond hair, while Scott described the shooter as dark-skinned and 5'9". Byrd identified two men from a photo array, but neither man was charged in connection with the shooting. Scott selected defendant from a photo array as one of the men involved in the shooting, but he later testified that he was unsure of his identification. At trial, Byrd identified defendant, by name, for the first time as one of the shooters. Scott, despite his earlier identification, did not identify defendant at trial. After sentencing, defendant appealed. While the appeal was pending, defendant and the prosecution moved jointly to remand for resentencing because of several errors during the sentencing hearing. The Court of Appeals, MURRAY, P.J., and FORT HOOD and LETICA, JJ., granted the motion and remanded for resentencing in an unpublished order. Defendant was resentenced after his guidelines range was corrected, but the trial court, Ulysses W. Boykin, J., imposed the same minimum sentence as defendant's original sentence, 264 months, which was within the revised guidelines range. The Court of Appeals, BOONSTRA, P.J., and MARKEY and FORT HOOD, JJ., then affirmed defendant's convictions and sentence. 334 Mich App 338 (2020). Defendant applied for leave to appeal in the Supreme Court, and the Court scheduled and heard oral argument on the application. 508 Mich 940 (2021).

In an opinion by Justice BOLDEN, joined in full by Justice BERNSTEIN, by Justice CAVANAGH except as to Part II(A)(3), and by Justice WELCH as to Parts II(A)(1), (2), note 10 of Part II(A)(3) concerning ineffective assistance of counsel, and II(B)(1) and (2); an opinion by

Justice CAVANAGH, joined in all but Part IV(B) and the statements concerning MCL 769.34(10) by Justice WELCH, and an opinion by Justice WELCH, the Supreme Court *held*:

The same due-process protections that apply to an in-court identification of a defendant that was preceded by an unnecessarily suggestive pretrial identification procedure also apply to a situation in which the identification of the defendant occurs for the first time at trial. When analyzing whether identification evidence must be excluded, the key question is whether it was rendered unreliable by state action, not just whether there was improper police activity. In this case, however, defendant was not entitled to relief from his convictions. Further, a defendant is entitled to challenge the proportionality of any sentence on appeal. When a trial court sentences a defendant within the guidelines' recommended range, it creates a rebuttable presumption that the sentence is proportionate. The first sentence of MCL 769.34(10) was struck to the extent that it rendered sentences within the guidelines unreviewable. *People v Schrauben*, 314 Mich App 181 (2016), was overruled in part, as was any other decision that required appellate courts to affirm within-guidelines sentences on appeal.

Court of Appeals judgment reversed in part and vacated in part; case remanded to the Court of Appeals for further proceedings. Leave to appeal denied in all other respects.

Justice BOLDEN, joined in full by Justice BERNSTEIN, further stated that because no objection had been raised to the introduction of Byrd's first-time-in-court identification of defendant as an assailant, there was an insufficient record for weighing the reliability of this identification evidence. She noted that defendant had not adequately explained how Byrd's identification affected other identification evidence produced at trial, such as surveillance video of the altercation and circumstantial evidence of defendant's identity. She also noted that the jury had been apprised of Byrd's inability to make a prior identification and of the fact that, between the time of his initial failure to identify Byrd and the time of trial, Byrd had been exposed to considerable media coverage that used defendant's name and photograph in connection with the altercation. She stated that defendant failed to explain how this in-court identification necessarily tainted the other evidence of defendant's identity. Accordingly, defendant did not meet the requirements of showing plain error that affected the outcome of the proceedings, nor had he established ineffective assistance of trial counsel. With respect to appellate review of sentences that are within the recommended guidelines range, Justice BOLDEN would also have held that the portion of MCL 769.34(10) requiring affirmation of within-guidelines sentences on appeal be struck as unconstitutional under *People v Lockridge*, 498 Mich 358 (2015), and *People v Steanhouse*, 500 Mich 453 (2017), reasoning that because MCL 769.34(10) requires that the Court of Appeals "shall" affirm and "shall not" remand any trial court's sentencing decision that is "within the sentencing guidelines," it necessarily refers to the sentencing guidelines as mandatory and, as such, was necessarily struck down by *Lockridge*. She stated that although the guidelines remained a highly relevant consideration when sentencing, they did not permit a trial court to use them as a shield against appellate review by rigidly imposing sentences within the guidelines. She further stated that without the ability to seek judicial review of the reasonableness of a sentence for which the minimum sentence falls within the guidelines, the guidelines would become effectively mandatory any time a defendant's minimum sentence was consistent with the guidelines.

Justice CAVANAGH, concurring in part and concurring in the judgment, joined Justice BOLDEN's opinion except as to Part II(A)(3), and Justice CAVANAGH's opinion was joined in all but Part IV(B), addressing ineffective assistance of counsel, and the statements concerning MCL 769.34(10) by Justice WELCH. Justice CAVANAGH agreed that the first sentence of MCL 769.34(10) was unconstitutional, and she concurred in full with the lead opinion's reasoning on that point. She also agreed that identifications of a defendant that occur for the first time at trial raise due-process concerns but that defendant was not entitled to relief from his conviction. Accordingly, she agreed that the case should be remanded to the Court of Appeals to review the proportionality of defendant's sentence. She wrote separately to further explain why first-time trial identifications raise due-process concerns and why, in her view, first-time trial identifications of a defendant with whom the witness had no prior interactions before the alleged crime would, under the generally recognized due-process framework for determining the admissibility of eyewitness identifications, almost always be insufficiently reliable to satisfy due-process requirements. She also wrote separately to elaborate on why the Court's holding as to first-time trial identifications was consistent with *Perry v New Hampshire*, 565 US 228 (2012). She stated that *Perry* did not address the issue of first-time trial identifications but rather clarified that intentional state use of an unnecessarily suggestive identification procedure is a prerequisite before due process requires exclusion. She further stated that there is no meaningful distinction between the prosecutor—an agent of the state—eliciting a first-time trial identification and the police engaging in an unnecessary pretrial showup, which is the type of unnecessarily suggestive procedure that the Due Process Clause has traditionally deterred. Finally, she stated that, instead of affirming defendant's convictions on the basis that defendant could not demonstrate prejudice, she would have affirmed because, under the state of the law when the trial occurred, the error in admitting Byrd's identification was not plain and trial counsel did not perform deficiently by failing to object to this testimony.

Justice WELCH, concurring in part, concurring in the judgment, and dissenting in part, joined Part II(A)(1) and (2) of the lead opinion in full, and also concurred with the handling of defendant's ineffective assistance of counsel claim in note 10 of Part II(A)(3) of the lead opinion. She agreed with Justice CAVANAGH's analysis regarding first-time-in-court identification of a defendant by a stranger and her handling of the plain-error analysis, and she therefore joined Justice CAVANAGH's concurrence except for Part IV(B) and the statements concerning MCL 769.34(10). With regard to appellate review for proportionality of sentences that fall within the sentencing guidelines, she joined Parts II(B)(1) and (2) and the remedy provided in Part II(B)(4) of the lead opinion, but she dissented from Part II(B)(3). She agreed that at least the first sentence of MCL 769.34(10) was invalid but disagreed that this conclusion was compelled by *Lockridge* and *Steanhouse*, because the constitutional defects identified in *Lockridge* had been cured by that opinion when it rendered the guidelines advisory. Instead, she concluded that MCL 769.34(10) impermissibly infringes a convicted individual's right to seek appellate review of the results of a criminal prosecution under Const 1963, art 1, § 20 by effectively eliminating the right to appeal any aspect of a sentencing decision that did not fall within the two enumerated categories of defects and by requiring the Court of Appeals to affirm such sentences without reviewing the merits of a defendant's legal arguments. Accordingly, Justice WELCH agreed that the first sentence of MCL 769.34(10) must be severed to the extent it required appellate courts to affirm within-guidelines sentences.

Chief Justice CLEMENT, joined by Justices ZAHRA and VIVIANO, concurring in part and dissenting in part, agreed that defendant was not entitled to relief for his due-process argument regarding the identification procedure, but otherwise dissented, stating that the majority's decision unduly expanded the Court's due-process jurisprudence regarding identification procedures from cases involving suggestive pretrial identification procedures to first-time-in-court identifications without precedential support or sufficient justification otherwise. She stated that admitting a first-time-in-court identification did not so violate fundamental conceptions of justice that a judicial reliability assessment was necessary before its admission in light of the protections available to a defendant at trial, a conclusion with which the federal appeals courts that had considered the issue agreed. She also disagreed that *Lockridge*, which rendered the sentencing guidelines advisory, was incompatible with the requirement in MCL 769.34(10) that appellate courts affirm within-guidelines sentences. Because she believed that the Court of Appeals correctly resolved both issues, she would have affirmed in full.

Justice ZAHRA, concurring in part and dissenting in part, agreed that defendant was not entitled to relief for his due-process argument regarding the identification procedure and that his conviction should be affirmed. He also joined the separate opinion authored by Chief Justice CLEMENT, specifically agreeing that MCL 769.34(10) does not violate the Sixth Amendment and that the majority opinion unduly and improperly expanded the scope of protection afforded a defendant with regard to in-court identifications. He wrote separately to emphasize that the majority's rule ran afoul of established precedent and would have a substantial negative impact on the criminal justice system for years to come. He noted that neither the prosecution nor the police in this case had taken any action to force, pressure, compel, or influence the witness's testimony; that there was no evidence of abnormality in the administration of the trial, judicial oversight, jury observation, or cross-examination; and that defendant had not alleged any form of prosecutorial misconduct. He stated that the majority's rule that certain in-court identifications, lacking any form of government coercion, pressure, or misconduct, could not be admitted for jury consideration was the first such holding in the history of the state's jurisprudence and conflicts with centuries of trial practice and precedent from the United States Supreme Court. He stated that the decision is in direct conflict with the interpretations of numerous federal circuit courts on the same issue and creates significant challenges for prosecutions and trial courts in administering this decision going forward. Justice ZAHRA would not have created a new constitutional right for defendants to exclude highly relevant in-court testimony under the auspices of due process, and he would have affirmed the Court of Appeals judgment in full.

# OPINION

Chief Justice:
  Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

FILED  July 31, 2023

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellee,

v                                                                No. 162373

DAMETRIUS BENJAMIN POSEY,

     Defendant-Appellant.

---

BEFORE THE ENTIRE BENCH

BOLDEN, J.

Two important issues are considered in this case.  The first issue addresses due-process rights and how prosecuting attorneys may introduce in-court testimony purporting to identify a defendant when the testifying witness had not identified the defendant before trial.  The second issue addresses how an appellate court must consider a defendant's challenge to a minimum sentence that falls within the minimum sentence range calculated by the sentencing guidelines.

For a jury to find a defendant guilty of a charged crime, the prosecution must demonstrate that the defendant is guilty of every element of a crime beyond a reasonable doubt. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). One of those elements is identity—whether the defendant was the person who committed the charged crime. *People v Oliphant*, 399 Mich 472, 489; 250 NW2d 443 (1976). At issue here is a witness's trial testimony identifying defendant as the perpetrator of a crime.

Witness identification is guarded by the Due Process Clause of the United States Constitution, and the process used to identify a witness must not be "so unnecessarily suggestive and conductive to irreparable mistaken identification" as to deny a defendant due process of law. *Neil v Biggers*, 409 US 188, 196; 93 S Ct 375; 34 L Ed 2d 401 (1972) (quotation marks and citation omitted). Whether an in-court identification of the defendant is admissible evidence depends on whether the procedures employed by the state to obtain the identification evidence result in an identification that is sufficiently reliable to be presented to the jury. *Manson v Brathwaite*, 432 US 98, 114; 97 S Ct 2243; 53 L Ed 2d 140 (1977). Even when the identification process is unnecessarily suggestive, identification evidence may nonetheless be admissible if there is an independent basis for establishing the reliability of the identification. *People v Kurylczyk*, 443 Mich 289, 303; 505 NW2d 528 (1993). This Court has established criteria for considering whether an independent basis exists, thus rendering the witness's identification reliable and admissible. *People v Gray*, 457 Mich 107, 115-116; 577 NW2d 92 (1998), citing *People v Kachar*, 400 Mich 78, 95-96; 252 NW2d 807 (1977).

This case is unique. Unlike in prior cases, the witness who identified defendant at trial did not identify defendant before trial; the witness's first recorded identification of

defendant as an assailant occurred at trial. In fact, the witness identified different individuals as possible assailants before trial. The Court of Appeals concluded that the reliability criteria could not be applied given that there was no improper law-enforcement activity and no pretrial identification of defendant obtained through an unnecessarily suggestive pretrial process. *People v Posey*, 334 Mich App 338, 350-351; 964 NW2d 862 (2020).

We disagree with the Court of Appeals on that point and vacate that portion of its opinion. The key to identification evidence is whether it was rendered unreliable by state action, not just whether there was improper police activity. Moreover, we extend the due-process based preadmissibility screening protections from *Gray* and *Kachar* to witness identifications of a defendant that take place for the first time at trial. However, we nonetheless affirm defendant's convictions because he has not shown plain error affecting his substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). We also agree with the Court of Appeals that defendant has not satisfied the burden of demonstrating ineffective assistance of trial counsel.

Secondly, this case contains an important issue regarding defendant's right to appeal a sentence. Over the past 10 years, this Court has considered questions about the mandatory nature of Michigan's sentencing guidelines scheme. In *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015), this Court decided that the Sixth Amendment of the United States Constitution requires that the sentencing guidelines used to calculate a suggested range for a defendant's minimum sentence are to be advisory—not mandatory—for trial courts when imposing sentences. This means that trial courts have discretion to impose minimum sentences outside the guidelines range so long as the sentence is

3

proportionate to the seriousness of the circumstances surrounding the offense and offender. Two years later, we considered additional issues stemming from the decision in *Lockridge*, holding, among other things, that the sentencing guidelines are advisory in all applications, that sentencing decisions must be reasonable, and that sentencing decisions are reviewed for an abuse of discretion by determining whether they violated the principle of proportionality. See *People v Steanhouse*, 500 Mich 453; 902 NW2d 327 (2017). In *Steanhouse*, we remanded to the Court of Appeals to determine whether the defendants' sentences—both of which exceeded the sentencing guidelines range—were reasonable. *Id*.

We must now decide whether appellate review is available for defendant's sentence that was *within* the sentencing guidelines' range. MCL 769.34(10) requires, in part, that, for such sentences, the Court of Appeals "shall affirm that sentence and shall not remand for resentencing absent an error in scoring the sentencing guidelines or inaccurate information relied upon in determining the defendant's sentence." Defendant is not challenging a scoring error or arguing that the trial court used inaccurate information to determine his sentence. Still, he seeks appellate review of his within-guidelines sentence.

As to this issue, we hold that *Lockridge* requires the conclusion that MCL 769.34(10) impermissibly precludes substantive appellate review of within-guidelines sentences. See *Lockridge*, 498 Mich at 365 n 1. In reaching our holding, we overrule the portion of *People v Schrauben*, 314 Mich App 181; 886 NW2d 173 (2016), that requires the Court of Appeals to affirm a trial court's sentence if the defendant's minimum sentence lies within the recommended guidelines minimum sentence range. We further hold, consistently with *Lockridge* and *Steanhouse*, that on appeal, challenges to within-

4

guidelines sentences are reviewed for reasonableness according to the test outlined in *Steanhouse*.

In light of these holdings, we remand this case to the Court of Appeals for a reasonableness review of defendant's sentence. In all other respects, leave to appeal is denied because we are not persuaded that the questions presented should be reviewed by this Court.

## I. FACTS AND PROCEDURAL HISTORY

On a Sunday afternoon in October 2017, Terrence Byrd and his cousin Dwayne Scott left a Detroit Lions tailgate to go to Super X Market in Detroit. They arrived at the market around 5:00 or 6:00 p.m. Scott had consumed alcohol, Byrd had not, and the two occasionally went inside the market to purchase lottery tickets before returning to Byrd's car.

At one point, the cousins witnessed two other men walk into the market wearing jeans and hoodies with their hoods up, despite the fact that the temperature at the time was warm. Byrd believed that one of the men was about 6'3" and the other was to be 5'7" and light-skinned. Byrd and Scott did not remember much more about these two men.

When the two men walked out of the store, the taller man pulled out what Byrd believed to be a nine-millimeter pistol and said something to Scott. The shorter man confronted Byrd. The witnesses recalled little about what happened immediately after, but gunfire erupted, lasting about one minute. Byrd did not know who shot first, but he testified that he fired 17 shots from his own gun, which emptied it, and that the bullets struck both

men.  Scott remembered running away, and he believed that he heard about 30 total shots fired.

Shortly after, Detroit police officers reported to the scene of the shootout.  None of the involved parties was present, but the officers found bullet casings, a gun, a right-footed low-top shoe, and blood spatter.  The recovered casings were later identified as having come from at least three types of guns.  The gun found at the scene was never tested for fingerprints.  It is unclear whether the blood at the scene was tested for DNA analysis, but no such DNA evidence was admitted at trial.  The police obtained surveillance footage of the shooting from the Super X Market.

Meanwhile, Byrd took Scott to Detroit Receiving Hospital, where he was treated for a broken bone and nerve damage in his left arm caused by a bullet wound sustained in the shooting.  Byrd recalled that when he arrived at the hospital, he believed there had been a car driving behind him with three individuals whom Byrd believed to be associated with the shooting.  Byrd reached for his gun while explaining the situation to a hospital security guard, but the guard confiscated it, explaining that guns were not permitted in the hospital.  The occupants of the vehicle did not enter the emergency room and instead drove away.  Byrd thought the three people in that car could have been the shooters, but he never relayed this information to the police—who arrived at the hospital to interview Byrd after retrieving a gun from the crime scene that nobody disputes belonged to Byrd.

At about 7:12 p.m. on the evening of the shooting, defendant, Dametrius Posey, was admitted to Oakwood Hospital in Dearborn, where he received treatment for injuries sustained from gunshot wounds.  The police arrived and interviewed him.  He initially misidentified himself as "Devone" Posey.  He told the officers that he believed he had been

6

shot around 7:45 p.m. that evening near Rosemont and Warren Streets, which is in a different part of Detroit than the Super X Market—even though he was admitted to Oakwood more than 30 minutes before the time he reported being shot. The police did not investigate the area where defendant told them he was shot. They confiscated defendant's clothes to enter them into evidence, but it is unclear what happened to his clothing once it was taken, and it was never presented at trial.

The day after the shooting, Byrd and Scott gave statements to the police. Scott thought the shooter was dark-skinned and 5'9," and Byrd thought that one individual was 6'3" and dark-skinned and the other was light-skinned with reddish-blonde hair. Byrd was given two photo arrays and asked whether he could identify the shooters. The photo arrays contained photographs of both defendant and codefendant, Sanchez Quinn. Byrd identified one man from each array; neither of the men he identified was charged in connection with this shooting. The next day, Scott was also given two photo arrays. He selected one man, defendant, as the individual he believed to be involved in the shooting, although he later testified that he was "unsure" and "didn't really know" if the person he picked was involved in the shooting because he was preoccupied with "getting out of the way of the bullets."

Almost one year later, defendant and his codefendant were tried jointly on multiple counts each of assault with intent to murder, MCL 750.83; assault with intent to commit great bodily harm less than murder, MCL 750.84; carrying a weapon with unlawful intent, MCL 750.226; being a felon in possession of a firearm (felon-in-possession), MCL 750.224f; and possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b. At trial, Byrd identified defendant, by name, for the first time ever, as one of the shooters. In contrast, Scott, who had previously identified defendant to the police,

7

did not identify defendant at trial. Trial counsel did not object to Byrd's identification. Identity was a key issue at trial, with the prosecution arguing that Scott had previously identified defendant two days after the shooting while his mind was fresh, and defendant stressing that Scott did not identify defendant at trial, that Byrd's first identification came at trial, and that no other evidence of identity was produced. Defendant was convicted as charged on July 23, 2018.[1]

Defendant was initially sentenced on August 2, 2018. His guidelines' recommended sentence range was a minimum sentence of 225 to 562 months' imprisonment on his controlling sentence of assault with intent to commit murder. He was sentenced within these guidelines to serve 264 months to 480 months in prison on that count.[2] However, both the prosecution and defendant filed a joint motion to remand for resentencing based on several errors during defendant's first sentencing hearing. The Court of Appeals granted the motion, and the case was remanded to the trial court for resentencing with the Court of Appeals retaining jurisdiction.

Defendant was resentenced on November 7, 2019. Upon rescoring, his guidelines range was corrected to 171 to 427 months. Defendant sought a lesser sentence than he had

---

[1] The codefendant was found guilty of two counts of assault with intent to do great bodily harm less than murder, one count of carrying a weapon with unlawful intent, felon-in-possession, carrying a concealed weapon, and two counts of felony-firearm. Although both defendants appealed and the Court of Appeals consolidated their appeals, the codefendant is no longer a part of this appeal, and thus only defendant Posey is relevant to this opinion and our legal analysis.

[2] The focus of the sentencing portion of this appeal concerns the sentence for defendant's conviction of assault with intent to murder. To simplify this opinion, defendant's other sentences are not discussed in detail.

received during his sentencing hearing, pointing out, among other things, that the 264-month minimum previously imposed was 11% of the original guidelines range and 11% of the rescored guidelines' range would be 189 months. The trial court rejected defendant's arguments and imposed the same minimum sentence—264 months—which was still within his revised guidelines range.

The Court of Appeals affirmed defendant's convictions and sentence. *Posey*, 334 Mich App 338. Defendant applied for leave to appeal in this Court. We scheduled oral arguments on the application, asking the parties to address:

> (1) whether the appellant was denied his right to due process when witness [Byrd] was allowed to identify him at trial, or denied the effective assistance of counsel when trial counsel failed to object to the witness' in-court identification testimony; (2) whether the requirement in MCL 769.34(10) that the Court of Appeals affirm any sentence within the guidelines range, absent a scoring error or reliance on inaccurate information, is consistent with the Sixth Amendment, the due-process right to appellate review, and . . . *Lockridge*, 498 Mich 358 (2015); and, if not, (3) whether the appellant's sentence is reasonable and proportionate. [*People v Posey*, 508 Mich 940, 940-941 (2021).]

## II. ANALYSIS

### A. DUE-PROCESS RIGHTS AND IN-COURT IDENTIFICATION

#### 1. STANDARD OF REVIEW

The procedure used to obtain identification evidence of a witness is an important consideration under the both the state and federal Constitutions' protections of defendants' rights to due process of law. US Const Am XIV; Const 1963, art 1, § 17; see also *Gray*, 457 Mich at 111 & n 5. Whether defendant's right to due process was violated is a constitutional question. *People v Smith*, 498 Mich 466, 475; 870 NW2d 299 (2015). Trial counsel did not object to Byrd's in-court identification of defendant, the key issue that

9

defendant argues violated his due-process rights, so the issue is not preserved. Unpreserved constitutional questions are reviewed for plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 764.

Defendant also raised, and we asked for briefing on, the question of whether trial counsel's failure to object to Byrd's testimony denied him his constitutional right to the effective assistance of trial counsel. This is a mixed question of fact and law. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012); *Strickland v Washington*, 466 US 668, 698; 104 S Ct 2052; 80 L Ed 2d 674 (1984). This Court reviews the questions of law de novo and the questions of fact for clear error. *Trakhtenberg*, 493 Mich at 47. De novo review means that this Court reviews the legal issue independently without deference to the lower court. *People v Bruner*, 501 Mich 220, 226; 912 NW2d 514 (2018).

## 2. RELIABILITY OF IN-COURT IDENTIFICATION

A defendant's due-process rights protect against the admissibility of in-court identification evidence that was preceded by a pretrial identification procedure that was "so unnecessarily suggestive" as to be conducive to mistaken identity. *Biggers*, 409 US at 196 (quotation marks and citation omitted). However, identification evidence stemming from a pretrial identification process that is unnecessarily suggestive may still be admissible if there is an independent basis for establishing the reliability of the identification. *Kurylczyk*, 443 Mich at 303. This Court, expanding on the factors articulated in *Biggers*, has identified eight factors to determine whether such an independent basis exists:

10

1. Prior relationship with or knowledge of the defendant.

2. The opportunity to observe the offense. This includes such factors as length of time of the observation, lighting, noise or other factor[s] affecting sensory perception and proximity to the alleged criminal act.

3. Length of time between the offense and the disputed identification.

4. Accuracy or discrepancies in the pre-lineup or show-up description and defendant's actual description.

5. Any previous proper identification or failure to identify the defendant.

6. Any identification prior to lineup or showup of another person as defendant.

7. . . . [T]he nature of the alleged offense and the physical and psychological state of the victim. In critical situations perception will become distorted and any strong emotion (as opposed to mildly emotional experiences) will affect not only what and how much we perceive, but also will affect our memory of what occurred.

Factors such as "fatigue, nervous exhaustion, alcohol and drugs," and age and intelligence of the witness are obviously relevant.

8. Any idiosyncratic or special features of defendant. [*Gray*, 457 Mich at 116, citing *Kachar*, 400 Mich at 95-96 (quotation marks, citations, and emphasis omitted; alterations in original).]

Whether the same protections that apply to an in-court identification that was preceded by an unnecessarily suggestive pretrial identification procedure apply to a situation in which there was no pretrial identification is a matter of first impression for this Court. Defendant argues that his right to due process was violated because Byrd was permitted to identify defendant as an assailant for the first time at trial, despite the fact that Byrd had been given photographic arrays before trial and identified individuals other than defendant and his codefendant as the assailants. The Court of Appeals disagreed, holding that, because there was no suggestive pretrial identification by Byrd and no improper police

11

behavior, there was no due-process violation. *Posey*, 334 Mich App at 350-351. The Court of Appeals reasoned that two cases supported this view: *People v Barclay*, 208 Mich App 670; 528 NW2d 842 (1995), and *Perry v New Hampshire*, 565 US 228; 132 S Ct 716; 181 L Ed 2d 694 (2012).

On the surface, language in both *Barclay* and *Perry* appears to support the Court of Appeals' holding, but closer examination shows that both cases are distinguishable, and the Court of Appeals erred by concluding that there was no due-process violation. In *Barclay*, the Court of Appeals held that there was no need to establish an independent basis for an in-court identification when an eyewitness did not identify the defendant during a pretrial corporeal lineup but then identified the defendant for the first time in the courtroom. *Barclay*, 208 Mich App at 676. However, the key distinction between this case and *Barclay* is that the witness's first identification of the defendant in *Barclay* occurred at a pretrial examination in the courtroom, not at trial.[3] The first time Byrd identified defendant was at trial, in front of a jury determining defendant's guilt.

In *Perry*, the United States Supreme Court noted that it had "not extended pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers." *Perry*, 565 US at 232. But *Perry* did not opine on whether a due-process violation occurs when a witness identifies the defendant for the first time at trial.[4] Instead, *Perry* was a case in which a defendant sought suppression of a pretrial

---

[3] Whether *Barclay* was correctly decided is not at issue in this case.

[4] We agree with the dissent that *Perry* does not compel this result. But *Perry* does not compel this result because *Perry* does not ask this question. Again, we find a meaningful difference here given that Byrd had identified individuals other than defendant during

12

witness identification when the witness initially identified the defendant as an assailant during a conversation with a police officer at the scene of the crime but later could not identify the defendant in a photographic array. *Id*. at 234. There was no evidence that any state actor intended the witness to see or identify the defendant at the scene of the crime. *Id*. at 240. *Perry* then held:

> When no improper law enforcement activity is involved, . . . it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt. [*Id*. at 232-233.]

Thus, *Perry* concluded that—absent intentional state action that *created* a substantial likelihood of misidentification—the witness's pretrial identification at the scene of the crime could be admissible at trial even though the witness later had difficulties identifying the defendant. But *Perry* did not change the due-process requirement that an

---

pretrial processes, admitted to having witnessed defendant's name and photograph associated with this crime in the time between his pretrial identifications of men other than defendant as the perpetrators and defendant's trial, and saw defendant sitting as an accused assailant in the courtroom. Although there is no allegation of impermissibly suggestive pretrial police behaviors, the reason that test exists is grounded in due process, which finds identification evidence inadmissible if it is procured by improper state action. We agree with the United States Court of Appeals for the Sixth Circuit and other courts that have held that due-process concerns apply equally to both in-court identifications and pretrial identifications. See, e.g., *United States v Hill*, 967 F2d 226, 232 (CA 6, 1992) ("The due process concerns are identical in both cases and any attempt to draw a line based on the time the allegedly suggestive identification technique takes place seems arbitrary. All of the concerns that underlie the *Biggers* analysis, including the degree of suggestiveness, the chance of mistake, and the threat to due process are no less applicable when the identification takes place for the first time at trial.").

identification procured by improper state action must be sufficiently reliable to be presented to the jury.[5]

Perry focuses on the notion that Supreme Court cases have held that the ordinary due-process check is "not [about] suspicion of eyewitness testimony generally, but only [about] improper police arrangement of the circumstances surrounding an identification." Id. at 242, citing Coleman v Alabama, 399 US 1; 90 S Ct 1999; 26 L Ed 2d 387 (1970). Perry also acknowledged that the Supreme Court had previously been concerned about the risk of "police rigging" of an unnecessarily suggestive identification procedure. Perry, 565 US at 242, citing United States v Wade, 388 US 218, 233, 235-236; 87 S Ct 1926; 18 L Ed 2d 1149 (1967). Thus, the facts that led to the development of the Supreme Court's doctrine concerning due-process rights implicated when identification evidence is admitted were premised on cases developed from unnecessarily suggestive pretrial identifications arranged by the police.

This case does not concern such police activity. But that does not mean that due-process rights might not still be implicated. Here, Byrd was not able to identify defendant before trial. The only time Byrd is on the record as having identified defendant was during defendant's trial, and that identification was elicited by the prosecution. We hold that Perry and Barclay are only binding when there is some pretrial identification by the witness presenting identification evidence that was not improperly facilitated by a state actor. Importantly, when there is no pretrial identification of the defendant by the witness at all

---

[5] Notably, unlike in this case, the defendant in Perry, by being identified by a particular witness in a pretrial hearing, was put on notice of the possibility that the witness would likely identify the defendant at trial.

and the identification evidence is presented for the first time before a jury, we hold that the crux of the analysis cannot be on whether the police behavior was improper, contrary to the Court of Appeals' approach. Rather, "reliability is the linchpin in determining the admissibility of identification testimony . . . ." *Brathwaite*, 432 US at 114.

Although this is an issue of first impression, there are concerns about unnecessary suggestiveness associated with first-time-in-court identification evidence. We note that the concern about unnecessary suggestiveness when showing a defendant singly to a witness is well documented. See, e.g., *People v Sammons*, 505 Mich 31, 41-47; 949 NW2d 36 (2020). As *Perry* acknowledged, "[m]ost eyewitness identifications involve some element of suggestion. Indeed, all in-court identifications do." *Perry*, 565 US at 244. This potential suggestiveness increases when the prosecution asks a witness to testify as to whether they can identify the person who committed the crime—for the first time—at the defendant's trial. Another jurisdiction has explained that,

> because the extreme suggestiveness and unfairness of a one-on[]-one in-court confrontation is so obvious, we find it likely that a jury would naturally assume that the prosecutor would not be allowed to ask the witness to identify the defendant for the first time in court unless the prosecutor and the trial court had good reason to believe that the witness would be able to identify the defendant in a nonsuggestive setting. [*State v Dickson*, 322 Conn 410, 425; 141 A3d 810 (2016).]

Like the United States Supreme Court, we "do not doubt either the importance or the fallibility of eyewitness identifications." *Perry*, 565 US at 245. An in-court identification following an unnecessarily suggestive out-of-court law-enforcement procedure implicates a defendant's due-process rights because of the involvement of improper state action. We hold that due-process rights are also implicated when the

15

prosecution—another agent of the state—conducts an unnecessarily suggestive *in-court* law-enforcement procedure by obtaining an in-court identification of a defendant by a witness who was unable to identify a defendant at any point prior to that identification.[6]

Accordingly, we hold that evidence of an unnecessary first-time-in-court identification procured by the prosecution—a state actor—implicates a defendant's due-process rights in the same manner as an in-court identification that is tainted by an unduly suggestive out-of-court identification procedure employed by the police.[7] Because the

---

[6] We note that a suggestive identification procedure is generally necessary only if there is no time to conduct a nonsuggestive identification procedure because of the imminent threat of harm to others or the loss of a witness. See *Sammons*, 505 Mich at 47-48; citing *Stovall v Denno*, 388 US 293, 302; 87 S Ct 1967; 18 L Ed 2d 1119 (1967). Neither circumstance is implicated during an in-trial identification because an in-trial identification is made by the witness—so the witness is not lost—and occurs long after relevant evidence has been preserved and the defendant's danger to the community has been assessed and contained as appropriate. See *Commonwealth v Crayton*, 470 Mass 228, 242; 21 NE3d 157 (2014) (noting that the general justification for using showup procedure "depends on the short duration of time between the crime and the showup, and will never justify an in-court showup"). We recognize that the necessity inquiry is a bit different in this context, as historically trial identifications have been a permissible part of the trial process. See *Walker v Commonwealth*, 74 Va App 475, 502 & n 13; 870 SE2d 328 (2022) (noting that in-court identifications "have long been a routine part of criminal trials" and therefore holding that they are "necessary" and do not constitute an "improper" identification procedure under *Perry*); but see *Dickson*, 322 Conn at 440-442 (questioning whether the historical rationale for in-court identifications justifies the practice today). But regardless of the continued utility of trial identifications as a general matter, we believe that it is never *necessary* for a prosecutor to ask a witness to identify a defendant *for the first time* at trial. The state can always employ a nonsuggestive identification procedure before trial or elicit other incriminating testimony as to the circumstances of the crime without asking the witness to identify the defendant in the courtroom. See *Dickson*, 322 Conn at 447.

[7] Several other jurisdictions have taken similar measures to ensure the protection of defendants' due-process rights. See, e.g., *Dickson*, 322 Conn at 424-426 (extending due-process-oriented screening requirements to first-time-in-court identification evidence); *United States v Morgan*, 248 F Supp 3d 208, 213 (D DC, 2017) (holding that, "[a]lthough the Supreme Court implied in *Perry* that it did not want *all* in-court identifications to be

same due-process rights are affected, trial courts must consider reliability factors such as those at issue when an in-court identification is tainted by an unduly suggestive out-of-court identification procedure. See *Gray*, 457 Mich at 116; *Kachar*, 400 Mich at 95-96.[8]

---

subject to judicial reliability screening, due process concerns require such screening for an initial in-court identification that is equivalent to a one-man showup") (citation omitted); *United States v Greene*, 704 F3d 298, 308 (CA 4, 2013), cert den 571 US 952 (2013) (applying the *Biggers* constitutional analysis to in-court identifications); *United States v Rogers*, 126 F3d 655, 658 (CA 5, 1997) (applying the *Biggers* analysis to in-court identification); *United States v Hill*, 967 F2d 226, 232 (CA 6, 1992), cert den 506 US 964 (1992) (holding that the *Biggers* constitutional analysis applies to in-court identifications for the same reasons that the analysis applies to impermissibly suggestive out-of-court identifications); *United States v Rundell*, 858 F2d 425, 427 (CA 8, 1988) (noting that there is "suggestiveness inherent in the witnesses' knowing that [the defendant] was the sole [person] charged" and applying the *Biggers* factors to in-court identification evidence); *United States v Morgan*, 248 F Supp 3d 208, 213 (D DC, 2017) (holding that "it is suggestive to ask a witness to identify the perpetrator of a charged crime when it is obvious to that witness which person is on trial for committing that crime" and applying the *Biggers* factors to such in-court identifications).

Other jurisdictions have concluded that their state constitutions supported expanding a per se exclusionary rule for eyewitness identification evidence when impermissibly suggestive identification procedures were used. See *State v Martinez*, 478 P3d 880, 903; 2021-NMSC-002 (2020); *People v Marshall*, 26 NY3d 495; 45 NE3d 954 (2015); *Commonwealth v Silva-Santiago*, 453 Mass 782; 906 NE2d 299 (2009), abrogated on other grounds by *Commonwealth v Moore*, 480 Mass 799 (2018). Defendant asks this Court to adopt such a per se exclusionary rule for first-time-in-court identification procedures. However, because the only jurisdictions we have found that support such a view conclude that it is a state constitutional right and defendant has not demonstrated that the Michigan Constitution compels such a result, we decline to adopt this position in this case.

[8] This does not prohibit the use of first-time-in-court identification procedures employed by prosecutors, but it limits the admissibility of such evidence by requiring the evidence to demonstrate reliability before it may be admitted. Specifically, this holding requires that the prosecution establish sufficient indicia of reliability before presenting this evidence to the jury when there are questions regarding whether the procedures used to procure the identification evidence were unnecessarily suggestive.

## 3. PREJUDICE

At trial, there was no objection raised to the introduction of Byrd's first-time-in-court identification of defendant as an assailant. Without an objection, there is an insufficient record for weighing the reliability of this identification evidence. Assuming that this procedure violated defendant's right to due process, defendant is not entitled to a new trial because he has not met the requirements of showing plain error or ineffective assistance of trial counsel.

The first question presented is whether defendant was denied due process of law when Byrd was permitted to identify defendant for the first time at trial. The alleged due-process violation is a constitutional error, but since defendant did not object at trial, the issue is unpreserved and subject to plain-error review. *Carines*, 460 Mich at 763. Plain error occurred if "1) error . . . occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*., citing *United States v Olano*, 507 US 725, 731-734; 113 S Ct 1770; 123 L Ed 2d 508 (1993). Further, for such an error to be reversed on appeal, the error must have "resulted in the conviction of an actually innocent defendant" or " 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings . . . .' " *Carines*, 460 Mich at 763-764, quoting *Olano*, 507 US at 736 (quotation marks and citation omitted).

At trial, Byrd was the only person to positively identify defendant. Although DS had identified defendant before trial, DS did not identify defendant as a perpetrator while testifying under oath before the jury. Assuming, without deciding, that the trial court's

18

admission of Byrd's identification was plain error, we conclude that defendant cannot show plain error requiring reversal.[9]

The third element of *Carines* "generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Carines*, 460 Mich at 763. We conclude that defendant has not made such a showing.

Defendant argues that the plain error affected his substantial rights because of the importance of Byrd's identification at trial. Defendant also argues that since Byrd identified defendant and that juries place disproportionate weight on eyewitness identifications, there was almost no evidence that went untainted at defendant's trial. Although this Court has recognized the importance of eyewitness identifications, defendant has not explained through more than mere conclusory statements how Byrd's identification affected other identification evidence produced at trial. Defendant ignores the fact that surveillance video of the altercation was admitted at trial. Circumstantial evidence of defendant's identity is also important. The prosecution produced evidence that defendant was admitted to a nearby hospital with gunshot wounds shortly after a shootout in which Byrd recalled shooting both assailants. There was also evidence that defendant, when interviewed by the police, gave false information about both his name and the time in which he arrived at the hospital in relation to the shooting he was involved in. Finally, the jury was apprised of Byrd's inability to make a prior identification of defendant when Byrd

---

[9] It is unnecessary for us to decide whether the trial court's admission of this evidence constituted plain error. However, this analysis is far from an admission that we consider the error to be plain, given that this Court is endorsing a new rule rather than one that was clearly established as a matter of law at the time of trial.

19

conceded on cross-examination that he had never before identified defendant as an assailant and that he was exposed to considerable media coverage that used defendant's name and photograph in connection with the altercation. In asking this Court to reverse his convictions under a plain-error analysis, defendant fails to explain how this in-court identification necessarily tainted the other evidence of defendant's identity. Defendant has not established that the asserted plain error affected the outcome of the proceedings, so he has not shown that this due-process violation caused the prejudice necessary for reversal. Therefore, we affirm the Court of Appeals' conclusion that reversal is not appropriate.[10]

## B. THE APPELLATE REVIEW OF WITHIN-GUIDELINES SENTENCES

## 1. STANDARD OF REVIEW

Whether *Schrauben* correctly interpreted MCL 769.34(10) to require an appellate court to affirm a defendant's within-guidelines sentence is a question of statutory interpretation, which we review de novo. *People v Carter*, 503 Mich 221, 226; 931 NW2d 566 (2019). The constitutionality of a statute is also a question that we review de novo. *Lockridge*, 498 Mich at 373. Again, de novo review means that this Court reviews the legal issue independently without deference to the lower court. *Bruner*, 501 Mich at 226.

---

[10] Defendant also raised the alternative possibility that trial counsel's failure to object to Byrd's in-court identification deprived him of effective assistance of trial counsel. We disagree. Defendant asks this Court to adopt the rule that a first-time-in-court identification by an eyewitness is per se inadmissible. It is not constitutionally deficient for trial counsel to fail to raise a challenge based on a desired change in the law. Any objection to the trial court's implementing the law in effect at the time of trial would have been meritless, and counsel is not ineffective for failing to make frivolous or meritless objections. See *People v Riley*, 468 Mich 135, 142; 659 NW2d 611 (2003). Accordingly, we conclude that defendant's claim of ineffective assistance of trial counsel lacks merit. *Strickland*, 466 US at 700; *Trakhtenberg*, 493 Mich at 51.

20

## 2. MANDATORY SENTENCING GUIDELINES

The Michigan Constitution vests sentencing authority in the Legislature. Const 1963, art 4, § 45; see also *People v Boykin*, 510 Mich 171, 183; 987 NW2d 58 (2022). For certain punishments, the Legislature has assigned discretionary authority to trial courts to sentence a defendant within a given range, with each sentence being individualized to the circumstances of the offense and the offender. *Boykin*, 510 Mich at 183, citing *People v McFarlin*, 389 Mich 557, 574; 208 NW2d 504 (1973). For the past 40 years, Michigan courts have used sentencing guidelines to help accomplish the task of individualizing sentences while reducing sentencing disparities based on factors other than the circumstances of the offense and the offender.

In 1983, this Court used an administrative order to implement judicial sentencing guidelines. *People v Babcock*, 469 Mich 247, 254; 666 NW2d 231 (2003).[11] The guidelines required sentencing courts to "follow the procedure of 'scoring' a case on the basis of the circumstances of the offense and the offender, and articulate the basis for any departure from the recommended sentence range yielded by this scoring." *People v Hegwood*, 465 Mich 432, 438; 636 NW2d 127 (2001). In 1998, the Legislature exercised its sentencing authority and replaced the judicial sentencing guidelines by enacting statutory sentencing guidelines, MCL 777.1 *et seq*., which allowed a sentencing court to depart from the guidelines' score only when there was a " 'compelling reason' " for doing so. *Babcock*, 469 Mich at 255, quoting MCL 769.34(3), as amended by 2002 PA 666.

---

[11] Administrative Order No. 1983-3, 417 Mich cxxi (1983), created these judicial guidelines.

From 1983 through 2015, for the most part, in Michigan, sentencing guidelines were mandatory.

During this time span, federal sentencing guidelines were undergoing a similar transition. In 1984, Congress passed the Sentencing Reform Act (SRA), which created the United States Sentencing Commission to develop guidelines sentencing ranges for various combinations of offender and offense characteristics and to provide guidance about applying the guidelines. 28 USC 991(a), 994(a). The United States Sentencing Commission promulgated federal sentencing guidelines in 1987. Before the federal guidelines were adopted, federal sentencing courts had broad discretion in determining the length of a criminal defendant's sentence. *Mistretta v United States*, 488 US 361, 363; 109 S Ct 647; 102 L Ed 2d 714 (1989). However, once the SRA became effective, the result was that district judges were required to "impose on a defendant a sentence falling within the range of the applicable Guideline, if the case is an ordinary one." *Koon v United States*, 518 US 81, 92; 116 S Ct 2035; 135 L Ed 2d 392 (1996).

The United States Supreme Court has entertained several questions about the constitutionality of federal and other states' mandatory sentencing guidelines. Focusing on just a few of those cases,[12] for example, the Supreme Court was faced with the question of whether a New Jersey sentencing enhancement that raised the statutory maximum penalty for firearm possession violated the Sixth Amendment unless it was submitted to a jury for proof beyond a reasonable doubt. *Apprendi v New Jersey*; 530 US 466, 490; 120

---

[12] A much more robust chronicle of the federal cases that have influenced Michigan's sentencing jurisprudence is found in *Lockridge*, 498 Mich at 369-373.

22

S Ct 2348; 147 L Ed 2d 435 (2000). The New Jersey statute at issue in *Apprendi* was held to be unconstitutional because sentencing factors that impose greater criminal punishments had to be found by a finder of fact, given that there was no constitutional distinction between "elements" and "sentencing factors." *Id*. at 494. The Court explained that "the relevant inquiry [was] one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Id*. The Court concluded that when sentencing factors increase the potential maximum sentence for a defendant, they deprive the defendant of their right to a jury trial and the right to have the prosecution prove all elements of a crime beyond a reasonable doubt, in violation of the Sixth Amendment. *Id*. at 496. Thus, sentencing factors become the functional equivalent of elements of a crime when they increase the potential maximum sentence. *Id*. at 494 n 19.

Then, the Court held that the federal guidelines must be read as merely advisory rather than mandatory for all judges to preserve the federal guidelines as constitutional under the Sixth Amendment's requirement that facts that increase maximum sentences must be submitted to a jury unless otherwise admitted by the defendant. *United States v Booker*, 543 US 220, 233; 125 S Ct 738; 160 L Ed 2d 621 (2005). This meant that the federal sentencing guidelines were to be advisory rather than mandatory, despite the seemingly mandatory language that the authorizing statute used, in order to protect the Sixth Amendment rights addressed in *Apprendi*. *Id*. Having held that the guidelines were advisory, the Supreme Court directed federal appellate courts to review sentences for reasonableness. *Id*. at 261, 264.

The Court later extended the logic set forth in *Apprendi* outside the context of maximum penalties to mandatory enhancements of minimum sentences. In *Alleyne v United States*, 570 US 99; 133 S Ct 2151; 186 L Ed 2d 314 (2013), the Court held that facts that increase the mandatory minimum sentence are elements of an offense that must be submitted to the jury and proved beyond a reasonable doubt. *Id*. at 108, citing *Apprendi*, 530 US at 483 n 10. Like any factor that increases the mandatory maximum sentence of a crime, any factor that increases the mandatory minimum sentence for a crime is an element of the crime itself and not a mere sentencing factor. *Alleyne*, 570 US at 103, overruling *Harris v United States*, 536 US 545; 122 S Ct 2406; 153 L Ed 2d 524 (2002).

With the United States Supreme Court jurisprudence setting these constitutional bounds in the background, in 2015, this Court recognized the same problems with Michigan's then-mandatory sentencing scheme. See *Lockridge*, 498 Mich 358. In *Lockridge*, this Court, in accordance with the Supreme Court's developing Sixth Amendment jurisprudence, severed two statutory provisions of Michigan's sentencing scheme as unconstitutional: MCL 769.34(2), as amended by 2002 PA 666, which made sentencing mandatory according to guidelines based on facts not submitted to a jury, and former MCL 769.34(3), which required articulation of substantial and compelling reasons to depart from the guidelines. *Id*. at 364-365, citing *Apprendi*, 530 US 466; *Alleyne*, 570 US 99; and *Booker*, 543 US at 264.[13] In light of these cases, Michigan's sentencing

---

[13] How appellate courts applied MCL 769.34(10) was not at issue in *Lockridge*, which solely addressed the threshold question of how the guidelines affected first-level sentencing determinations made by trial courts. *Lockridge*, 498 Mich at 368 n 11. However, *Lockridge* stated: "To the extent that any part of MCL 769.34 or another statute refers to

24

guidelines are no longer mandatory, but they "remain a highly relevant consideration in a trial court's exercise of sentencing discretion." *Lockridge*, 498 Mich at 391. Before being severed (and subsequently amended), MCL 769.34(3) required trial courts to explain, on the record, "substantial and compelling reasons" for departing from the sentencing guidelines. Although it was directed at trial courts, former MCL 769.34(3) also served as an express statutory instruction to appellate courts about how to review a sentence that went outside the sentencing guidelines. Essential to why *Lockridge* struck down this statutory provision was that it required courts to sentence defendants within the guidelines except in extreme circumstances, rendering the guidelines more than merely advisory. This Court asserted that out-of-guidelines sentences would be reviewed instead for reasonableness. *Id*. at 392, citing *Booker*, 543 US at 261.

Two years later, this Court provided further guidance in *Steanhouse*, 500 Mich 453. After *Lockridge*, questions remained about whether the guidelines were discretionary only when judicial fact-finding was made that increased a defendant's sentencing range. *Id*. at 465. This Court clarified that *Lockridge* stood for the proposition that the guidelines were advisory in *all applications* because the sentencing guidelines required both judicial fact-finding and adherence to the guidelines by sentencing courts. *Id*. at 466-467. The Court explained that the "guidelines 'remain a highly relevant consideration in a trial court's exercise of sentencing discretion' that trial courts ' "must consult" ' and ' "take . . . into account when sentencing." ' " *Id*. at 474-475, quoting *Lockridge*, 498 Mich at 391, quoting

use of the sentencing guidelines as mandatory or refers to departures from the guidelines, that part or statute is also severed or struck down as necessary." *Id*. at 365 n 1.

25

*Booker*, 543 US at 264. In practice, appellate courts are now required to review a sentence that goes beyond the guidelines for reasonableness, with the key test being " 'whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines' recommended range[.]' " *Steanhouse*, 500 Mich at 475, quoting *People v Milbourn*, 435 Mich 630, 661; 461 NW2d 1 (1990).

### 3. WITHIN-GUIDELINES SENTENCES MUST BE REVIEWED ON APPEAL FOR REASONABLENESS

After *Lockridge* was decided, the Court of Appeals interpreted *Lockridge* to have kept MCL 769.34(10) intact. *Schrauben*, 314 Mich App at 196 n 1. *Schrauben* correctly understood *Lockridge* to require reviewing out-of-guidelines sentences for reasonableness. *Id*. at 193, citing *Lockridge*, 498 Mich at 392. However, *Schrauben* did not deal with a departure sentence; the defendant's sentence was within the guidelines' recommended range. *Schrauben*, 314 Mich at 196. When the panel concluded that the Court of Appeals "must affirm the [within-guidelines] sentence" unless a defendant "argue[s] that the trial court relied on inaccurate information or that there was an error in scoring the guidelines," the Court of Appeals erred. *Id*. We now overrule that portion of *Schrauben* and hold that *Lockridge* requires that the portion of MCL 769.34(10) requiring affirmation of within-guidelines sentences on appeal be struck as unconstitutional.

In *Lockridge*, this Court noted that "[t]o the extent that any part of MCL 769.34 or another statute refers to use of the sentencing guidelines as mandatory or refers to departures from the guidelines, that part or statute is also severed or struck down as necessary." *Lockridge*, 498 Mich at 365 n 1. Without much analysis, *Schrauben*

26

concluded that *Lockridge* "did not alter" MCL 769.34(10). *Schrauben*, 314 Mich App at 196 n 1. In so doing, *Schrauben* tried to fit a square peg into a round hole.

Footnote 1 of *Lockridge* necessarily, in striking down "any part of MCL 769.34" that "refers to use of the sentencing guidelines as mandatory," held MCL 769.34(10) to be unconstitutional. MCL 769.34(10) provides that, "[i]f a minimum sentence is within the appropriate guidelines sentence range, the [C]ourt of [A]ppeals *shall* affirm that sentence and *shall not* remand for resentencing absent an error in scoring the sentencing guidelines or inaccurate information relied upon in determining the defendant's sentence." (Emphasis added.) This Court has long and consistently held that *shall* is a mandatory directive. See, e.g., *Lockridge*, 498 Mich at 387 ("As we have stated many times, 'shall' indicates a *mandatory* directive."); see also *Browder v Int'l Fidelity Ins Co*, 413 Mich 603, 612; 321 NW2d 668 (1982), citing *Smith v Sch Dist No 6, Fractional, Amber Twp*, 241 Mich 366, 369; 217 NW 15 (1928) (explaining that "the presumption is that 'shall' is mandatory"); *State Hwy Comm v Vanderkloot*, 392 Mich 159, 180; 220 NW2d 416 (1974) ("Certainly the popular and common understanding of the word 'shall' is that it denotes mandatoriness.").[14] When MCL 769.34(10) requires that the Court of Appeals "shall" affirm and "shall not" remand any trial court's sentencing decision that is "within the sentencing guidelines," it necessarily, then, refers to the sentencing guidelines as

---

[14] In this very context, the United States Supreme Court has also interpreted "shall" to be mandatory and binding. See, e.g., *Booker*, 543 US at 233-234 ("While subsection (a) of § 3553 of the [federal] sentencing statute lists the Sentencing Guidelines as one factor to be considered in imposing a sentence, subsection (b) directs that the court '*shall* impose a sentence of the kind, and within the range' established by the Guidelines, subject to departures in specific, limited cases. . . . Because they are binding on judges, we have consistently held that the Guidelines have the force and effect of laws.").

mandatory. A mandate on the Court of Appeals is just that—a mandate. Thus, it was necessarily struck down by *Lockridge*. *Lockridge*, 498 Mich at 365 n 1.[15] As discussed further below, a mandate on an appellate court to affirm perpetuates the constitutional violation wrought by the identical mandate on the trial court. It is part and parcel of the unconstitutional scheme reflected in the statutory provisions severed as unconstitutional by *Lockridge*.

In *Lockridge*, we held—as reaffirmed in *Steanhouse*—that the legislative sentencing guidelines are advisory in all applications. *Steanhouse*, 500 Mich at 459. We now reaffirm *Lockridge* again, holding that the legislative sentencing guidelines are advisory in all applications, including on appeal. Any confusion about the possible applicability of this footnote to MCL 769.34(10) was clarified by this Court's later adoption of the reasonableness review centered on the principle of proportionality articulated in *Milbourn*. In its most basic form, *Steanhouse* was a consolidated case that sought to provide clarity about what the appropriate standard of review was for out-of-guidelines sentences once *Lockridge* was decided. *Steanhouse* adopted its appellate standard from *Milbourn*, by verbatim asserting that " 'the key test is whether the sentence is proportionate to the seriousness of the matter, not whether it departs from *or adheres to* the guidelines' recommended range.' " *Steanhouse*, 500 Mich at 475 (emphasis added), quoting *Milbourn*,

---

[15] *Lockridge* explains that "[a] sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *Lockridge*, 498 Mich at 392, citing *Booker*, 543 US at 261. *Lockridge*'s holding does not preclude the result that a sentence that does not depart from the applicable guidelines range is also reviewed for reasonableness. *Lockridge* simply did not expressly decide the applicable standard of review for an appeal of a within-guidelines sentence because the defendant's sentence was outside the guidelines. *Lockridge*, 498 Mich at 368 n 11.

435 Mich at 661. It is notable that *Milbourn*'s proportionality review was reaffirmed, because *Milbourn* expressly considered the need for proportionality review, even of sentences that fell within the judicial sentencing guidelines in place at that time. *Milbourn*, 435 Mich at 661, citing *People v Broden*, 428 Mich 343, 354 n 18; 408 NW2d 789 (1987) (noting that "[c]onceivably, even a sentence within the sentencing guidelines could be an abuse of discretion in unusual circumstances"). This means that this Court has consistently required sentencing decisions to be based on the principle of proportionality across different sentencing regimes.

Had this Court believed that out-of-guidelines sentences and within-guidelines sentences should have been given differential treatment on appeal, the "or adheres to" language would have been omitted from its quotation of *Milbourn*. But "or adheres to" is important. A sentence that adheres to the guidelines' recommended range is reviewed for proportionality. *Steanhouse* meant what it said as it reaffirmed this holding from *Milbourn*, a case that had been abrogated by statute, and included "or adheres to the guidelines' recommended range" to explain that a sentence's relationship to its guidelines does not alter the standard of review. *Steanhouse*, 500 Mich at 473.

Here, we assert the same. In accordance with *Lockridge* and *Steanhouse*, we hold that appellate courts must review all sentences for reasonableness, which requires the reviewing court to consider whether the sentence is proportionate to the seriousness of the matter. *Steanhouse*, 500 Mich at 473. The guidelines remain important as an advisory resource for sentencing courts and continue to be a "highly relevant consideration" on appeal. But the portion of MCL 769.34(10) that requires appellate affirmation of within-guidelines sentences that are based on accurate information without scoring errors is

29

unconstitutional because, as we explained in *Lockridge*, it would necessarily render the guidelines mandatory.

Evidence supporting this holding is also found in the ways the Court of Appeals has attempted to apply MCL 769.34(10). It is apparent that the Court of Appeals has struggled with the literal interpretation of MCL 769.34(10) articulated in *Schrauben*. In *People v Conley*, 270 Mich App 301, 316-317; 715 NW2d 377 (2006), for example, the Court of Appeals held that MCL 769.34(10) was inapplicable to claims of constitutional sentencing error when a defendant argued that his within-guidelines sentence was based, in part, on his refusal to admit guilt. Taken on its face, MCL 769.34(10) provides no such constitutional carveout for appellate courts to exercise their discretion. The only exceptions included in the plain language of the statute through which a defendant may challenge a within-guidelines sentence are a scoring error or a demonstration that the defendant's sentence was based on inaccurate information. The statute provides no exceptions for constitutional challenges. *Conley* correctly recognized that MCL 769.34(10) is untenable without such a carveout but failed to recognize that the statute's mandatory nature *creates* this problem.[16] In fact, *Booker* rejected the type of bifurcated review that would allow guidelines to be mandatory in some cases and discretionary in others. *Booker*, 543 US at 266-267. Like *Booker*, we conclude that this type of bifurcated appellate review is incompatible with *Lockridge*.

---

[16] Moreover, imposing an exception for challenges rooted in constitutionality would seemingly be impossible to administer and without limits. Any wily defendant could argue that, as applied, their sentence is cruel or unusual in violation of Const 1963, art 1, § 16 in order to evade the mandatory affirmation required by MCL 769.34(10).

Moreover, a mandate that a within-guidelines sentence be affirmed on appeal would effectively collapse the requirement in *Lockridge* that the sentencing guidelines be advisory "in all applications." *Steanhouse*, 500 Mich at 466, citing *Lockridge*, 498 Mich at 364. Instead, it creates a situation through which a sentencing court can effectively become its own appellate court simply by applying a within-guidelines sentence. In other words, under *Schrauben*, a sentencing court that wishes to evade appellate review can do just that by imposing a within-guidelines sentence.[17] Allowing *Schrauben* to stand would thus transform the mandatory affirmation required by MCL 769.34(10) into a tool by which a trial court that wishes for the sentencing guidelines to be mandatory can make the sentencing guidelines mandatory just by rigidly applying them—thereby precluding appellate review.

Without the ability to seek judicial review of the reasonableness of a sentence for which the minimum sentence falls within the guidelines, the guidelines become effectively mandatory any time a defendant's minimum sentence is consistent with the guidelines. Given the statement in *Lockridge* that "[t]o the extent that any part of MCL 769.34 . . . refers to use of the sentencing guidelines as mandatory . . . that part or statute is also severed or struck down as necessary," and having explained that MCL 769.34(10) refers to the use of the sentencing guidelines as mandatory, we must decide whether it is

---

[17] Although it is unnecessary for us to consider whether such a scheme deprives defendants of their appeal by right guaranteed by Const 1963, art 1, § 20, it is difficult for us to contemplate how such a right can exist simultaneously with a statute that enables a trial court to render a sentence final and effectively unreviewable by correctly following the guidelines and considering correct information.

31

necessary to strike down the portion of MCL 769.34(10) that requires affirmation on appeal. We conclude that it is.

*Lockridge* explained that its constitutional holding had two bases: the judicial fact-finding required to score the sentencing guidelines, and the guidelines' mandatory nature. *Lockridge*, 498 Mich at 364; see also *Steanhouse*, 400 Mich at 466-467. These concerns do not stop at the point a sentence is ordered. Although the guidelines remain a highly relevant consideration, they do not permit a trial court to use them as a shield against appellate review.

In *Steanhouse*, we explained why this is the case by showing how our proportionality test, which asks "whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines' recommended range," comports with Supreme Court caselaw. *Id.* at 475, quoting *Milbourn*, 435 Mich at 661. In particular, we explained that our proportionality test—the same test we applied in *Steanhouse*, and the same one we apply here—comports with the Supreme Court's warning that reasonableness review may " 'come too close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range.' " *Steanhouse*, 500 Mich at 474, quoting *Gall v United States*, 552 US 38, 47; 128 S Ct 586; 169 L Ed 2d 445 (2007). We concluded that the principle of proportionality we apply on appeal "does not create such an impermissible presumption" because "[r]ather than impermissibly measuring proportionality by reference to deviations from the guidelines," we apply the proportionality test outlined in *Milbourn*. *Steanhouse*, 500 Mich at 474. The differential treatment of within- and outside-guidelines sentences by both trial courts and appellate courts pre-*Lockridge* created both a preference for within-guidelines sentences

32

and a presumption of unreasonableness for outside-guidelines sentences. If we are concerned about creating an "impermissible presumption of unreasonableness for sentences outside the [g]uidelines range," it is necessary to permit proportionality review of within-guidelines sentences to erase that concern. *Id.*, quoting *Gall*, 552 US at 47.

Consider an illustration. Two defendants with similar backgrounds are convicted of similar crimes. Both are required to have a sentence that is "proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Milbourn*, 435 Mich at 636. Both defendants' guidelines are scored identically. Defendant A receives a minimum sentence matching the highest end of their guidelines. Defendant B receives a minimum sentence in excess of the guidelines' highest end by 6 months. MCL 769.34(10), as written, requires affirmation of Defendant A's sentence without regard to whether that sentence was proportionate on appeal. Defendant B may appeal the proportionality of their sentence. In essence, given that sentencing courts are all tasked with sentencing according to the principle of proportionality, a sentencing scheme that limits appellate review to only Defendant B and those similarly situated necessarily creates two categories of sentences: "proportionate because it matches the guidelines" and "possibly disproportionate because it does not." But proportionality must be measured according to the offense and the offender, not according to the sentence's relationship to the guidelines. Therefore, it is necessary to strike the portion of MCL 769.34(10) that requires appellate courts to affirm

within-guidelines sentences because it violates *Lockridge* and *Steanhouse*.[18]   As the illustration shows, striking MCL 769.34(10) is necessary to avoid perpetuating the Sixth Amendment violation through unyielding pressure from the appellate courts above.  The provision impermissibly passes the constitutional violation along to the appellate court.

## 4.  PRESUMPTION OF PROPORTIONALITY

Although it is insufficient to limit proportionality review on appeal to just those challenges that the Court of Appeals deems constitutional, the Court of Appeals reviews only such "constitutional challenges" to within-guidelines sentences for proportionality. *People v Powell*, 278 Mich App 318, 323; 750 NW2d 607 (2008), citing *Broden*, 428 Mich at 354-355.  Defendant bears the burden of overcoming the presumption. *Powell*, 278 Mich App at 324.  We adopt this approach for all appellate challenges to within-guidelines sentences.

Again, the United States Supreme Court's rulings in this context, although not directly on point, are illustrative.  *Booker* requires federal courts of appeals to review federal sentences for unreasonableness.  *Booker*, 543 US at 261.  After that case was decided, the federal circuit courts were split as to whether that meant there should be a

---

[18] To be very clear, only the part of MCL 769.34(10) which requires appellate courts to affirm within-guidelines sentences on appeal is being severed.  This is consistent with MCL 8.5, which states, in part, that

> [i]f any portion of an act or the application thereof to any person or circumstances shall be found to be invalid by a court, such invalidity shall not affect the remaining portions or applications of the act which can be given effect without the invalid portion or application, provided such remaining portions are not determined by the court to be inoperable, and to this end acts are declared to be severable.

presumption that a within-guidelines federal sentence was reasonable. Ultimately, the Supreme Court required appellate courts to apply a reasonableness presumption on appeal of a within-guidelines sentence. *Rita v United States*, 551 US 338, 341; 127 US 2456; 168 L Ed 2d 203 (2007).[19] The reasons given in support of a presumption were: (1) a presumption is not binding, and (2) a within-guidelines sentence reflects that both the sentencing court and sentencing guidelines reached the same conclusion regarding the appropriate punishment for a defendant considering their circumstances and their offenses. *Id*. at 347. Although *Rita* imposed a presumption of reasonableness, it took seriously the concern that such a presumption would encourage sentencing courts to sentence defendants within the guidelines to limit appellate review of the sentence. *Id*. at 354. Nonetheless, when considering the constitutionality of the sentencing scheme, *Rita* concluded that "[a] nonbinding appellate presumption that a Guidelines sentence is reasonable does not *require* the sentencing judge to impose that sentence." *Id*. at 353.

---

[19] Notably, *Rita* did not present the question we address here about whether there was a mandated affirmation of a within-guidelines sentence. Rather, it considered whether reasonableness review of within-guidelines sentences afforded reviewing courts the discretion to apply a presumption of reasonableness when conducting reasonableness review. See *Rita*, 551 US at 346 (showing examples of which federal circuit courts of appeals applied a presumption of reasonableness and which did not). To simplify, the question here is whether appellate review is permissible for within-guidelines sentences. The question in *Rita* was, given that each of the circuit courts was reviewing within-guidelines sentences for reasonableness, what such reasonableness review entails. To illustrate, consider one of the cases abrogated by *Rita* because it did not apply a presumption of reasonableness: *United States v Jiménez-Beltre*, 440 F3d 514 (CA 1, 2006) (opinion en banc), abrogated by *Rita*, 551 US at 346. In *Jiménez-Beltre*, the United States Court of Appeals for the First Circuit held that it was not permissible to apply a presumption of reasonableness of within-guidelines sentences on appeal because a presumption reasonableness "tends in [the] direction" of a mandate, which would not be permitted under *Booker*. *Jiménez-Beltre*, 440 F3d at 518.

The Court must now approach the same problem from the opposite direction. This Court has made clear that Michigan's sentencing scheme is modeled to be parallel to the federal sentencing scheme. See, e.g., *Lockridge*, 498 Mich at 391 (explaining that Michigan's sentencing scheme was "*Booker*-ize[d]" when the guidelines were rendered advisory). The appellate considerations are also the same as identified in *Booker*— reasonableness review in which the guidelines are highly relevant. *Steanhouse*, 500 Mich at 474-475, citing *Booker*, 543 US at 264. In *Steanhouse*, we also recognized that the key to reasonableness review is whether the sentence is proportionate. *Steanhouse*, 500 Mich at 475, citing *Milbourn*, 435 Mich at 661. Thus, like the *Rita* Court, we conclude that on appeal, within-guidelines sentences are to be reviewed for reasonableness, but that applying a presumption of proportionality—such as the one applied by the Court of Appeals in *Powell*, through which the defendant bears the burden of demonstrating that their within-guidelines sentence is unreasonable or disproportionate—is appropriate.

We reach many of the same conclusions reached in *Rita*. A presumption of proportionality does not mean that a within-guidelines sentence is binding on the Court of Appeals. *Rita*, 551 US at 353. Because the presumption is nonbinding, it alleviates pressure faced by sentencing courts to impose within-guidelines sentences. *Id*. And it positions appellate courts to recognize both that the guidelines remain highly relevant to sentencing decisions and that a within-guidelines sentence may indeed be disproportionate or unreasonable. See *Lockridge*, 498 Mich at 391; *Milbourn*, 435 Mich at 661.

## III. APPLICATION

The Court of Appeals affirmed defendant's sentence "[b]ecause MCL 769.34(10) precludes appellate review . . . ." *Posey*, 334 Mich App at 359. However, we now hold that the portion of MCL 769.34(10) mandating appellate affirmation of within-guidelines sentences is severed as inconsistent with our sentencing approaches in *Lockridge* and *Steanhouse*. Thus, we reverse the part of the Court of Appeals opinion addressing sentencing and the proportionality of defendant's sentence and remand to that Court to review defendant's sentence for reasonableness. Because defendant's minimum sentence is within his guidelines' range, on remand, the Court of Appeals shall apply a nonbinding rebuttable presumption of proportionality.

## IV. CONCLUSION

In holding that there was no due-process violation when a witness identified defendant for the first time at trial, the Court of Appeals erred. The admissibility of in-court identification is premised on reliability, and this identification was not reliable. Accordingly, we vacate the portion of the Court of Appeals opinion analyzing in-court identification, but nonetheless affirm defendant's convictions because defendant has neither shown plain error nor ineffective assistance of trial counsel.

We also reverse the judgment of the Court of Appeals as to whether defendant could challenge his within-guidelines sentence on appeal. In accordance with our decision in *Lockridge*, we hold that defendants may challenge the proportionality of any sentence on appeal and that the sentence is to be reviewed for reasonableness. When a trial court sentences a defendant within the guidelines' recommended range, it creates a presumption that the sentence is proportionate. However, unlike a mandate that an appellate court affirm

37

a within-guidelines sentence, the presumption of proportionality may be overcome. We therefore reaffirm the part of *Lockridge* that declared that any portion of MCL 769.34 that imposed a mandatory consideration of the sentencing guidelines to be necessarily unconstitutional, and we strike the portion of MCL 769.34(10) requiring such consideration for that reason. In the process, we overrule *Schrauben* in part, as well as any other decision that requires appellate courts to affirm within-guidelines sentences on appeal, and we overrule the Court of Appeals' holdings that are inconsistent with this approach. Finally, we remand this case to the Court of Appeals for further proceedings not inconsistent with this opinion.

Kyra H. Bolden
Richard H. Bernstein

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                           No. 162373

DAMETRIUS BENJAMIN POSEY,

      Defendant-Appellant.

_____

CAVANAGH, J. (*concurring in part and concurring in the judgment*).

I concur in the Court's judgment, the majority's broad holdings, and in all but Part II(A)(3) of Justice BOLDEN's lead opinion.[1] Specifically, I agree with the majority that the first sentence of MCL 769.34(10) is unconstitutional, and I concur in full with the lead opinion's reasoning on this point. I also agree with the majority that identifications of a defendant that occur for the first time at trial raise due-process concerns but that defendant is not entitled to relief from his conviction. Accordingly, I concur in remanding to the Court of Appeals to review the proportionality of defendant's sentence.

I write separately for three reasons. First, I write to provide additional explanation as to why first-time trial identifications raise due-process concerns and why, in my view, first-time trial identifications of a defendant with whom the witness had no prior

_____

[1] In this opinion, I refer to Justice BOLDEN's opinion as the "majority" where four justices have signed on to that part of the opinion and as the "lead opinion" where a majority agrees with that opinion's holding but not its rationale.

interactions before the alleged crime[2] will almost always be insufficiently reliable to satisfy due-process requirements. Second, I write to elaborate on why the Court's holding as to first-time trial identifications is consistent with *Perry v New Hampshire*, 565 US 228; 132 S Ct 716; 181 L Ed 2d 694 (2012). Finally, I write to explain why, instead of affirming defendant's convictions on the basis that defendant cannot demonstrate prejudice, I would affirm because, under the state of the law when the trial occurred, the error in admitting Terrence Byrd's identification was not "plain" and trial counsel did not perform deficiently by failing to object to this testimony.

## I. THE BIG PICTURE

I agree with the majority that due process is implicated where a witness identifies the defendant as the perpetrator for the first time at trial.[3] It is clear that in-court identifications are highly suggestive; they are simply a formalized version of a police "showup."[4] As aptly stated by the Connecticut Supreme Court, "we are hard-pressed to imagine how there could be a more suggestive identification procedure than placing a witness on the stand in open court, confronting the witness with the person who the state has accused of committing the crime, and then asking the witness if he can identify the person who committed the crime." *State v Dickson*, 322 Conn 410, 423; 141 A3d 810

---

[2] Throughout this opinion, I refer to such defendants as "strangers" for ease of reference.

[3] I also agree with the majority that, because it is not what occurred in this case, it is unnecessary to address a situation where the only pretrial identification occurred at the preliminary examination.

[4] *People v Sammons*, 505 Mich 31, 36 n 1; 949 NW2d 36 (2020) ("A showup is '[a] police procedure in which a suspect is shown singly to a witness for identification[.]' "), quoting *Black's Law Dictionary* (11th ed).

(2016) (emphasis omitted). And the dangers of permitting such identifications are not merely hypothetical or ideological; it is well established both in law and in science that "mistaken eyewitness identifications are a significant cause of erroneous convictions" and that the risk of erroneous convictions is exacerbated "when the identification has been tainted by an unduly suggestive procedure." *Id*. at 425.[5]

While the Due Process Clause does not require trial judges "to prescreen eyewitness evidence for reliability *any time* an identification is made under suggestive circumstances," *Perry*, 565 US at 240 (emphasis added),[6] it does function to deter state action that

_____

[5] As early as 1973, this Court recognized that

> there are serious problems concerning the accuracy of eyewitness identification and that real prospects for error inhere in the very process of identification completely independent of the subjective accuracy, completeness or good faith of witnesses. For almost 100 years these problems have occupied the energy of some very astute judges, prosecutors and scholars who have consistently identified the problems. [*People v Anderson*, 389 Mich 155, 180; 205 NW2d 461 (1973), overruled on other grounds by *People v Hickman*, 470 Mich 602 (2004).]

The United States Supreme Court has long recognized similar concerns, and "a vast body of scientific literature has reinforced every concern [those] precedents articulated . . . ." *Perry*, 565 US at 262-263 (SOTOMAYOR, J., dissenting); see also *id*. at 244-245 (opinion of the Court) ("We do not doubt either the importance or the fallibility of eyewitness identifications."). In short, scientific evidence indicates that eyewitness identifications are less reliable than they are commonly perceived to be and that "jurors routinely overestimate the accuracy of eyewitness identifications." *Id*. at 264 (SOTOMAYOR, J., dissenting); see also *Sammons*, 505 Mich at 57 (noting that "[c]ourts have widely acknowledged that juries place disproportionate weight on eyewitness identifications, even if they lack indicia of reliability").

[6] Even where due process does not require excluding a witness identification from trial, courts have long had the discretion to do so under MRE 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." See *Perry*, 565 US at 247.

3

unnecessarily *creates* a "substantial likelihood of misidentification," *id*. at 239 (quotation marks and citation omitted); see also *id*. at 241-242.  Contrary to the Court of Appeals' holding below, I see no reason why this deterrent rationale does not apply to first-time trial identifications, especially where the witness had no preexisting relationship with the defendant before the crime occurred.  This procedure is never "necessary."  And given the highly questionable reliability of such identifications and the likelihood that jurors will give them undue weight, their admission undermines the search for truth, "which is the *sine qua non* of a fair trial."  *Estes v Texas*, 381 US 532, 540; 85 S Ct 1628; 14 L Ed 2d 543 (1965).[7]

## II.  DUE PROCESS AND FIRST-TIME TRIAL IDENTIFICATIONS OF A STRANGER

This Court recently summarized the framework for determining the admissibility of eyewitness identifications under the Due Process Clause:

> Due process protects criminal defendants against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures.  Exclusion of evidence of an identification is required when (1) the identification procedure was

---

[7] For the reasons stated later, this holding is consistent with United States Supreme Court precedent interpreting the federal Due Process Clause.  US Const, Am XIV.  However, I note that defendant argued in his Standard 4 brief, filed pursuant to Supreme Court Administrative Order No. 2004-6, that the in-court identification here violated Michigan's Due Process Clause, Const 1963, art 1, § 17, and this may provide an alternative basis for this holding.  See *Bauserman v Unemployment Ins Agency*, 503 Mich 169, 185 n 12; 931 NW2d 539 (2019) (noting that caselaw interpreting the federal Due Process Clause is not binding when interpreting Michigan's Due Process Clause); *Sammons*, 505 Mich at 50 n 13 (noting that some states have interpreted their state due-process protections for unnecessarily suggestive identifications differently than the federal protections); cf. *Commonwealth v Crayton*, 470 Mass 228; 21 NE3d 157 (2014) (limiting the admissibility of in-court identifications under Massachusetts common law); *Commonwealth v Collins*, 470 Mass 255; 21 NE3d 255 (2014) (same).

4

suggestive, (2) the suggestive nature of the procedure was unnecessary, and (3) the identification was unreliable. [*People v Sammons*, 505 Mich 31, 41; 949 NW2d 36 (2020) (quotation marks and citations omitted).]

If evidence of an identification is inadmissible under this test, the witness may identify the defendant at trial only if they have an "independent basis" for the in-court identification. *People v Gray*, 457 Mich 107, 114-115; 577 NW2d 92 (1998).[8] This is not a new concept, as it has existed in various forms since the 1960s. See *Perry*, 565 US at 237-240 (summarizing Supreme Court caselaw on the issue).[9] Thus, the question is simply whether first-time trial identifications fall within this framework.[10] In my view, a first-time trial identification of a stranger will almost always violate due process under this framework.[11]

---

[8] In *Sammons*, the Court did not engage in the independent-basis inquiry because the identification was erroneously admitted only through the testimony of an officer involved in the improper identification procedure; the witness at issue declined to identify the defendant at either the preliminary examination or trial. *Sammons*, 505 Mich at 39-40.

[9] Due-process rights in this context belong exclusively to a criminal defendant and are not shared by the state. See US Const, Am XIV ("[N]or shall any State deprive any *person* of life, liberty, or property without due process of law[.]") (emphasis added); Const 1963, art 1, § 17 ("No *person* shall . . . be deprived of life, liberty or property, without due process of law.") (emphasis added). As this Court recently recognized, "[t]he purpose of codifications of rights in the federal Constitution, our Constitution, and the constitutions of other states is to protect against" " 'wrongs committed under authority of the state.' " *Bauserman v Unemployment Ins Agency*, 509 Mich 673, 696; 983 NW2d 855 (2022) (citation omitted). Accordingly, the "double standard" between the rights of a defendant and the rights of the prosecution that Justice ZAHRA identifies is an integral part of our constitutional system.

[10] For these reasons, Justice ZAHRA's suggestion that the majority's position is a radical departure from historical practice and precedent is incorrect.

[11] A preserved constitutional error requires reversal of a conviction unless the prosecution can show that the error was harmless beyond a reasonable doubt. *Sammons*, 505 Mich at 56. As recognized in the majority opinion, defendant's argument here was unpreserved, so a more demanding prejudice standard applies.

First, in-court identifications are obviously highly suggestive. As this Court recently explained, it "has long been beyond debate" that a pretrial "showup"—in which a suspect is shown singly to a witness—is a highly suggestive procedure that creates a strong likelihood of misidentification. *Sammons*, 505 Mich at 41; *id* at 41-47. Such a procedure clearly signals to the witness that this is the person the police suspect of having committed the crime, making the witness more likely to incorrectly identify that person as the perpetrator. *Id*. at 44 (noting "empirical finding[s] that innocent suspects are more often identified in showups than lineups"). This is especially true when a showup is conducted in a police stationhouse. *Id*. The inherent suggestiveness of showing a suspect singly to the witness is exacerbated to the extreme during in-court identifications. By bringing charges against a defendant, the state is unequivocally expressing its belief to the witness not only that the defendant committed the crime, but also that it can present sufficient evidence to satisfy the relevant burden of proof. See *Dickson*, 322 Conn at 423 & n 9 (citing cases). "If this procedure is not suggestive, then *no* procedure is suggestive." *Id*. at 424; see also *Sammons*, 505 Mich at 44 (stating that "[i]n this case, all we need to observe in order to conclude that the procedure was suggestive is that defendant was shown singly to the witness").

Second, I agree with the majority that it is never necessary to elicit a witness identification for the first time at trial; the state "can always employ a nonsuggestive identification procedure before trial or elicit other incriminating testimony as to the circumstances of the crime without asking the witness to identify the defendant in the

6

courtroom." *Ante* at 16 n 6.[12]  As the Connecticut Supreme Court explained, if a trial identification is insufficiently reliable to satisfy due process, "[t]he prosecutor may still examine the witness . . . about his or her observations of the perpetrator at the time of the crime, but the prosecutor should avoid asking the witness if the defendant resembles the perpetrator." *Dickson*, 322 Conn at 447.  Contrary to Justice ZAHRA's suggestion, these requirements do not place an undue burden on the prosecution.  The requirement that any pretrial identification procedure be nonsuggestive is well established, as are the types of identification procedures that meet this requirement.  See *Sammons*, 505 Mich at 46-47.  There is quite simply no evidence that the state lacks the knowledge or the ability to use a nonsuggestive pretrial identification procedure where one is necessary to ensure that a trial identification is sufficiently reliable.  Indeed, I can discern no principled reason why a prosecutor would *want* to elicit an unreliable identification at trial from a witness who was

---

[12] In limiting the admissibility of first-time trial identifications under Massachusetts common law, the Massachusetts Supreme Court held that "there may be other grounds [beyond those that would justify an out-of-court showup] that constitute 'good reason' for an in-court showup . . . ." *Crayton*, 470 Mass at 242.  As examples, the court pointed to situations in which "the eyewitness was familiar with the defendant before the commission of the crime" or where a police officer witnessed the crime and is merely confirming "that the defendant is the person who was arrested for the charged crime." *Id*.  The court reasoned that "in both of these circumstances, where the witness *is not identifying the defendant based solely on his or her memory of witnessing the defendant at the time of the crime*, there is little risk of misidentification arising from the in-court showup despite its suggestiveness." *Id*. at 243 (emphasis added).  Similarly, the Connecticut Supreme Court held that first-time trial identifications are permissible where there is no factual dispute as to the identity of the perpetrator. *Dickson*, 322 Conn at 446.  These scenarios are inapplicable to this case, so it is unnecessary to address to what extent exclusion may be required under these circumstances.

7

entirely unable to identify the defendant before trial, especially where the witness had no relationship with the defendant before the alleged crime.[13]

Third, I believe that where a witness identifies a stranger for the first time at trial, that identification will rarely be sufficiently reliable to satisfy due process. The United States Supreme Court has rejected a per se exclusionary rule for unnecessarily suggestive identification procedures in favor of a totality-of-the-circumstances test to determine whether there is a substantial likelihood of misidentification. *Sammons*, 505 Mich at 49.[14] In conducting this inquiry, courts consider a nonexclusive list of factors, which includes:

---

[13] Contrary to Justice ZAHRA's suggestion, I do not interpret the Court's opinion as precluding the prosecution from calling an eyewitness to provide general statements on the perpetrator's appearance or to provide other testimony describing the crime. See *post* at 22 n 43 (ZAHRA, J., dissenting). Rather, the majority's holding today only precludes first-time trial *identifications* of the defendant as the perpetrator. However, where due process requires exclusion of an identification, a prosecutor, in eliciting relevant general testimony regarding the perpetrator and offense, cannot indirectly produce the functional equivalent of an identification of the defendant as the perpetrator. See *Dickson*, 322 Conn at 447.

[14] As I have suggested elsewhere, I am open to considering the approaches of other states that have adopted a more robust exclusionary rule for unnecessarily suggestive identification procedures than provided under federal Due Process law. See, e.g., *People v Bearden*, 509 Mich 986, 987-988 (2022) (CAVANAGH, J., concurring) (noting that the United States Supreme Court's rejection of a per se exclusionary rule was based on a prediction that a totality-of-the-circumstances rule would sufficiently deter the use of such procedures and questioning whether that prediction has come to pass). Moreover, as suggested by the briefs in this case from defendant and amicus The Innocence Project, there has been "a growing awareness [among courts] that the continuing soundness of the [reliability test set forth in *Manson v Brathwaite*, 432 US 98, 114; 97 S Ct 2243; 53 L Ed 2d 140 (1977)] has been undermined by a substantial body of peer-reviewed, highly reliable scientific research." *United States v Greene*, 704 F3d 298, 305 n 3 (CA 4, 2013); cf. *People v Parks*, 510 Mich 225, 249; 987 NW2d 161 (2022) (relying on "undisputed scientific evidence" when interpreting Michigan's Constitution). I need not address here whether this Court should adopt a different standard under Michigan law because, even applying the generally recognized federal standard, I believe that a first-time trial

(1) "the opportunity of the witness to view the criminal at the time of the crime," (2) "the witness' degree of attention," (3) "the accuracy of his prior description of the criminal," (4) "the level of certainty demonstrated at the confrontation," and (5) "the time between the crime and the confrontation." [*Id*. at 50-51, quoting *Manson v Brathwaite*, 432 US 98, 114; 97 S Ct 2243; 53 L Ed 2d 140 (1977).]

The prosecutor bears the burden to show that the indicia of reliability " 'are strong enough to outweigh the corrupting effect' " of the unnecessarily suggestive identification. *Sammons*, 505 Mich at 55, quoting *Perry*, 565 US at 232. This analysis requires a court to consider *how* suggestive the specific procedure at issue was. *Sammons*, 505 Mich at 49 n 12 (identifying the "extent of [the] suggestiveness" of a procedure as part of the reliability inquiry).

As discussed earlier, the "corrupting effect" of a first-time trial identification is strong, which weighs heavily in favor of finding a substantial likelihood of misidentification. Moreover, there is always a significant lapse in time between the crime and any trial identification. The Supreme Court has recognized that a lapse of seven months between the crime and identification is a "serious[] negative factor in most cases," *Neil v Biggers*, 409 US 188, 201; 93 S Ct 375; 34 L Ed 2d 401 (1972), and criminal trials often occur more than seven months after the offense is committed. Where a witness has no prior relationship with the offender and has not identified the defendant previously in a nonsuggestive identification procedure, it is hard to envision any set of circumstances in which the prosecutor could prove there are sufficient indicia of reliability to outweigh the corrupting effect of the first-time trial identification.

---

identification of a stranger will almost always create a substantial likelihood of misidentification.

9

For the same reasons, it is unlikely that a witness in these circumstances will ever have an independent basis for the identification. Generally, the reliability and independent-basis inquiries substantially overlap. See *Gray*, 457 Mich at 115-116 & n 10.[15] The distinction is that the reliability inquiry focuses on the admissibility of the pretrial identification, while the independent-basis inquiry focuses on whether a witness who was subject to an unnecessarily suggestive pretrial procedure may nonetheless identify the defendant at trial. *Id*. at 114-115 & n 9. In the context of first-time trial identifications, these inquiries essentially collapse into each other, as the trial identification itself is the improper identification procedure.

Chief Justice CLEMENT notes that, unlike a suggestive pretrial identification procedure, a first-time trial identification occurs in front of the defendant and the jury. She argues that because any suggestive identification procedure occurs publicly, there is a greater chance that defense counsel will point out the flaws in the identification and that the jury will recognize such flaws.[16] But it is well established that an in-court identification

---

[15] This Court has listed the following eight factors for determining whether there is an independent basis, many of which overlap with the *Manson* reliability factors: (1) the witness's "prior relationship with or knowledge of the defendant," (2) the witness's "opportunity to observe the offense," (3) the "length of time between the offense and the disputed identification," (4) any discrepancies in the witness's "pre-lineup or showup description and defendant's actual description," (5) "any previous proper identification or failure to identify the defendant" by that witness, (6) "any identification prior to lineup or showup of another person as defendant" by that witness, (7) "the nature of the alleged offense and the physical and psychological state of the victim," and (8) "any idiosyncratic or special features of defendant." *Gray*, 457 Mich at 116 (cleaned up).

[16] This argument is reflected in many decisions holding that first-time trial identifications do not implicate due process. See, e.g., *Garner v People*, 436 P3d 1107, 1114, 1117, 1119-1120; 2019 CO 19 (Colo, 2019).

10

that is tainted by a suggestive pretrial identification is subject to exclusion from trial, notwithstanding its public nature. See, e.g., *Moore v Illinois*, 434 US 220, 227; 98 S Ct 458; 54 L Ed 2d 424 (1977); *Gray*, 457 Mich at 114-115. This is because, where the state employs an unnecessarily suggestive identification procedure, "reliability is the linchpin in determining the admissibility of identification testimony," *Manson*, 432 US at 114, and this reliability is assessed by reference to the extent of suggestiveness of the procedure and other factors that might nonetheless render the identification reliable.[17] In other words, the question is whether state action unnecessarily created an identification so unreliable that the normal protections of trial are insufficient to satisfy due process. *Id*. at 112 (noting that the Supreme Court's cases "reflect the concern that the jury not hear eyewitness testimony unless that evidence has aspects of reliability"). First-time trial identifications—which are essentially formalized showups—fall comfortably within that category.[18] Moreover, as

[17] Notably, while there is caselaw highlighting the hidden nature of pretrial identification procedures and the importance of effective trial scrutiny of such identifications, see *United States v Wade*, 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967), the generally recognized factors for assessing reliability and whether there was an independent basis for an in-court identification do not account for the ability (or lack thereof) of the defendant and the jury to personally view the unnecessarily suggestive identification procedure. See *Manson*, 432 US at 114; *Gray*, 457 Mich at 116. For example, these factors do not suggest that the existence of an audio- or videorecording of an unnecessarily suggestive pretrial identification procedure weighs against exclusion of that identification from trial. Moreover, these factors do not indicate that the effectiveness of defense counsel's cross-examinations—or their trial performance generally—is relevant to whether an identification should have been excluded.

[18] As other courts have recognized, it is questionable whether, as an empirical matter, the ability of defense counsel and the jury to view the suggestive identification procedure makes any significant difference to a jury's tendency to give undue weight to such identifications. See *Dickson*, 322 Conn at 439-440; *Crayton*, 470 Mass at 239-240. But even assuming there is some evaluative benefit from viewing the identification procedure in person, it does not make the identification itself more reliable, and I do not believe this is sufficient protection to satisfy due process in light of the well-recognized tendency of

11

discussed later, conditioning exclusion on whether an unnecessarily suggestive showup occurs in court or not would create perverse incentives and undermine the deterrent purpose that exclusion serves in this context.

In sum, under the generally accepted framework set forth by caselaw, I believe that a first-time trial identification of a stranger will, at minimum, almost always violate due process and therefore must be excluded from trial.[19]

## III.  STATE ACTION AND *PERRY v NEW HAMPSHIRE*

In rejecting defendant's due-process argument, the Court of Appeals did not dispute any of the above points.  Indeed, it did not engage in this analysis at all.  Rather, it held that, under *Perry v New Hampshire*, the Due Process Clause does not require exclusion of witness identifications if "there was no improper law enforcement activity and no pretrial

---

juries to give undue weight to eyewitness testimony, even when such testimony is tainted by an unnecessarily suggestive identification procedure.

[19] In holding that first-time-in-court identifications are subject to due-process protections, the Connecticut Supreme Court held that the state must request permission from the trial court for such identifications and "the trial court may grant such permission only if it determines that there is no factual dispute as to the identity of the perpetrator, or the ability of the particular eyewitness to identify the defendant is not at issue." *Dickson*, 322 Conn at 446; *id*. at 444 (laying out in greater detail "the specific procedures that the parties and the trial court must follow" in such circumstances).  The Massachusetts Supreme Court held that the prosecution bears the burden to file a motion in limine if it intends to elicit such an identification and, once that motion is filed, the defendant bears the burden to show that the identification would be unnecessarily suggestive and that there is not "good reason" for such an identification. *Crayton*, 470 Mass at 243.  I agree with the majority that, at minimum, where there is a question as to the propriety of a first-time trial identification, the prosecution bears the burden to establish sufficient indicia of reliability to present the testimony to the jury.  See *ante* at 17 n 8.  Beyond that, given the lack of briefing on this point, I would not endorse in this case any specific procedure for the admission of first-time-at-trial identifications.

identification . . . ." *People v Posey*, 334 Mich App 338, 351; 964 NW2d 862 (2020), citing

*Perry*, 565 US at 231-233. Under these circumstances, according to the Court of Appeals,

" 'it suffices to test reliability through the rights and opportunities generally designed for

that purpose,' " such as cross-examination and the rules of evidence. *Id*. at 350, quoting

*Perry*, 565 US at 233. While this position is consistent with how many courts have

interpreted *Perry*,[20] I agree with the majority that *Perry* does not dictate such a result.[21]

---

[20] See, e.g., *State v Doolin*, 942 NW2d 500, 511-512 (Iowa, 2020) (citing cases to support the conclusion that "[m]ost courts adjudicating due process claims after *Perry* allow first-time, in-court identifications"); *Garner*, 436 P3d at 1118 (noting that only "[a] small minority of courts have applied *Biggers* to first-time in-court identifications since *Perry* was decided"); *United States v Whatley*, 719 F3d 1206, 1216 (CA 11, 2013) (holding that "*Perry* makes clear that, for those defendants who are identified under suggestive circumstances not arranged by police [including in-court identifications], the requirements of due process are satisfied in the ordinary protections of trial").

[21] While this is the minority position among courts to have addressed the issue post-*Perry*, this Court is not bound by other courts' interpretations of Supreme Court precedent. See *People v Beck*, 504 Mich 605, 625-629; 939 NW2d 213 (2019) (holding that considering conduct of which a defendant had been acquitted when imposing a sentence violated federal due process even though this holding represented the minority position on the issue); see also *Dickson*, 322 Conn at 431 (arguing that "this is an issue for which the arc of logic trumps the weight of authority"). Notably, this Court is not alone in concluding post-*Perry* that at least some in-court identifications could raise federal due-process concerns. See *Dickson*, 322 Conn at 431-434 (holding that such identifications violate due process notwithstanding *Perry*); *United States v Morgan*, 248 F Supp 3d 208, 213 (DDC, 2017) (holding that "[a]lthough the Supreme Court implied in *Perry* that it did not want *all* in-court identifications to be subject to judicial reliability screening, due process concerns require such screening for an initial in-court identification that is equivalent to a one-man showup") (citation omitted); *Greene*, 704 F3d at 305-310 (applying the *Biggers* factors to an in-court identification post-*Perry*); *Lee v Foster*, 750 F3d 687, 690-692 (CA 7, 2014) (inquiring into the suggestiveness and reliability of an in-court identification even after *Perry*); *City of Billings v Nolan*, 385 Mont 190; 383 P3d 219 (2016) (same); *United States v Correa-Osorio*, 784 F3d 11, 19-20 (CA 1, 2015) (asserting that "[o]ne could argue either way" whether the *Biggers* analysis applies to in-court identifications after *Perry*); *id*. at 31-32 (Barron, J., concurring in part and dissenting in part) (arguing that *Perry* "does not shield from *Biggers* review any in-court identification that is untainted by a prior suggestive out-of-court prompt"); *Galloway v State*, 122 So 3d 614, 663 (Miss, 2013)

As the majority notes, *Perry* did not address whether an identification elicited for the first time at trial violates due process. In *Perry*, the witness saw through her window the defendant standing next to a police officer shortly after the crime occurred. *Perry*, 565 US at 233-234. A month later, the witness was unable to identify the defendant in a pretrial photographic array. *Id*. at 234. The legal dispute in *Perry* concerned whether admission of the witness's prearrest identification of the defendant as evidence at trial violated due process. *Id*. at 234-235. Critical to this dispute was the lack of evidence that any state actor intended the witness to see the defendant through her window. *Id*. at 240. Thus, the overarching question was whether the Due Process Clause requires "trial judges to prescreen eyewitness evidence for reliability *any time* an identification is made under suggestive circumstances." *Id*. (emphasis added).

The Supreme Court rejected such a broad ruling, reasoning that its due-process identification caselaw was not intended to ensure that only reliable identifications are presented at trial because it is traditionally the jury's role to assess reliability subject to generally applicable rules of evidence and "other safeguards built into our adversary system . . . ." *Id*. at 245. Instead, the Court interpreted its caselaw as only mandating exclusion of unreliable identifications where exclusion would deter the use of unnecessarily suggestive identification procedures:

---

(stating that as of 2013, "[t]he United States Supreme Court has not decided whether *Biggers* applies to an in-court identification not preceded by an impermissibly suggestive pretrial identification"); *Doolin*, 942 NW2d at 543 (Appel, J., dissenting) (arguing that "*Perry* has no applicability to first-time, in-court identification") (italics omitted); *Garner*, 436 P3d at 1121, 1123 (Hart, J., dissenting) (arguing that *Perry* did not consider or resolve whether due-process protections apply to in-court identifications).

14

> A primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place. Alerted to the prospect that identification evidence improperly obtained may be excluded, . . . police officers will "guard against unnecessarily suggestive procedures." This deterrence rationale is inapposite in cases . . . in which the police engaged in no improper conduct. [*Id*. at 241-242, quoting *Manson*, 432 US at 112 (citation omitted).]

Thus, *Perry* reasoned that "[t]he fallibility of eyewitness evidence does not, *without the taint of improper state conduct*, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." *Id*. at 245 (emphasis added).

The takeaway from *Perry* is that the federal Due Process Clause does not require a prescreening for reliability of *all* witness identifications, but it does require prescreening if exclusion would deter the state from using unnecessarily suggestive identification procedures that *create* a substantial likelihood of misidentification. Admittedly, *Perry* makes frequent reference to law enforcement pretrial identification procedures, which many courts have read to categorically exclude first-time-in-court identifications elicited by prosecutors. But both in constitutional and in practical terms, the line between law enforcement and prosecutors is not airtight. See *Genesee Prosecutor v Genesee Circuit Judge*, 386 Mich 672, 683; 194 NW2d 693 (1972) (noting that "[w]e have held in the past that the prosecutor is the chief law enforcement officer of the county"); *Kalina v Fletcher*, 522 US 118, 127; 118 S Ct 502; 139 L Ed 2d 471 (1997) (characterizing the Attorney General of the United States as "the senior law enforcement official in the Nation"). To the extent *Perry* is properly understood to refer only to pretrial police activity, the Supreme Court's focus on such conduct makes sense, given that its prior caselaw addressed only

15

such situations. *Perry*, 565 US at 240. But *Perry* did not address whether the deterrent rationale underlying the Supreme Court's due-process caselaw would also apply to a prosecutor eliciting a first-time trial identification.

In my view, the deterrence rationale endorsed in *Perry* clearly applies with equal force to first-time trial identifications. Applying an exclusionary rule would deter prosecutors from *creating* a substantial likelihood of misidentification by eliciting unreliable first-time trial identifications. It would also create an incentive for both police and prosecutors to timely employ a pretrial nonsuggestive identification procedure where the identity of the perpetrator is at issue.

Prosecutors are clearly state actors subject to constitutional and ethical limitations on their conduct, including the obligation to comply with due process. See, e.g., MRPC 3.8 (describing the "Special Responsibilities of a Prosecutor"). Among other obligations, the Due Process Clause (1) prohibits prosecutors from knowingly using perjured testimony,[22] (2) prohibits prosecutors from using a defendant's post-*Miranda* silence to impeach a later exculpatory statement at trial,[23] and (3) imposes an affirmative obligation on prosecutors to discover and disclose to the defendant exculpatory evidence known to any governmental actor, including the police.[24] Moreover, when prosecutors engage in functions "normally performed by a detective or police officer," they are subject to the

---

[22] *Mooney v Holohan*, 294 US 103, 112-113; 55 S Ct 340; 79 L Ed 791 (1935).

[23] *Doyle v Ohio*, 426 US 610, 618; 96 S Ct 2240; 49 L Ed 2d 91 (1976).

[24] *Kyles v Whitley*, 514 US 419, 437; 115 S Ct 1555; 131 L Ed 2d 490 (1995).

same constitutional limitations that govern officer behavior.[25]  Due-process requirements are not hurdles for prosecutors to circumvent, but rather are safeguards that further the paramount role of prosecutors to ensure "that justice shall be done."  *Berger v United States*, 295 US 78, 88; 55 S Ct 629; 79 L Ed 1314 (1935).  Accordingly, there is no reason why an unnecessarily suggestive identification procedure arranged by a prosecutor should not implicate due process to the same extent as such a procedure arranged by the police.  *Dickson*, 322 Conn at 426.

Moreover, it is logical to conclude that exclusion of such identifications at trial (and possible reversal of a conviction on appeal) would deter prosecutors from eliciting such identifications and would encourage them to advise law enforcement to timely employ pretrial nonsuggestive identification procedures.  Prosecutors are not bystanders who passively present all relevant evidence to a jury.  Rather, they have significant discretion as to all aspects of a criminal case, including what evidence of guilt is presented (or not presented) to the jury.  See, e.g., *People v Pratt*, 254 Mich App 425, 429; 656 NW2d 866 (2002) ("Case law is clear that a prosecutor has the discretion to prove his case by whatever admissible evidence he chooses."); *People v Gillis*, 474 Mich 105, 141 n 19; 712 NW2d 419 (2006) (noting that "[t]he exercise of judicial power over the discharge of the prosecutor's duties is limited to those activities or decisions by the prosecutor that are unconstitutional, illegal, or ultra vires") (quotation marks and citation omitted).

---

[25] *Kalina*, 522 US at 126 (holding that qualified immunity rather than complete immunity applies where the prosecutor is acting as a police officer and not in the role of an advocate) (quotation marks and citation omitted).

Moreover, a necessary part of a prosecutor's job is to communicate and coordinate with law enforcement regarding pending and future cases.[26]  Indeed, such coordination is expected to ensure compliance with shared constitutional obligations.[27]  In light of the significant prosecutorial discretion and the frequent coordination with law enforcement, "the rationale for the rule excluding identifications that are the result of unnecessarily suggestive procedures—deterrence of improper conduct by a state actor—applies equally to prosecutors." *Dickson*, 322 Conn at 426; see also *Colorado v Connelly*, 479 US 157, 169; 107 S Ct 515; 93 L Ed 2d 473 (1986) (recognizing that "[e]xclusionary rules are . . . aimed at deterring lawless conduct by police *and prosecution*") (emphasis added; quotation marks and citation omitted).

*Perry* is clear that the Due Process Clause does not categorically preclude a prosecutor from presenting identification testimony at trial that is of questionable reliability.  Nor does it impose on trial courts the obligation to prescreen all eyewitness testimony that a prosecutor seeks to present at trial.  *Perry*, 565 US at 243 (declining to adopt a rule that would "open the door to judicial preview, under the banner of due process, of most, if not all, eyewitness identifications").  Thus, not *all* prosecutorial conduct that elicits unreliable evidence is subject to prescreening and exclusion under the Due Process Clause.

---

[26] See generally *Moldowan v City of Warren*, 578 F3d 351, 378 (CA 6, 2009) (noting the distinct but interdependent roles played by the police and the prosecution in the state's search for truth in criminal matters).

[27] See *Kyles*, 514 US at 438 (stating that there is no "serious doubt" that procedures and regulations can be established to ensure that prosecutors comply with their obligation to discover and disclose exculpatory evidence known to police officers).

But the situation here is narrower than that. The question is whether the prosecutor may—working in concert with the police—forgo entirely nonsuggestive pretrial identifications procedures or (as in this case) ignore the unfavorable results of a nonsuggestive pretrial identification and nonetheless elicit identification testimony of a stranger for the first time at trial. This goes beyond merely presenting unreliable evidence to a jury. Rather, this is state action that *creates* a substantial likelihood of misidentification, especially as applied to strangers. As Justice Appel of the Iowa Supreme Court aptly explained:

> Plainly, a first-time, in-court identification is infused with state action. The state has arrested the defendant, charged the defendant with a crime, brought the defendant into court, and presented the jury with an eyewitness who knows that the state believes the defendant is the culprit. It is hard to imagine a more intensive state involvement in a suggestive lineup.
>
> A contrary view would set a dangerous precedent and invite gamesmanship. Specifically, if the state is concerned that an eyewitness might be uncertain, it could avoid a nonsuggestive lineup or photo array, and instead present the witness in-court where the defendant is on trial. In the most suggestive environment imaginable, a court of law, where the defendant is facing potentially severe penalties, the witness is then asked to identify the defendant. The witness knows their role, does not want to disappoint, and is inclined to be helpful to the state. Even a witness who could not describe the defendant's facial features contemporaneously with the crime can have a sudden improvement in memory! [*State v Doolin*, 942 NW2d 500, 543 (Iowa, 2020) (Appel, J., dissenting).]

Like the majority, I see no meaningful difference between this scenario and the police improperly using a pretrial showup, which is precisely the type of unnecessarily suggestive procedure that the Due Process Clause deters. See *United States v Morgan*, 248 F Supp 3d 208, 213 (DDC, 2017) (holding that "[a]lthough the Supreme Court implied in *Perry* that it did not want *all* in-court identifications to be subject to judicial reliability screening, due

19

process concerns require such screening for an initial in-court identification that is equivalent to a one-man showup") (citation omitted); *Crayton*, 470 Mass at 241 (comparing a first-time-in-court identification to an out-of-court showup and concluding that "[w]here an eyewitness has not participated before trial in an identification procedure, we shall treat the in-court identification as an in-court showup"); *Commonwealth v Collins*, 470 Mass 255, 265; 21 NE3d 255 (2014) (holding that "we shall not admit [an unnecessarily suggestive showup identification] in evidence simply because it occurred in the court room rather than out of court").[28]

At various times in his dissent, Justice ZAHRA characterizes the majority opinion as requiring a judicial assessment of reliability where the state did not "influence" the identification and where there was "no intentional government suggestion." According to Justice ZAHRA, the Court is now requiring judicial prescreening where "witnesses *on their own* changed their mind after a prior identification, recollected their memories, and provided an in-court identification in conflict with a prior statement." But as discussed earlier, the prosecutor—an agent of the state—plays a very active role in the decision to

---

[28] In rejecting the argument that due process does not require exclusion of all unreliable eyewitness testimony, the *Perry* Court cited in passing its prior decision in *Connelly*, 479 US 157. *Perry*, 565 US at 242. *Connelly* held that "police overreaching" is an essential requirement for exclusion of a confession obtained after an allegedly involuntary waiver of *Miranda* rights. *Connelly*, 479 US at 170. The Court explained that, in the absence of police compulsion, "suppressing respondent's statements would serve absolutely no purpose in enforcing constitutional guarantees," *id*. at 166, given that *Miranda*'s function is solely to "protect[] defendants against *government coercion* leading them to surrender rights protected by the Fifth Amendment," *id*. at 170 (emphasis added). This case is distinguishable from *Connelly* because applying an exclusionary rule in this context would deter state use of an unnecessarily suggestive identification procedure (an in-court showup), which is precisely the role the Due Process Clause plays by excluding certain unreliable identifications from trial. See *Perry*, 565 US at 241-242.

20

elicit a first-time trial identification. And it is beyond any reasonable doubt that a first-time trial identification is at least *as suggestive* as a pretrial showup, which generally triggers a judicial prescreening for reliability. In practice, there is no way to divorce a first-time trial identification from *state action* that is likely to influence a witness's identification and create a substantial likelihood of misidentification.

As noted earlier, Chief Justice CLEMENT argues that first-time trial identifications are categorically distinct from pretrial suggestive identification procedures because the former occur publicly in the presence of the defendant and the jury, while the latter do not. She therefore finds *Perry*'s observations regarding the other avenues for challenging unreliable identifications (including the right to cross-examine) applicable to first-time trial identifications. But again, it is well established that an in-court identification that is tainted by a suggestive pretrial identification is subject to exclusion from trial, notwithstanding its public nature. See, e.g., *Moore*, 434 US at 227; *Gray*, 457 Mich at 114-115. While *Perry* emphasized other avenues for challenging unreliable identifications at trial, it did so in the context of holding that exclusion is not required where there was no intentional state action that created a substantial likelihood of misidentification, i.e., where exclusion would not deter state use of an unnecessarily suggestive identification procedure. *Perry*, 565 US at 245-248. *Perry* clearly did not overrule prior caselaw indicating that due process requires exclusion of some in-court identifications notwithstanding the other avenues a defendant has for challenging such identifications. See *Dickson*, 322 Conn at 439 n 22. In other words, *Perry* clarified that intentional state use of an unnecessarily suggestive identification procedure is a prerequisite before due process mandates exclusion, but it did not alter the standard for when exclusion is required if that prerequisite is satisfied.

21

I recognize that the United States Supreme Court is generally circumspect in mandating exclusion as a remedy where exclusion would undermine the truth-seeking function of the criminal trial. See, e.g., *Herring v United States*, 555 US 135, 141-142; 129 S Ct 695; 172 L Ed 2d 496 (2009); *Manson*, 432 US at 112. However, this concern is minimized in this context, given that identifications are only excluded where state action creates a "substantial likelihood of misidentification." *Biggers*, 409 US at 201. Unlike other contexts in which the exclusionary rule serves *only* a deterrent purpose (such as the Fourth Amendment), exclusion in this context may further the search for truth in criminal trials by excluding evidence that a jury is likely to give undue weight. *Manson*, 432 US at 112 (noting "the concern that the jury not hear eyewitness testimony unless that evidence has aspects of reliability"); cf. MRE 403 (providing trial courts the discretion to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury").

I therefore disagree with Justice ZAHRA that the Court's decision today "deprives juries of highly relevant information that can be foundational to a proper determination of truth." Under today's decision, prosecutors are only deprived of the use of unreliable identifications that would be excluded from trial under preexisting caselaw if a similar unnecessarily suggestive procedure was arranged by the police before trial. It would be inappropriate and highly formalistic to base exclusion on which state actor arranged the unnecessarily suggestive identification procedure. It is worth emphasizing that reliance on unnecessarily suggestive identification procedures does not benefit anyone, because such reliance is "counterproductive to efforts to obtain the most accurate and reliable evidence." *Sammons*, 505 Mich at 49 n 11; see also *Berger*, 295 US at 88 ("It is as much [the

prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.").[29]

## IV. NO PLAIN ERROR OR INEFFECTIVE ASSISTANCE OF COUNSEL

In this case, Byrd had no prior relationship with defendant before the offense at issue, and he identified defendant for the first time at trial. Accordingly, I would hold that Byrd's identification violated due process because this is not the rare situation in which a first-time trial identification of a stranger could possibly be sufficiently reliable to satisfy due process.

However, as the lead opinion recognizes, this does not settle the question of whether defendant is entitled to relief from his conviction. For an unpreserved constitutional error, a defendant is only entitled to relief if they can demonstrate plain error or ineffective assistance of counsel. See *People v Hughes*, 506 Mich 512, 523; 958 NW2d 98 (2020). The lead opinion concludes that defendant was not sufficiently prejudiced by the error to warrant relief under plain-error review and that trial counsel's failure to object to the identification testimony did not fall below an objective standard of reasonableness. I agree that defendant is not entitled to relief, but I reach that conclusion for different reasons.

---

[29] Justice ZAHRA criticizes the majority for its alleged "abject failure to fully consider" Supreme Court precedent. However, both the majority and this concurrence rely on the precedent directly applicable to this issue; namely, the precedent governing due-process limitations on the admission of witness identifications at trial, with a special focus on *Perry v New Hampshire*. While Justice ZAHRA disagrees with how we interpret this precedent, it is readily apparent that we do not "fail[] to fully consider" it. Further, as noted earlier, this Court is not bound by other courts' interpretations of Supreme Court precedent, and this Court is not alone in reading *Perry* as not foreclosing the position we adopt in this case. See note 21 of this opinion.

23

As this Court has noted, the standards for plain error and ineffective assistance of counsel have separate elements, and "the specific error that is the focus of each standard is different." *People v Randolph*, 502 Mich 1, 10-11; 917 NW2d 249 (2018). In broad strokes, the plain-error standard focuses on the trial court's behavior and whether the court's failure to sua sponte recognize the error and prevent it from occurring requires reversal. See *id*. at 10. By contrast, the ineffective-assistance-of-counsel analysis in this context focuses on whether trial counsel failed to act as counsel guaranteed under the Sixth Amendment when they failed to object in an attempt to prevent the error from occurring or to make a record for appellate review. *Id*. at 10-11. Despite this different focus, the standards overlap in many respects. As relevant to this case, under both standards a defendant must show more than an error and prejudice to be entitled to relief.

## A. PLAIN ERROR

Under the plain-error standard, a defendant must show that any error was "plain." *Id*. at 10. An error is "plain" if the error is so "clear or obvious" that it "is not subject to reasonable dispute." *Id*. (quotation marks and citation omitted). As discussed earlier, the position the Court adopts today is the minority position among courts that have addressed this issue post-*Perry*. See notes 20 and 21 of this opinion. And, before the Court's decision today, there was no Michigan caselaw recognizing a due-process violation under these circumstances.[30] Finally, as noted by the majority, in-court identifications have historically

---

[30] Indeed, as the majority notes, there was a prior published Court of Appeals decision holding, in a roughly analogous context, that it did not violate due process to permit a trial identification where the only prior identification was at the preliminary examination. *People v Barclay*, 208 Mich App 670, 675-676; 528 NW2d 842 (1995).

24

been considered a permissible part of the trial process. See, e.g., *Walker v Commonwealth*, 74 Va App 475, 502 & n 13; 870 SE2d 328 (2022). Accordingly, I cannot say that the trial court "plainly" erred by not sua sponte excluding Byrd's identification testimony.[31]

### B. INEFFECTIVE ASSISTANCE OF COUNSEL

To demonstrate ineffective assistance of counsel, defendant must show that trial counsel's failure to object to the identification fell below an objective standard of reasonableness. *Randolph*, 502 Mich at 9. Trial counsel's failure to object to the identification in this case did not fall below an objective standard of reasonableness for the same reasons that the trial court did not plainly err.

I emphasize that, in some circumstances, defense counsel's failure to object could constitute deficient performance even if the error was not sufficiently plain for the purposes of plain error. See *id*. at 11-12 (noting that the "obviousness" of the error for plain-error purposes might not correlate with whether trial counsel performed deficiently). I agree with a recent decision of the Court of Appeals that there need not be "authority directly addressing" an issue for trial counsel's failure to object to constitute deficient performance if there are "well-established broader principles to draw from and caselaw to analogize" to the situation at hand or if there is "existing precedent that would have strongly supported" that position. *People v Hughes (On Remand)*, 339 Mich App 99, 109; 981 NW2d 182 (2021), lv den 509 Mich 867 (2022). Relatedly, I agree that in some circumstances trial counsel's failure to preserve an issue for appeal via a broad objection may constitute

---

[31] See *Crayton*, 470 Mass at 245 (concluding that an in-court identification should have been excluded but that the trial court did not abuse its discretion by allowing the testimony in light of the existing caselaw at the time of trial).

deficient performance even if no Michigan appellate opinion has yet adopted the precise analysis that would provide defendant relief. *Id.* As I recently noted, " '[t]he purpose of the appellate preservation requirement is to induce litigants to do what they can in the trial court to prevent error and eliminate its prejudice, *or to create a record of the error and its prejudice.*' " *People v Tyson*, ___ Mich ___ (2023) (Docket No. 162968) (CAVANAGH, J., dissenting), slip order at 13, quoting *People v Mayfield*, 221 Mich App 656, 660 (1997) (emphasis added). Thus, reasonable counsel would be aware that a timely objection might be warranted in some circumstances to facilitate appellate review even if it is unlikely that the trial court will sustain that objection under current law.

I disagree with the lead opinion to the extent it endorses a blanket rule that it is never deficient performance if trial counsel does not lodge an objection that seeks to clarify or modify currently binding Michigan law. There may be circumstances in which Michigan law is unclear, undeveloped, or in tension with caselaw from other jurisdictions. A per se rule that trial counsel always performs effectively by accepting the status quo would undermine a defendant's Sixth Amendment right to counsel and the related right to a fair criminal proceeding conducted consistently with the law. Moreover, such a per se rule would inhibit the development of Michigan caselaw, especially where, as in this case, this Court has not addressed an issue and the only arguably governing caselaw is from the Court of Appeals.

But it also true that trial counsel cannot reasonably be expected to predict *every* new development in the law. *Hughes (On Remand)*, 339 Mich App at 109, citing *United States v Palacios*, 982 F3d 920, 924 (CA 4, 2020). While I believe that trial counsel could have lodged a meritorious objection to Byrd's trial identification, under these specific

26

circumstances, I cannot say that the law was sufficiently clear when trial occurred that defense counsel performed deficiently by not recognizing that Byrd's testimony should have been excluded.

## C. SUMMARY

In sum, considering the existing law when trial occurred, I do not believe that either the trial court or defense counsel failed in their duties by not recognizing that Byrd's trial identification should have been excluded. Therefore, defendant is not entitled to relief from his conviction.[32] However, the Court's decision today clearly establishes the rule for Michigan criminal trials going forward such that the bench and the bar are now on notice that unreliable first-time trial identifications violate due process and must be excluded from trial.[33]

---

[32] Because I believe defendant cannot show that any error was plain or that trial counsel performed deficiently, I would not address to what extent he was prejudiced by the error in this case. However, given the well-recognized tendency of juries to give undue weight to identification testimony tainted by suggestive identification procedures (especially identifications that, like in this case, are stated with confidence), I question whether the lead opinion overly relies on defense counsel's cross-examination when concluding that defendant was not prejudiced by any error here.

[33] I note that this Court regularly addresses the substantive merits of a constitutional issue even when denying relief under a different prong of the plain-error standard and that such holdings have been considered binding precedent. See, e.g., *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015) (holding that Michigan's sentencing guidelines violated the Sixth Amendment and clarifying how this new holding would apply to future defendants even though that defendant was not entitled to relief under plain-error review); *People v Carines*, 460 Mich 750, 770; 597 NW2d 130 (1999); *People v Pipes*, 475 Mich 267; 715 NW2d 290 (2006); *People v Borgne*, 483 Mich 178, 197; 768 NW2d 290 (2009), aff'd on reh in part 485 Mich 868 (2009); *People v Vaughn*, 491 Mich 642; 821 NW2d 288 (2012); *People v Beck*, 510 Mich 1; 987 NW2d 1 (2022); *People v Kowalski*, 489 Mich 488, 506; 803 NW2d 200 (2011). See also *People v Breidenbach*, 489 Mich 1, 14; 798 NW2d 738 (2011) (overruling prior caselaw and denying the defendant relief based on the substantive issue even though the argument was unpreserved so the defendant could have been denied

27

## V.  CONCLUSION

The Court takes two steps in the right direction today by holding that first-time trial identifications implicate due process and that, post-*Lockridge*, all sentences are subject to appellate review for reasonableness.  I concur in these broad holdings, in all but Part II(A)(3) of the lead opinion, and in the judgment affirming defendant's conviction and remanding to the Court of Appeals to assess his sentence for reasonableness.  However, I would hold that the identification here was insufficiently reliable to satisfy due process but that defendant is not entitled to relief from his conviction because, under the law predating this decision, the error was not plain and trial counsel did not perform deficiently by failing to object.

Megan K. Cavanagh

---

relief on different grounds); *Hughes*, 506 Mich 512 (holding that the Fourth Amendment was violated and remanding to the Court of Appeals to address whether the defendant was entitled to relief based on ineffective assistance of counsel); *People v Smith*, 438 Mich 715; 475 NW2d 333 (1991) (overruling prior caselaw interpreting the 180-day rule in MCL 780.313 even though the defendant waived the issue by pleading guilty), overruled by *People v Williams*, 438 Mich 715 (2006).

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                        No. 162373

DAMETRIUS BENJAMIN POSEY,

      Defendant-Appellant.

_____

WELCH, J. (*concurring in part, dissenting in part, and concurring in the judgment*).

I agree with the results reached in Justice BOLDEN's lead opinion, but because I reach those results using different legal rationales, I concur in part, dissent in part, and concur in the judgment. As to the issue of first-time-in-court identifications of a defendant by a stranger, I join Part II(A)(1) and (2) of the lead opinion in full, and I also concur with the handling of defendant's ineffective assistance of counsel claim in note 10 of Part II(A)(3) of the lead opinion. I agree with Justice CAVANAGH's additional analysis regarding first-time-in-court identification of defendant by strangers and her handling of the plain error analysis, and I therefore join her concurrence except for Part IV(B).

I write separately to offer different legal reasoning about appellate review for proportionality of sentences that fall within the sentencing guidelines. As to this issue, I join Parts II(B)(1) and (2) and the remedy provided in (B)(4) of the lead opinion, but I respectfully dissent from Part II(B)(3). My focus concerns the continued viability of MCL 769.34(10), which provides that appellate courts must affirm a within-guidelines sentence absent a guidelines scoring error or reliance on inaccurate information when imposing the

sentence. I agree with the lead opinion that at least the first sentence of this provision is invalid and must be rendered advisory. I do not agree, however, that this conclusion is alone compelled by *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015), and *People v Steanhouse*, 500 Mich 453; 902 NW2d 327 (2017).

Rather, I believe the Sixth Amendment constitutional defects identified in *Lockridge* were cured by that opinion when the guidelines were rendered advisory such that they no longer restrict a trial court's exercise of sentencing discretion. Thus, I do not believe a Sixth Amendment violation can be found within MCL 769.34(10) based upon *Lockridge* and *Steanhouse* because the prior constitutional defect at issue in those cases was already cured, and MCL 769.34(10) does not constrain the sentencing discretion of trial courts or mandatorily increase a defendant's minimum term of punishment. As a result, I do not agree that reliance upon these cases alone provides a pathway for striking down the relevant portion of MCL 769.34(10). While I disagree with the lead opinion on that point, I conclude that MCL 769.34(10) creates a different problem: it infringes a convicted individual's right to seek appellate review of the results of a criminal prosecution under Const 1963, art 1, § 20. The statutory provision does this by effectively eliminating the right to appeal any aspect of a sentencing decision that does not fall within the two enumerated categories of defects and by requiring the Court of Appeals to affirm such sentences without reviewing the merits of a defendant's legal arguments. While our legal analysis is different, I reach the same conclusion as the lead opinion. The first sentence of

2

MCL 769.34(10) must be severed to the extent it requires appellate courts to affirm within-guidelines sentences.[1]

## I. *LOCKRIDGE* AND *STEANHOUSE* DO NOT, ON THEIR OWN, MANDATE RENDERING MCL 769.34(10) ADVISORY

The ultimate question before the Court is whether MCL 769.34(10) remains enforceable. That provision states as follows:

> *If a minimum sentence is within the appropriate guidelines sentence range, the court of appeals shall affirm that sentence* and shall not remand for resentencing *absent* an error in scoring the sentencing guidelines or inaccurate information relied upon in determining the defendant's sentence. [MCL 769.34(10) (emphasis added).]

On its face, the first sentence of MCL 769.34(10) allows an appellate court to disturb a sentence falling within the applicable guidelines range in only two situations. Although I agree with the lead opinion's conclusion that MCL 769.34(10) cannot preclude appellate courts from reviewing the trial court's exercise of its discretion in crafting a sentence following a criminal prosecution, I do not agree that the statute was "necessarily struck down by *Lockridge*" or that this conclusion can be derived from the subsequent statement in *Steanhouse* that the sentencing guidelines are advisory in all applications.

To understand the limits of the Court's holding in *Lockridge*, it is necessary to review the nature of the constitutional violation that was at issue and remedied in that case. In *Lockridge*, this Court stated the following about whether a mandatory minimum

---

[1] I also agree with the lead opinion that the first sentence of MCL 769.34(10) must be severed and the statute construed to create no more than a rebuttable appellate presumption that within-guidelines sentences that are not otherwise constitutionally defective are reasonable and proportionate. Accordingly, as previously stated, I concur with the remedy provided in Part II(B)(4) of the lead opinion.

sentencing statute violates the Sixth Amendment under *Apprendi v New Jersey*, 530 US 466; 120 S Ct 2348; 147 L Ed 2d 435 (2000), and later cases after *Apprendi*:

> Does that scheme constrain the discretion of the sentencing court by compelling an increase in the mandatory minimum sentence beyond that authorized by the jury's verdict alone? Michigan's sentencing guidelines do so to the extent that the floor of the guidelines range compels a trial judge to impose a mandatory minimum sentence beyond that authorized by the jury verdict. Stated differently, to the extent that [offense variables] scored on the basis of facts not admitted by the defendant or necessarily found by the jury verdict increase the floor of the guidelines range, i.e., the defendant's "mandatory minimum" sentence, that procedure violates the Sixth Amendment. [*Lockridge*, 498 Mich at 373-374.]

The majority in *Lockridge* specifically acknowledged that if a sentencing court had complete discretion to impose a sentence within a range that is statutorily authorized by the jury's verdict, then there would have been no Sixth Amendment violation. *Id*. at 375-377. But we determined that Michigan's sentencing scheme violated the Sixth Amendment because the sentencing courts were both required by statute to score variables based on facts found by the judge rather than the jury and to impose a minimum sentence within a subset of the total possible ranges that resulted from scoring those variables. *Id*. at 377-379. A variable score *required* the sentencing court to impose a higher minimum sentence.

The *Lockridge* remedy for this violation was to render advisory the requirement in MCL 769.34(2), as amended by 2002 PA 666, that sentencing courts "shall" impose a sentence within the applicable guidelines range, and to eliminate the requirement in MCL 769.34(3), as amended by 2002 PA 666, that a substantial and compelling reason be provided for departing from the guidelines. *Id*. at 391. The result was that the guidelines remained relevant and had to be consulted before imposing a sentence—partially to facilitate appellate review and partially to respect the intent of the Legislature—but the

4

guidelines no longer mandatorily limited a trial court's exercise of sentencing discretion to craft a minimum term of punishment. *Id*. at 391-392. Thus, the Sixth Amendment problems with the mandatory sentencing scheme were remedied.

The lead opinion premises its decision to also render MCL 769.34(10) advisory on a footnote from *Lockridge* stating, "[t]o the extent that any part of MCL 769.34 or another statute *refers to use of the sentencing guidelines as mandatory* or refers to departures from the guidelines, that part or statute is also severed or struck down *as necessary*." *Id*. at 365 n 1 (emphasis added). But the lead opinion does not hold that MCL 769.34(10) creates the same Sixth Amendment problems as those that were remedied in *Lockridge*. While MCL 769.34(10) states that an appellate court "shall" affirm a within-guidelines sentence if the two enumerated categories of error are not present, MCL 769.34(10) does not contain the same problems *Lockridge* found inherent in former MCL 769.34(2). Specifically, unlike former MCL 769.34(2), there is nothing in MCL 769.34(10) that limits the trial court's discretion or mandatorily increases the minimum term of punishment that such a court can or must impose.

Additionally, like Chief Justice CLEMENT in her partial dissent, I do not agree that a single footnote from *Lockridge* can be read to justify striking a lawfully enacted statutory provision in the absence of a constitutional infirmity specific to the provision in question. Because MCL 769.34(10) does not limit a *trial court's* authority to impose a particular sentence that is within or outside the statutory guidelines range, it does not violate the Sixth Amendment. As the United States Supreme Court acknowledged in *Rita v United States*, 551 US 338, 354; 127 S Ct 2456; 168 L Ed 2d 203 (2007), the mere fact that trial courts might be "encourage[d]" but not legally obligated to impose a sentence within the

5

applicable guidelines range does not "change the constitutional calculus." Rather than limit a trial court's sentencing discretion, MCL 769.34(10) limits the substantive scope of *appellate review* after the trial court imposes a sentence within the applicable guidelines range. This is not a Sixth Amendment violation. Statutorily stripping appellate courts of the authority to review a trial court's exercise of sentencing discretion is wholly different from requiring a trial court to score guidelines that increase the minimum term of imprisonment and mandating that a sentence within the resulting range be imposed by that court. Contrary to the majority's assertion, the limitations imposed by MCL 769.34(10) do not "perpetuate[] the constitutional violation wrought by the identical mandate on the trial court" precisely because the mandates are not identical in form or substance and because a trial court's sentencing discretion has been fully restored.

When this Court decided *Steanhouse*, it explicitly *declined* to address the viability of MCL 769.34(10) post-*Lockridge*. *Steanhouse*, 500 Mich at 471 n 14. This was entirely proper considering that *Steanhouse* and *Lockridge* both concerned above-the-guidelines sentences. I also agree with most of Chief Justice CLEMENT's analysis of *Steanhouse* and her conclusion that the "or adheres to" language that was quoted from *People v Milbourn*, 435 Mich 630, 661; 461 NW2d 1 (1990), does not compel the conclusion that MCL 769.34(10) has already necessarily been rendered inoperable.[2] While *Milbourn* noted the

---

[2] The full passage from *Milbourn* that the lead opinion relies on, and that *Steanhouse* readopted, stated as follows:

> Conceivably, even a sentence within the sentencing guidelines could be an abuse of discretion in unusual circumstances. See *People v Broden*, 428 Mich 343, 354, n 18, 408 NW2d 789 (1987). As noted above, in the interest of allowing the guidelines to continue to evolve, trial judges shall remain entitled to depart from the guidelines if the recommended ranges are

6

need for proportionality review of sentences that fall within and outside the applicable judicially created guidelines in place at that time,[3] *Milbourn*, 435 Mich at 661, citing *People v Broden*, 428 Mich 343, 354 n 18; 408 NW2d 789 (1987), that statement preceded the enactment of the legislative sentencing guidelines, including MCL 769.34(10). See 1998 PA 317. This historical context cannot be ignored when considering how best to read the aspects of *Milbourn* that were reaffirmed by *Steanhouse*.

Based on the foregoing, I do not believe MCL 769.34(10) violates the Sixth Amendment or that *Lockridge*, *Steanhouse*, and *Milbourn*, on their own, lead to a result that requires striking down that statutory section. But I still find the statute unconstitutional, in part, because it violates the right to appellate review of criminal matters guaranteed by Const 1963, art 1, § 20.

---

considered an inadequate reflection of the proportional seriousness of the matter at hand. Just as the guidelines may not be a perfect embodiment of the principle of proportionality, so too may a sentence within the guidelines be disproportionately severe or lenient. Thus, contrary to the implication of the dissent's repeated observation that departures may be risked only "on pain of reversal" (*post*, pp 670, 692), the key test is whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines' recommended range. [*Milbourn*, 435 Mich at 661.]

[3] The judicially created sentencing guidelines were effective when *Milbourn* was decided. See Administrative Order No. 1984-1, 418 Mich lxxx (1984); Administrative Order No. 1985-2, 420 Mich lxii (1985); Administrative Order No. 1988-4, 430 Mich ci (1988). Although trial courts were required to score the guidelines for included offenses, actual sentencing within the guidelines was not mandatory. A judge could "depart" from the guidelines' range by simply explaining the aspects of the case that warranted departure. Departure Policy, Michigan Sentencing Guidelines (2d ed), p 7 ("Whenever the judge determines that a minimum sentence outside the recommended minimum range should be imposed, the judge may do so. . . . [T]he judge must explain on the sentencing information report and on the record the aspects of the case that have persuaded the judge to impose a sentence outside the recommended minimum range.").

7

## II.  THE STATE CONSTITUTIONAL RIGHT TO APPEAL IN CRIMINAL PROSECUTIONS PRECLUDES THE LEGISLATURE FROM FORECLOSING APPELLATE REVIEW OF A CRIMINAL SENTENCE

MCL 769.34(10) requires that all within-guidelines sentences be affirmed on appeal, with two limited exceptions.  This violates the Michigan Constitution's guarantee of a right to seek appellate review in "every criminal prosecution."  Const 1963, art 1, § 20.[4]  A survey of the development of criminal sentencing and appellate review in Michigan explains why.

### A.  MICHIGAN CONSTITUTIONAL AND LEGISLATIVE AUTHORITY

The Michigan Constitution grants the Legislature the power to set the terms of a sentence to be imposed as punishment upon a convicted individual.  See Const 1963, art 4, § 45 ("The legislature may provide for indeterminate sentences as punishment for crime and for the detention and release of persons imprisoned or detained under such sentences.").  Constitutional authority for a system of indeterminate sentencing has long

---

[4] While not the basis for the lead opinion or my opinion, I disagree with Chief Justice CLEMENT that there is no constitutional problem with MCL 769.34(10) creating a "bifurcated system of review wherein defendants who received within-guidelines sentences receive no appellate review and defendants who received departure guidelines sentences receive appellate review."  Like the lead opinion and the United States Supreme Court in *United States v Booker*, 543 US 220, 265-266; 125 S Ct 738; 160 L Ed 2d 621 (2005), I believe a bifurcated system of sentencing review is constitutionally suspect, even if it is clearly what the Legislature intended when enacting MCL 769.34(10).

been enshrined in the Michigan Constitution. See Const 1850, art 4, § 47;[5] Const 1908, art 5, § 28;[6] Const 1963, art 4, § 45.

As a result, the Legislature has long enacted statutes to create a system of indeterminate sentencing for criminal convictions, and it has also consistently delegated to the judiciary the authority to exercise discretion in setting the minimum term of imprisonment in accordance with the sentencing statutes enacted by the Legislature. See *People v Boykin*, 510 Mich 171, 183; 987 NW2d 58 (2022); *People v Garza*, 469 Mich 431, 434; 670 NW2d 662 (2003). One such sentencing statute is MCL 769.8(1), which currently states:

> When a person is convicted for the first time for committing a felony and the punishment prescribed by law for that offense may be imprisonment in a state prison, the court imposing sentence shall not fix a definite term of imprisonment, but shall fix a minimum term, except as otherwise provided in this chapter. The maximum penalty provided by law shall be the maximum sentence in all cases except as provided in [Chapter 9 of the Code of Criminal Procedure, MCL 769.1 *et seq.*] and shall be stated by the judge in imposing the sentence.

Under this indeterminate sentencing scheme, the sentencing judge does not determine the exact amount of time a convicted individual will serve. Rather, the judge sets the minimum term of years and imposes the statutory maximum term of years. The Court reaffirmed last term that "[i]t is the trial court's duty to exercise discretion in a way

---

[5] Const 1850, art 4, § 47 ("The legislature may, by law, provide for the indeterminate sentences, so called, as a punishment for crime, on conviction thereof, and for the detention and release of persons imprisoned or detained on said sentences.").

[6] Const 1908, art 5, § 28 ("The legislature may provide by law for indeterminate sentences, so called, as a punishment for crime, on conviction thereof, and for the detention and release of persons imprisoned or detained on said sentences.").

9

that ensures the individualized sentence conforms with the principle of proportionality."
*Boykin*, 510 Mich at 183.  But whether convicted individuals will remain incarcerated after completing their minimum sentence is left to the parole board.  MCL 791.234(1).  A grant of parole is completely within the discretion of the parole board, as a defendant has no right to be paroled prior to the end of the statutory maximum for the conviction.  MCL 791.234(11).

### B.  JUDICIAL REVIEW OF SENTENCING—*PEOPLE v COLES*

It is undisputable that a certain amount of judicial discretion is inherent in a system that uses an indeterminate sentencing scheme.  Prior to 1983, the exercise of this judicial discretion had few limitations in Michigan.  Appellate courts had been reviewing certain aspects of a trial court's exercise of sentencing discretion in piecemeal fashion, but, when initially faced with the "strong case" for "appellate review of sentencing[s]," the Court was "not . . . yet prepared to take that step."  *People v Burton*, 396 Mich 238, 243; 240 NW2d 239 (1976).  In 1983, however, this Court formally held that a convicted individual was entitled to appellate review of a trial court's exercise of its sentencing discretion so that excessively severe sentences and "impermissible" "[u]njustified disparities" in sentencing, such as those based on race, economic status, or personal bias, could be reviewed and corrected by the judiciary when necessary.  *People v Coles*, 417 Mich 523, 541-546; 339 NW2d 440 (1983), overruled in part on other grounds by *Milbourn*, 435 Mich 630.

*Coles* did not overrule *Burton* but instead took the next step that *Burton* refused to take, holding that appellate review of sentences was required.  The Court acknowledged in

*Coles* that the Court's "general review power is grounded in Const 1963, art 6, § 4,"[7] and

that both the Legislature and this Court had further defined the scope of the judicial power

of review through statutes and court rules. *Coles*, 417 Mich at 534. *Coles* went on to hold:

> [*A*] *sentence following a conviction is as much a part of the final judgment of the trial court as is the conviction itself.* Since the Court of Appeals has jurisdiction to hear appeals from final judgments of trial courts [under MCL 600.308], whether the appeal be one to which a defendant is absolutely entitled or one in which a defendant must apply for leave to appeal, the Court of Appeals has jurisdiction to hear appeals involving a review of a defendant's sentence. We find no sound reason for interpreting the applicable constitutional and statutory provisions as carving out an exception to the right of appeal regarding sentencing matters. None of those relevant provisions limit the particular issues subject to appellate review. We therefore conclude that the foregoing constitutional and statutory authority vest appellate courts with the jurisdiction to review all sentencing issues. [*Coles*, 417 Mich at 535 (emphasis added).]

*Coles* further held that appellate review of sentencing discretion did not offend separation

of powers principles. *Id.* at 538-540.

Coles grounded its holding both in public policy and the Court's general powers

under Const 1963, art 6, § 4. See *Coles*, 417 Mich at 542. *Coles* recognized that a

"[d]efendant's due process right to be sentenced to an ascertainable term of punishment

within statutory limits which do not constitute cruel or unusual punishment" and "a

defendant's procedural due process right to be sentenced on the basis of legally valid

considerations," had both been closely guarded by the judiciary. *Id.* But for reasons that

are not clear from the face of the *Coles* decision, the Court went on to state:

---

[7] "[*T*]*he supreme court shall have* general superintending control over all courts; power to issue, hear and determine prerogative and remedial writs; *and appellate jurisdiction as provided by rules of the supreme court.*" Const 1963, art 6, § 4 (emphasis added).

11

We do not agree that the constitutionally guaranteed right of appeal mandates review of the trial court's exercise of discretion in sentencing in order to comport with due process of law. The expansion of the scope of appellate review of sentencing is a matter of public policy within this Court's power to adopt; it is not constitutionally required. [*Id*.]

Nothing in *Coles* suggests that this statement was necessary to resolution of the legal dispute at hand, considering the *Coles* Court's earlier conclusion that its general power of review granted it authority to review the exercise of sentencing discretion. Stated differently, it was not necessary for *Coles* to decide whether due process or the state constitutional right to appeal *also* required appellate courts to review a trial court's exercise of sentencing discretion. "[S]tatements concerning a principle of law not essential to determination of the case are obiter dictum and lack the force of an adjudication[.]" *Roberts v Auto-Owners Ins Co*, 422 Mich 594, 597-598; 374 NW2d 905 (1985).

*Coles* contained limited analysis as to why a convicted individual's state constitutional right to appeal under Const 1963, art 1, § 20—a unique personal right that has no federal constitutional counterpart—does not constitutionally mandate appellate review of a trial court's exercise of sentencing discretion. In fact, *Coles* seemed to erroneously relegate the independent state constitutional right to appeal to a subset of general procedural due process rights.[8] *Coles* did make clear, however, that it "intend[ed] this step toward greater review of sentencing to be a starting point. The scope of review may subsequently evolve, by means of case law or statutory enactment, into something more definite or even different from that which we announce today." *Coles*, 417 Mich at 549. Significantly, when *Coles* was decided, neither Michigan's now defunct judicial

[8] An individual's state constitutional right to due process of law is provided by Const 1963, art 1, § 17, and not Const 1963, art 1, § 20.

12

sentencing guidelines nor the previously mandatory (but now advisory) sentencing guidelines had been implemented. In other words, *Coles* was not a case challenging sentences under the sentencing guidelines because they did not yet exist. Given the foregoing, I do not believe *Coles* in any way binds this Court as to whether MCL 769.34(10) violates a defendant's constitutional right to appeal under Const 1963, art 1, § 20.

Even if we treat *Coles*'s statement—that appellate review of sentences is not rooted in due process—as binding precedent (as opposed to dicta), the state constitutional right to appeal is independent from any due process rights implicated in a criminal prosecution. Thus, the most *Coles* can logically stand for is that the lack of an ability to seek appellate review of the exercise of sentencing discretion does not offend constitutionally guaranteed due process requirements. But it still offends the clear language of Michigan's Constitution. If a judgment of sentence is just as much a part of the final judgment in a criminal case as the conviction itself, *Coles*, 417 Mich at 535, then I see no avenue for denying a constitutional right to appeal that sentence under Const 1963, art 1, § 20.

## C. THE RIGHT TO SEEK APPELLATE REVIEW FOLLOWING A CRIMINAL PROSECUTION

I am convinced that a more thorough review of the state constitutional right to appeal in criminal prosecutions and subsequent developments in this Court's jurisprudence compel us to step through the door that *Coles* left open. To begin, Const 1963, art 1, § 20, as amended in 1994, provides that "[i]n every criminal prosecution, the accused shall have the *right . . . to have an appeal as a matter of right, except as provided by law an appeal by an accused who pleads guilty or nolo contender shall be by leave of the court . . . .*"

13

Prior to the 1994 amendment, Const 1963, art 1, § 20 provided an appeal as a matter of right to every accused in every criminal prosecution, regardless of whether they entered a plea.

At the 1961–1962 Constitutional Convention, the official committee comment concerning the addition of the right to appeal following criminal prosecutions provided as follows:

> The guarantee of a categorical right of appeal in criminal cases the committee believes to be consistent with the recent trend of opinion in the federal courts and, in any event, to be sound and fair procedural practice. As one of the members of the committee said, "It is not merely the consequence or inconsequence of the punishment which may be imposed upon a defendant upon conviction; there is also the fact that a conviction for any offense, no matter how trivial it may be, nowadays constitutes a blot upon an individual's record which may be of subsequent significance with respect to employment, government service, or merely a person's standing and reputation in the community at large." We desire to grant the status of a categorical constitutional right to at least one appeal in a criminal case. We do not intend to restrict the legislature in its power to provide by law for additional appeals. [1 Official Record, Constitutional Convention 1961, p 469.]

There was debate at the convention about whether this right should be enshrined in the state Constitution, with some delegates raising concerns about the burden such a right would place on the taxpayers and court dockets. But this debate did not contemplate excluding from this right of appeal the review of a sentence imposed following a conviction. See 1 Official Record, Constitutional Convention 1961, pp 564-568.

As originally ratified by the electorate of Michigan, this new personal right to appeal in criminal prosecutions—a right that did not exist under the 1908 Michigan Constitution[9]

---

[9] See Const 1908, art 2, § 19 ("*In every criminal prosecution, the accused shall have the right to* a speedy and public trial by an impartial jury, which may consist of less than 12 men in all courts not of record; to be informed of the nature of the accusation; to be

and that lacks a counterpart in the United States Constitution—applied equally to those convicted following a trial and those who entered a plea. Then, in 1994, the electorate approved Proposal B—a legislatively proposed constitutional amendment to limit those who enter a plea in a criminal matter to an appeal by leave of the court—enshrining the current text of Const 1963, art 1, § 20. Wholly absent from the history of the right to appeal in criminal prosecutions provided in Const 1963, art 1, § 20 is discussion extracting from this constitutional right the ability to seek appellate review of a sentence imposed following a criminal conviction.

Considering this history, it is surprising that the Legislature has claimed the authority to make exceptions to the substance of this constitutional right to appeal. Even before the sentencing guidelines were enacted, *Coles* recognized that "[t]he judicial power to exercise discretion in the imposition of sentences is thus an integral part of the legislative scheme of indeterminate sentencing, and it will always remain that unless removed or curtailed by the Legislature." *Coles*, 417 Mich at 539. Stated differently, so long as the Legislature chooses to provide for a legislative system of indeterminate sentencing that is to be administered at the discretion of the judiciary, the judiciary will have a critical role to play both in imposing those sentences at the trial court level and ensuring that trial courts do not abuse the discretionary authority that the Legislature has delegated.

As Justice BOLDEN points out, the Court of Appeals has already struggled with the constitutional problems that arise from reading MCL 769.34(10) literally. On its face, the

confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor; to have the assistance of counsel for his defense; and in courts of record, *when the trial court shall so order; to have such reasonable assistance as may be necessary to perfect and prosecute an appeal.*") (emphasis added).

15

statute would not permit an appellate court to review and vacate a defendant's sentence on the basis that the sentence violates the Michigan or United States Constitution. As the Court of Appeals recognized in this case, "MCL 769.34(10) does not and cannot preclude *constitutional* appellate challenges to a sentence . . . ." *People v Posey*, 334 Mich App 338, 357; 964 NW2d 862 (2020). This is not a surprising statement of law, and it is one that the Court of Appeals made long before the decision in *Lockridge* rendered the legislative sentencing guidelines advisory for trial courts. See *People v Powell*, 278 Mich App 318, 323; 750 NW2d 607 (2008) (holding that MCL 769.34(10) did not preclude the Court from considering the defendant's argument that his within-guidelines sentence was cruel and unusual punishment under the federal and state Constitutions); *People v Conley*, 270 Mich App 301, 314-317; 715 NW2d 377 (2006) (holding that MCL 769.34(10) did not preclude granting relief on the defendant's argument that his Fifth Amendment rights were violated when the sentencing court based the within-guidelines sentence, in part, on defendant's refusal to admit guilt).

It is well established that the Legislature has no authority to take away a right that the Constitution explicitly provides to the People. See, e.g., *Silver Creek Drain Dist v Extrusions Div, Inc*, 468 Mich 367, 374; 663 NW2d 436 (2003) ("[N]o act of the Legislature can take away what the Constitution has given."); *Sharp v Lansing*, 464 Mich 792, 810; 629 NW2d 873 (2001) ("[I]t is axiomatic that the Legislature cannot grant a license to state and local governmental actors to violate the Michigan Constitution. In other words, the Legislature cannot so 'trump' the Michigan Constitution.").[10]

---

[10] This Court has previously held that the first sentence of MCL 769.34(10) does not violate separation of powers principles. *Garza*, 469 Mich at 432-435. But the defendant in *Garza* did not argue that MCL 769.34(10) violated his right to appeal under Const 1963, art 1,

## D.  THE LEGISLATURE CANNOT ELIMINATE A CONSTITUTIONALLY PROVIDED RIGHT TO APPEAL

More recent precedent from this Court hammers home the point that the right to judicial review cannot be eliminated by statute.  In *Midland Cogeneration Venture Ltd Partnership v Naftaly*, 489 Mich 83; 803 NW2d 674 (2011), this Court considered whether a statutory provision—MCL 211.34c(6)—that precluded judicial review of quasi-judicial state tax commission decisions affecting private rights and provided that such decisions were final and binding was unconstitutional.[11]  The Court held that it was.  *Naftaly*, 489 Mich at 94-95.  In doing so, the Court focused on Const 1963, art 6, § 28, which provides that a final quasi-judicial decision that affects private rights "shall be subject to direct review by the courts *as provided by law*."  (Emphasis added.)  The state Constitution explicitly provided for a right to judicial review—i.e., an appeal—*as provided by law*. *Naftaly* rejected an argument that the "as provided by law" language in Const 1963, art 6,

---

§ 20, nor did this Court render such a holding or even mention that constitutional provision. Then, in *Midland Cogeneration Venture Ltd Partnership v Naftaly*, 489 Mich 83; 803 NW2d 674 (2011), this Court clarified the scope of the Legislature's authority to regulate or limit a constitutionally provided right to appeal.

[11] MCL 211.34c(6) has not been amended since *Naftaly* was decided, and it states:

> An owner of any assessable property who disputes the classification of that parcel shall notify the assessor and may protest the assigned classification to the March board of review.  An owner or assessor may appeal the decision of the March board of review by filing a petition with the state tax commission not later than June 30 in that tax year.  The state tax commission shall arbitrate the petition based on the written petition and the written recommendations of the assessor and the state tax commission staff. *An appeal may not be taken from the decision of the state tax commission regarding classification complaint petitions and the state tax commission's determination is final and binding for the year of the petition*.  [Emphasis added.]

17

§ 28 authorized the Legislature to limit the constitutionally set jurisdiction of the circuit court, to completely remove the right to appeal a final agency decision, or otherwise conflict with the constitutional parameters of the right to appeal. *Naftaly*, 489 Mich at 94-96. Rather, *Naftaly* held that the "as provided by law" language merely allowed the Legislature to dictate the "mechanics" of the agency appeal at issue, such as how, when, and what type of appeal (i.e., by right or by leave) is permitted, as well as whether a stay pending appeal could be obtained and what the controlling standard of review would be. *Id*. at 94. The Court held that MCL 211.34c(6) operated as "a complete prohibition of court review of [state tax commission] classification decisions. There is a significant difference between dictating the mechanics of an appeal and preventing an appeal altogether." *Id*. Moreover, "[t]he Legislature may not eradicate a constitutional guarantee in reliance on the language 'as provided by law.' " *Id*. *Naftaly* thus provides the following rule: If the state Constitution provides a right to appeal the state's legal decision *as provided by law*, the Legislature does not have authority to enact a statute stating that the decision is final and cannot be appealed.

While *Naftaly* was a civil case involving the constitutional right to appeal quasi-judicial administrative decisions, the logic of that decision applies analogously to the issue here. This Court has previously concluded that "a sentence following a conviction is as much a part of the final judgment of the trial court as is the conviction itself." *Coles*, 417 Mich at 535. The authority of appellate courts to hear appeals from a criminal conviction is partially set by statute, but the right of a convicted individual to appeal is mandated by Const 1963, art 1, § 20.

18

Moreover, while Const 1963, art 1, § 20 does use the "as provided by law" language to grant the Legislature the authority to limit the substance of what an individual convicted of a crime may appeal, this limitation is attached only to the 1994 amendments to the Constitution related to the right of an individual "who pleads guilty or nolo contendere" to seek "leave of the court" to appeal. There is no similar qualifying language for individuals convicted by a jury following a trial, which indicates that the Legislature has very limited authority to regulate that right by statute. Under the reasoning in *Naftaly*, the qualifying language as applied to those who plead guilty or *nolo contendere* merely allows the Legislature to regulate the mechanics of seeking leave to appeal. Regulating the mechanics of a constitutional right to appeal does not include eliminating the right or a core substantive aspect of that right.

Although *Coles* stated that the initial recognition of the right to appeal a trial court's exercise of sentencing discretion was not required by Const 1963, art 1, § 20 "in order to comport with due process of law," as I previously noted, that statement was unnecessary dictum given the Court's stated justifications for recognizing a right to appellate review of sentences. *Coles*, 417 Mich at 542; see *Roberts*, 422 Mich at 597-598. *Coles* also explicitly stated that "[t]he scope of review may subsequently evolve, by means of case law or statutory enactment, into something more definite or even different from that which we announce today." *Coles*, 417 Mich at 549.

Just as the Court took a step in *Coles* that was explicitly rejected in *Burton* without overruling its prior decision, I would do the same here. The Court's reasoning in *Naftaly* compels the conclusion that there are substantial constitutional limitations on how the Legislature may constrain a convicted individual's constitutionally mandated appellate

19

rights in all criminal prosecutions. If applied as written, MCL 769.34(10) effectively eliminates the constitutional right to appeal any substantive legal issues concerning a judgment of sentence that are not enumerated in the statute by requiring the appellate court to affirm the sentence. The practical effect of this limitation is nearly identical to the statute at issue in *Naftaly*—the contested decision is final and may not be contested on appeal. This goes beyond regulating the mechanics of the appeal or setting a standard of review, and thus the statute violates Const 1963, art 1, § 20. The Legislature does not have authority to eliminate an individual right granted by the state Constitution.

Just as the Legislature does not have authority to preclude a defendant from arguing that their within-guidelines sentence is unconstitutional, see *Powell*, 278 Mich App at 323; *Conley*, 270 Mich App at 314-317, the Legislature does not have authority to preclude appellate review of a sentencing court's exercise of discretion in setting the minimum term of imprisonment under its chosen indeterminate sentencing scheme.[12] Stated differently,

---

[12] Chief Justice CLEMENT cites *State v Delbosque*, 195 Wash 2d 106, 125; 456 P3d 806 (2020) (en banc), and *State v Ammons*, 105 Wash 2d 175, 182-183, 713 P2d 719 (1986) (en banc), to support her assertion that the Legislature can effectively eliminate appellate review of a trial court's in-guidelines sentences without violating a defendant's state constitutional right to appeal. *Delbosque* did not concern whether within-guidelines sentences are appealable and in fact held that RCW 10.95.035(3) (concerning appeals from the resentencing of defendants who were juveniles sentenced to life without parole prior to June 1, 2014), as amended by 2015 c 134 § 7, violated article I, § 22 of the Washington Constitution. *Delbosque*, 195 Wash 2d at 125, 130. But *Delbosque* also cited *Ammons*, 105 Wash 2d at 182-183, in which the Washington Supreme Court had previously held that the prohibition on appealing a within-guidelines sentence contained in RCW 9.94A.210(1), as amended by 1984 c 209 § 13, did not violate the state's constitutional right to appeal following a criminal conviction because by "establishing presumptive sentence ranges," the state legislature had "structured the trial court's discretion" and thus there could not be an "abuse of discretion" that could be subject to appellate review. Michigan appellate courts review criminal sentences under the principle of proportionality, which is a modified version of the normal abuse of discretion standard, and there does not appear to be a similar

20

while the Legislature may lawfully mandate a specific standard of review that appellate courts must apply when reviewing the exercise of sentencing discretion and impose general procedural rules under Const 1963, art 4, § 45, the Legislature cannot wholly eliminate a core aspect of a convicted individual's constitutional appellate rights in "every criminal prosecution," Const 1963, art 1, § 20.

## III. REMEDY—AN APPELLATE PRESUMPTION OF PROPORTIONALITY

Given my conclusion that MCL 769.34(10) violates Const 1963, art 1, § 20, the next question concerns the remedy. I agree with the lead opinion's decision to adopt an appellate presumption of proportionality for review of within-guidelines sentences that can be rebutted by a defendant. I also agree with looking to *Rita*, 551 US 338, for guidance given that Michigan's legislative sentencing guidelines were modeled after the federal guidelines.

As this Court did in both *Naftaly*, 489 Mich at 95-97, and *Lockridge*, 498 Mich at 389-392, the Court must determine whether MCL 769.34(10) is entirely unconstitutional or whether portions of the statute can be severed. MCL 8.5 provides the following guidance:

---

standard under Washington's common or statutory law. See *Steanhouse*, 500 Mich at 459; *Milbourn*, 435 Mich at 661 ("Conceivably, even a sentence within the [judicial] sentencing guidelines could be an abuse of discretion in unusual circumstances."). Third, for the reasons previously explained, I disagree with *Ammons* that a complete bar to appellate review of a within-guidelines sentence, as opposed to merely setting the standard of review, does not infringe the constitutional right to appeal. The Washington Supreme Court also noted that RCW 9.94A.210(1) is not absolute because, "even where a statute appears to broadly prohibit any direct appeal, certain appeals must be allowed pursuant to article I, section 22" of the Washington Constitution. *Delbosque*, 195 Wash 2d at 126, citing *State v Williams*, 149 Wash 2d 143, 146-147; 65 P3d 1214 (2003).

If any portion of an act or the application thereof to any person or circumstances shall be found to be invalid by a court, such invalidity shall not affect the remaining portions or applications of the act which can be given effect without the invalid portion or application, provided such remaining portions are not determined by the court to be inoperable, and to this end acts are declared to be severable.

The statute at issue in this case provides as follows:

*If a minimum sentence is within the appropriate guidelines sentence range, the court of appeals shall affirm that sentence and shall not remand for resentencing absent an error in scoring the sentencing guidelines or inaccurate information relied upon in determining the defendant's sentence.* A party shall not raise on appeal an issue challenging the scoring of the sentencing guidelines or challenging the accuracy of information relied upon in determining a sentence that is within the appropriate guidelines sentence range unless the party has raised the issue at sentencing, in a proper motion for resentencing, or in a proper motion to remand filed in the court of appeals. [MCL 769.34(10).]

The second sentence of MCL 769.34(10) is not constitutionally infirm. At most, it regulates the mechanism of seeking to appeal aspects of a sentencing decision by requiring that certain challenges be raised at sentencing before being raised on appeal. The first sentence of MCL 769.34(10) is unconstitutional to the extent it forbids appellate courts from considering a defendant's constitutional or proportionality challenges to their judgment of sentence. However, given the Legislature's constitutional authority to craft Michigan's indeterminate sentencing scheme, as in *Lockridge*, we have an obligation to preserve as much as possible the intent of the Legislature.

Despite its constitutional flaws, MCL 769.34(10) is a clear statement of legislative intent that within-guidelines sentences should rarely be disturbed. The Court recognized as much in *Garza*, even though it was operating under the erroneous assumption that statutory sentencing guidelines were entirely constitutional. It would be inconsistent with

22

the intent of the Legislature to give no weight to the imposition of a within-guidelines sentence. A rebuttable appellate presumption of proportionality is a remedy that recognizes the Legislature's intent while also being consistent with this Court's holdings in *Lockridge* and *Steanhouse* that the guidelines remain highly relevant and must be scored and consulted when crafting a sentence. Accordingly, I join Part II(B)(4) of the lead opinion and agree with the remedy of severing the first sentence of MCL 769.34(10) to the extent that it renders within-guidelines sentences unreviewable and to impose an appellate presumption of proportionality for such sentences that a defendant may attempt to rebut on appeal.

## IV. CONCLUSION

Although I do not agree with the lead opinion's conclusion that MCL 769.34(10) was necessarily struck down by *Lockridge* and *Steanhouse*, I am compelled by the changes wrought by those decisions and the reasoning in *Naftaly* to conclude that the first sentence of the statute violates the right to appeal provided by Const 1963, art 1, § 20. I also agree with the remedy of rendering the statute advisory in part and adopting an appellate presumption of proportionality for review of within-guidelines sentences that can be rebutted by a defendant. For these reasons, I concur in the judgment of the Court.

Elizabeth M. Welch

23

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                    No. 162373

DAMETRIUS BENJAMIN POSEY,

      Defendant-Appellant.

_____

CLEMENT, C.J. (*concurring in part and dissenting in part*).

I respectfully dissent. Although I agree that defendant is not entitled to relief for his due-process argument regarding the identification procedure, I believe that the majority's decision today unduly expands our due-process jurisprudence regarding identification procedures from cases involving suggestive pretrial identification procedures to first-time-in-court identifications without precedential support or sufficient justification otherwise. I also disagree that this Court's decision rendering our sentencing guidelines advisory in *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015), is incompatible with the requirement in MCL 769.34(10) that appellate courts affirm within-guidelines sentences. Because I believe that the Court of Appeals opinion below correctly resolved both issues, I would have affirmed in full.

## I. DUE PROCESS AND FIRST-TIME-IN-COURT IDENTIFICATIONS

In the present case, a witness who previously failed to identify defendant in a pretrial photographic array identified defendant for the first time during his trial testimony. The

majority holds that this identification violated defendant's due-process rights. But the precedent relied on by the majority to come to this conclusion is conditioned on the existence of a suggestive pretrial identification, which did not occur in this case. Further, first-time-in-court identifications are subject to the myriad constitutional and statutory protections available to a defendant at trial, and these safeguards prevent the admission of such an identification from rising to the level of a due-process violation absent unusual circumstances.

## A.  FACTUAL BACKGROUND

I do not dispute the facts as laid forth by the lead opinion but reiterate here the pertinent factual background of the identification at issue.

Defendant's convictions arise from an October 2017 shooting outside the Super X Market in Detroit. Victims Terrence Byrd and Dwayne Scott, who had been hanging out in the market's parking lot, were approached by two assailants brandishing firearms. Byrd drew his (lawfully carried, concealed) firearm, and an exchange of gunfire occurred. Scott and the two assailants were shot.

The police investigation quickly focused on defendant and Sanchez Quinn as the suspected assailants when the two were discovered being treated for gunshot wounds at local area hospitals. Quinn initially denied being at the scene, but then admitted to having been present. Defendant provided a false name and claimed that he had been shot by two men at a location on the other side of town.

The police separately presented Byrd and Scott with two photographic arrays within two days of the shooting. Byrd chose one individual from each array and identified them

2

as the assailants. Neither of the chosen individuals was defendant or Quinn, and law enforcement informed Byrd of this fact. Scott identified defendant from the photographic arrays.

Defendant was eventually charged with two counts of assault with intent to commit murder, two counts of assault with intent to do great bodily harm less than murder, carrying a concealed weapon, arming oneself with a weapon with unlawful intent, being a felon in possession of a firearm, and six counts of possession of a firearm during the commission of a felony. At trial, Byrd—who had failed to identify defendant in the photographic arrays—identified defendant as one of the shooters, but Scott—who had identified defendant in the photographic arrays—did not identify defendant as one of the shooters. On cross-examination and in closing arguments, defense counsel emphasized Byrd's failure to identify defendant shortly after the shooting in the photographic arrays and argued that Byrd's in-court identification was based only on media coverage and the charges against defendant rather than any true memory of defendant at the scene. Ultimately, the jury found defendant guilty as charged.

Defendant now argues that Byrd's in-court identification of defendant violated his due-process rights such that he is entitled to a new trial.

B. LEGAL BACKGROUND

Both the United States and Michigan Constitutions provide that no person will be deprived of life, liberty, or property, without the due process of law. US Const, Am XIV; Const 1963, art 1, § 17. The admission of certain types of evidence at trial can violate due process, but only where the introduction of such evidence "is so extremely unfair that its

3

admission violates fundamental conceptions of justice." *Dowling v United States*, 493 US 342, 352; 110 S Ct 668; 107 L Ed 2d 708 (1990) (quotation marks and citation omitted). This due-process limitation on the admission of evidence is "very narrowly" interpreted, in part to prevent the constitutional protections from being arbitrarily defined by any one judge's or court's idea of fairness. *Id*. at 352-353. Evidence that does not rise to this level of extreme unfairness is otherwise regulated by state and federal rules regarding the admissibility of evidence and through constitutional safeguards such as the right to counsel, compulsory process, confrontation of witnesses, and cross-examination of witnesses, which "afford[] the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." *Perry v New Hampshire*, 565 US 228, 237; 132 S Ct 716; 181 L Ed 2d 694 (2012).

The United States Supreme Court has recognized that the admission of a witness's identification of a defendant can rise to this extraordinary level of a due-process violation when the circumstances of the identification were so suggestive that they led to a substantial likelihood of misidentification. *Neil v Biggers*, 409 US 188, 196, 201; 93 S Ct 375; 34 L Ed 2d 401 (1972); *People v Kurylczyk*, 443 Mich 289, 302; 505 NW2d 528 (1993). Such suggestive identification procedures can include photographic arrays or lineups where one person is singled out in some way or where only a single suspect is shown to the witness. *People v Gray*, 457 Mich 107, 111; 577 NW2d 92 (1998). See also *Foster v California*, 394 US 440, 442-443; 89 S Ct 1127; 22 L Ed 2d 402 (1969) (finding an identification procedure impermissibly suggestive where the defendant was taller than the other two participants in an initial lineup and was the only individual wearing similar clothing to the perpetrator, a second lineup was conducted where the defendant was the

4

only person who participated in both lineups, and the police arranged an eventual one-on-one showup between the defendant and the witness). These identification procedures lead to a substantial likelihood of misidentification because their "suggestive elements . . . [make] it all but inevitable" that the witness will identify the defendant. *Id*. at 443. Further, these identifications are largely insulated from later challenge, because "there is serious difficulty in depicting what transpires at lineups and other forms of identification confrontations" later at trial. *United States v Wade*, 388 US 218, 230; 87 S Ct 1926; 18 L Ed 2d 1149 (1967). This often leaves defense counsel unable to effectively challenge the identification procedure at trial, so "the jury's choice is between the accused's unsupported version and that of the police officers present." *Id*. at 231.

Nonetheless, if the totality of the circumstances surrounding the identification demonstrates that it "was reliable even though the confrontation procedure was suggestive," the identification may still be admitted. *Id*. at 199. Among the circumstances to be considered are (1) "the opportunity of the witness to view the criminal at the time of the crime"; (2) "the witness' degree of attention"; (3) "the accuracy of the witness' prior description of the criminal"; (4) "the level of certainty demonstrated by the witness at the confrontation"; and (5) "the length of time between the crime and the confrontation." *Biggers*, 409 US at 199-200.

When a pretrial identification is excluded under *Biggers*, a question may remain whether the witness may nonetheless be allowed to identify the defendant at trial. This Court has previously recognized that an identification derived from a suggestive pretrial procedure "may unduly influence any subsequent identification" because the witness is unlikely to change that selection once made. *People v Carter*, 415 Mich 558, 598; 330

NW2d 314 (1982), overruled on other grounds *People v Sturgis*, 427 Mich 392, 410 n 6 (1986). See also *Wade*, 388 US at 229 ("[I]t is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial.") (quotation marks and citation omitted). Given the influence of a suggestive pretrial identification procedure, a subsequent in-court identification by the same witness is only permissible if the prosecution can prove that a basis for the in-court identification exists that is untainted by the suggestive pretrial identification procedure. *Kurylczyk*, 443 Mich at 303. To determine whether such an independent basis exists, the court should consider: (1) the witness's "[p]rior relationship with or knowledge of the defendant"; (2) the witness's "opportunity to observe the offense"; (3) the "[l]ength of time between the offense and the disputed identification"; (4) any discrepancies between the witness's "pre-lineup or show-up description and defendant's actual description"; (5) "[a]ny previous proper identification or failure to identify the defendant" by that witness; (6) "[a]ny identification prior to lineup or showup of another person as defendant" by that witness; (7) "the nature of the alleged offense and the physical and psychological state of the victim"; and (8) "[a]ny idiosyncratic or special features of defendant." *People v Kachar*, 400 Mich 78, 95-96; 252 NW2d 807 (1977).

Particularly relevant to the present case is the United States Supreme Court's decision in *Perry*, in which the Court considered whether the above-described framework applies to all identifications resulting from suggestive procedures or only those identifications whose suggestive procedures were arranged by law enforcement. *Perry*,

6

565 US at 231-232. In *Perry*, law enforcement responded to a complaint from an apartment-complex resident that a Black man was attempting to break into vehicles in the parking lot. *Id*. at 233. A responding officer discovered the defendant in the parking lot with two car-stereo amplifiers; the defendant claimed that he had found them in the parking lot. *Id*. As the defendant was being questioned at the scene by the first officer, a second officer went to the apartment of another resident, Nubia Blandon, who claimed to have seen someone breaking into her neighbor's car. *Id*. at 234. Blandon reported that she had seen "a tall, African-American man roaming the parking lot and looking into cars"; when asked for a more detailed description of the man, Blandon "pointed to her kitchen window and said the person she saw breaking into [her neighbor's] car was standing in the parking lot, next to the police officer." *Id*. Blandon was unable to identify the defendant in a photographic array arranged one month later. *Id*.

Before trial, the defendant moved to suppress Blandon's identification from the evening of the defendant's arrest, arguing that under *Biggers* the identification procedure— effectively a one-person showup—was so suggestive that it led to a substantial likelihood of misidentification and that the totality of the circumstances did not otherwise render the identification sufficiently reliable to be admissible. *Id*. at 234-235. The state court rejected the defendant's motion, reasoning that the *Biggers* framework applied only where law enforcement created the unnecessarily suggestive identification procedure. *Id*. at 235. Because law enforcement had not manufactured the showup at issue, the state court concluded that the admission of the identification did not violate due process.

On appeal, the United States Supreme Court agreed, holding that due-process concerns arise only when the suggestive identification procedure is manufactured by law

7

enforcement. *Id*. at 232-233. In reviewing *Biggers* and its progeny, the Court concluded that each case involved improper police arrangement of the identification procedure. *Id*. at 241-242. See also, e.g., *Wade*, 388 US at 228 (referring to the confrontation "compelled by the State"); *Manson v Brathwaite*, 432 US 98, 112; 97 S Ct 2243; 53 L Ed 2d 140 (1977) (reasoning that a primary aim of the *Biggers* framework is to deter police from using unnecessarily suggestive procedures "for fear that their actions will lead to the exclusion of identifications as unreliable"). The Court further reasoned that applying the *Biggers* framework to suggestive identifications outside those arranged by law enforcement "would open the door to judicial preview, under the banner of due process, of most, if not all, eyewitness identifications." *Perry*, 565 US at 243. Such a broad application would be inconsistent with the Court's earlier rulings that "the potential unreliability of a type of evidence does not alone render its introduction at the defendant's trial fundamentally unfair" because it is "the jury, not the judge, [who] traditionally determines the reliability of evidence" and existing safeguards protect and bolster the jury's ability to make that reliability determination wisely. *Id*. at 245. These safeguards include the ability to cross-examine witnesses to expose the fallibility of their testimony as well as jury instructions or the introduction of expert testimony generally explaining the inherent weaknesses of eyewitness testimony. *Id*. at 245-246. Accordingly, the Court found no reason to expand the *Biggers* framework beyond its traditional application to suggestive identification procedures arranged by law enforcement. *Id*. at 248. And because the suggestive identification in *Perry* occurred by happenstance rather than at the direction of law enforcement, the Court concluded that the trial court had properly allowed the admission of Blandon's identification of the defendant. *Id*.

8

## C. APPLICATION

Today, the lead opinion assumes that Byrd's first-time-in-court identification of defendant as one of his assailants constituted plain error but holds that defendant is not entitled to relief because he has not proved that the error was prejudicial.[1] While I agree that defendant is not entitled to relief, I disagree that plain error occurred.

To reach the assumption that plain error occurred, the lead opinion has expanded the *Biggers* framework to apply to first-time-in-court identifications[2] without any precedential support.[3] Although *Biggers* refers generally to "suggestive identification procedures," *Biggers* and its progeny all involve the admission of suggestive *pretrial* identifications—or in-court identifications following suggestive *pretrial* identifications. See, e.g., *Biggers*, 409 US at 196-198; *Brathwaite*, 432 US at 101; *Wade*, 388 US at 220;

---

[1] Because defendant did not object to the admission of Byrd's identification below, his argument was not preserved and must be reviewed for plain error. *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999). To succeed under the plain-error standard, a defendant must prove that error occurred, that the error was plain, and that the plain error affected the defendant's substantial rights. *Id*. at 763. Further, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763 (quotation marks, citation, and brackets omitted).

[2] Although Justices CAVANAGH and WELCH do not join the lead opinion in assuming that plain error occurred, they do join the lead opinion in its formulation and promulgation of its new rule, forming a majority.

[3] Given that the in-court identification at issue here followed a pretrial lineup where another person was identified as the assailant, there is little reason to think that the holding of the Court will be limited to "first time" identifications. For example, it seems that the same suggestibility and unfairness allegedly inherent in an in-court identification would also be present when a testifying witness has conflicting pretrial identifications (i.e., identified a third party at one pretrial procedure, but then identified the defendant at another).

9

*Perry*, 565 US 234-235; *Kurylczyk*, 443 Mich at 303-304; *Kachar*, 400 Mich at 85-86.

Here, the challenged identification is the in-court identification by Byrd, not the pretrial

photographic arrays. Further, in *Perry*, the United States Supreme Court affirmed that the

*Biggers* framework applies only where law enforcement arranged for the suggestive

pretrial identification. *Perry*, 565 US at 232-233. Here, the police did not arrange the

challenged identification. The majority argues that *Biggers* should apply nonetheless by

attempting to limit this rule from *Perry* to only pretrial identifications, but the majority fails

to recognize that the precedent it applies exclusively involves suggestive pretrial

identifications, like *Perry*. If *Perry* is meaningfully distinguishable because it applies to

pretrial identifications alone, so is all the caselaw on which the majority relies.[4]

In support of applying the *Biggers* framework to the first-time-in-court

identification offered by Byrd, the majority summarily quotes *Brathwaite* for the

proposition that "reliability is the linchpin in determining the admissibility of identification

testimony . . . ." *Braithwaite*, 432 US at 114. But the majority here makes the same

mistake that the defendant in *Perry* made: it has "removed [the Court's] statement in

---

[4] And indeed, as Justice ZAHRA's dissent demonstrates, most courts after *Perry* have concluded that first-time-in-court identifications do not trigger due-process concerns. See, e.g., *United States v Whatley*, 719 F3d 1206, 1216 (CA 5, 2013) ("Perry makes clear that, for those defendants who are not identified under suggestive circumstances not arranged by police, the requirements of due process are satisfied in the ordinary protections of trial."); *State v Doolin*, 942 NW2d 500, 511 (Iowa, 2020) ("Most courts adjudicating due process claims after *Perry* allow first-time, in-court identifications.") (collecting cases). *Doolin* explained that where there is no impermissible pretrial identification, " 'and where nothing beyond the inherent suggestiveness of the ordinary courtroom setting made the in-court identification itself constitutionally suspect, due process does not require the trial court to assess the identification for reliability under *Biggers*.' " *Id*. at 512, quoting *Garner v People*, 436 P3d 1107, 1120; 2019 CO 19 (Colo, 2019) (en banc).

10

*Brathwaite* from its mooring, and thereby attributes to the statement a meaning a fair reading of [the] opinion does not bear." *Perry*, 565 US at 241. As emphasized in *Perry*, "the *Brathwaite* Court's reference to reliability appears in a portion of the opinion concerning the appropriate remedy *when the police use an unnecessarily suggestive identification procedure*." *Id*. This statement does not support applying a reliability framework outside the context of a suggestive pretrial identification arranged by law enforcement.

To the extent that the majority opinion can be interpreted as an argument that *Biggers* should be broadened to first-time-in-court identifications because of their suggestive nature, the caselaw does not support such an expansion. "[T]he jury, not the judge, traditionally determines the reliability of evidence," *Perry*, 565 US at 245, and only that evidence whose admission "is so extremely unfair that its admission violates 'fundamental conceptions of justice,' " *Dowling*, 493 US at 352 (citation omitted), is subject to a judicial reliability assessment. The justification offered in categorizing suggestive pretrial identifications as this type of "extremely unfair" evidence is not applicable to first-time-in-court identifications. Pretrial lineups, photographic arrays, and showups often occur in secrecy, which causes "a gap in our knowledge as to what in fact goes on" at the identification, making it difficult for a defendant to "reconstruct the manner and mode" of the identification at trial in order to effectively challenge it. *Wade*, 388 US at 230 (quotation marks and citation omitted). Further, those present at the pretrial identification may not be "apt to be alert for conditions prejudicial to the suspect." *Id*.

But first-time-in-court identifications occur publicly, with both the defendant and counsel present. This means that the defendant is fully aware of the manner and mode in

11

which the witness was asked to identify the assailant and is alert for any prejudicial conditions. Defendants also have a constitutional right to confront and cross-examine identifying witnesses and to an effective attorney's assistance in doing so. *Perry*, 565 US at 245-246. In addition, defendants challenging a first-time-in-court identification need not testify themselves, as might be required when challenging a pretrial identification procedure. See *Wade*, 388 US at 230. And because the jury has witnessed the first-time identification and subsequent challenge to that identification, the jury has a more robust decision than a choice merely "between the accused's unsupported version [of the identification] and that of the police officers present." *Id*. Further, a defendant faced with a first-time-in-court identification may request jury instructions or present expert witness testimony explaining the weaknesses inherent in eyewitness identification. *Perry*, 565 US at 246-247. The defendant may also challenge the admissibility of the identification as incompatible with federal or state rules of evidence—for example, if the probative value of the identification is outweighed by its prejudicial effect or potential for misleading the jury. *Id*. at 247. Considering the protections available to a defendant at trial, the admission of a first-time-in-court identification does not violate our fundamental conceptions of justice such that a judicial reliability assessment is necessary before its admission. See *Dowling*, 493 US at 352. This conclusion is consistent with the conclusions of the federal appeals courts that have considered the issue. See, e.g., *Lee v Foster*, 750 F3d 687, 691 (CA 7, 2014) (noting that "a defendant's mere presence at the defense table is not enough to establish a violation of due process") (quotation marks and citation omitted); *United States v Davis*, 103 F3d 660, 670 (CA 8, 1996) (rejecting the defendant's argument that the in-court identification procedure was impermissibly suggestive under *Biggers*); *United*

12

*States v Domina*, 784 F2d 1361, 1369 (CA 9, 1986) ("There is no constitutional entitlement to an in-court line-up or other particular methods of lessening the suggestiveness of in-court identification, such as seating the defendant elsewhere in the room.").[5]

I dispute neither the potential fallibility of eyewitness evidence nor the importance that is often placed on eyewitness evidence by juries. See *Perry*, 565 US at 244-245. However, "the potential unreliability of a type of evidence does not alone render its introduction at the defendant's trial fundamentally unfair." *Id*. at 246. In the absence of the significant and irremediable unfairness in *pretrial* suggestive identifications, I do not believe that first-time-in-court identifications are the type of evidence whose admission is violative of our fundamental conceptions of justice such that it justifies thieving the reliability analysis from the jury.[6] Today, it appears that the majority has done what the

[5] To the extent that the majority asserts that its conclusion is supported by the decision of the United States Court of Appeals for the Sixth Circuit in *United States v Hill*, 967 F2d 226, 232 (CA 6, 1992) (wherein the Sixth Circuit held that the *Biggers* analysis should apply to first-time-in-court identifications), *Hill* was decided before the United States Supreme Court's decision in *Perry*. At least one other circuit that had decided consistently with *Hill* before *Perry* was decided has since recognized that those decisions were abrogated by *Perry*. See *Whatley*, 719 F3d at 1215. And, albeit not yet in a published decision, the Sixth Circuit itself has turned away from *Hill*. See, e.g., *United States v Hughes*, 562 F Appx 393, 398 (2014); *Howard v Warden*, 519 F Appx 360, 369 (2013).

[6] This conclusion is consistent with the Court of Appeals decision in *People v Barclay*, 208 Mich App 670, 675-676; 528 NW2d 842 (1995). There, the defendant challenged the first-time-in-court identification of the defendant where the witness had failed to identify the defendant at a pretrial lineup procedure. *Id*. at 676. The Court rejected the defendant's challenge, reasoning that without an argument that the pretrial lineup procedure was improper, "this was a credibility issue that was properly before the jury to determine." *Id*. at 676. The majority distinguishes *Barclay* on the same basis as it did *Perry*, i.e., that it only concerns pretrial identification procedures. This argument is subject to the same weakness as discussed above in that the reliability analysis itself also only applies to suggestive pretrial identification procedures.

United States Supreme Court has repeatedly cautioned against: it has substituted its own notions of fairness for those fundamental conceptions of justice and, in so doing, eroded the province of the jury. See *Dowling*, 493 US at 352-353. Because I believe that the reliability of Byrd's identification was properly submitted to the jury, I would have affirmed the Court of Appeals decision below that no error occurred. Even if I agreed with the majority's new rule, I would have found that the trial court did not plainly err by failing to apply a rule that did not exist at the time of trial, and so would have held that defendant still could not establish entitlement to relief.[7]

## II. CONSTITUTIONALITY OF MCL 769.34(10)

Although the lead opinion assumes that the admission of Byrd's identification was erroneous, the majority holds that defendant is not entitled to relief on that ground because he has not proven prejudice, and so the majority also addresses defendant's sentencing argument regarding the constitutionality of MCL 769.34(10). That provision states, in relevant part, that "[i]f a minimum sentence is within the appropriate guidelines sentence range, the court of appeals shall affirm that sentence and shall not remand for resentencing absent an error in scoring the sentencing guidelines or inaccurate information relied upon

---

The majority also notes that in *Perry*, the defendant "was put on notice of the possibility that the witness would likely identify the defendant at trial." *Ante* at 14 n 5. But defendant was presumably aware that Byrd would testify, MCL 767.40a, and the majority provides no support for the implication that any defendant has a constitutional right to know exactly what a witness will testify to at trial. Moreover, it is difficult to believe that defense counsel would not anticipate the possibility that an eyewitness is asked to identify their assailant at trial, no matter the failure to identify the assailant previously.

[7] I would also affirm the Court of Appeals holding that defense counsel was not ineffective because defense counsel is not required to raise a meritless argument. *People v Snider*, 239 Mich App 393, 425; 608 NW2d 502 (2000).

14

in determining the defendant's sentence."  Defendant asserts that this provision is incompatible with this Court's decision in *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015), wherein this Court rendered the sentencing guidelines advisory to cure a constitutional violation.  To assess defendant's challenge, it is necessary to understand the historical underpinnings and the federal counterpart of the *Lockridge* decision.

## A.  *LOCKRIDGE* AND THE MOVEMENT TO ADVISORY SENTENCING GUIDELINES

The Sixth Amendment of the United States Constitution provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation . . . .

See also Const 1963, art 1, § 20 ("In every criminal prosecution, the accused shall have the right to a speedy and public trial by an impartial jury . . . .").  Pursuant to the constitutional right to trial by jury, the elements of each charged offense must be found beyond a reasonable doubt by the trier of fact or admitted by the defendant.  See *Jones v United States*, 526 US 227, 232; 119 S Ct 1215; 143 L Ed 2d 311 (1999).  Historically, it was not always clear which findings should be considered elements of an offense that must satisfy those requirements and which findings should be considered merely sentencing factors that were not subject to these requirements.  See, e.g., *McMillan v Pennsylvania*, 477 US 79; 106 S Ct 2411; 91 L Ed 2d 67 (1986).  However, beginning with *Jones* and culminating in *Apprendi v New Jersey*, 530 US 466, 490; 120 S Ct 2348; 147 L Ed 2d 435 (2000), the United States Supreme Court clarified that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond

a reasonable doubt."  See also *Jones*, 526 US at 243 n 6 ("[A]ny fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.").  Later, in *Alleyne v United States*, 570 US 99, 103; 133 S Ct 2151; 186 L Ed 2d 314 (2013), the Supreme Court extended this ruling to findings that increase the mandatory minimum sentence for a crime, holding that "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt."

This interpretation of the right to jury trial, originally developed in the context of sentencing enhancement laws, had significant consequences for the federal—and later, this state's—sentencing guidelines scheme.  Both the federal and state sentencing guidelines schemes provided a sentencing range based on the trial court's assessment of offender and offense characteristics, and the trial courts were generally required to adhere to that range. See *Koon v United States*, 518 US 81, 92; 116 S Ct 2035; 135 L Ed 2d 392 (1996); *People v Hegwood*, 465 Mich 432, 438; 636 NW2d 127 (2001).  But in *United States v Booker*, 543 US 220, 227; 125 S Ct 738; 160 L Ed 2d 621 (2005), the United States Supreme Court held that this process ran afoul of the *Apprendi* rule.  When the trial court made additional factual findings about the defendant and the offense to calculate the mandatory sentencing guidelines range, it increased the defendant's sentence beyond what was authorized by the jury verdict alone.  *Id*. at 232-233.  In other words, the application of the sentencing guidelines caused a defendant's sentence to be based on facts not found beyond a reasonable doubt by the jury or admitted by the defendant, violating the defendant's Sixth Amendment rights.  See *id*.

As applied in *Booker*, the defendant was convicted of possessing at least 50 grams of crack cocaine based on the jury's determination that he possessed approximately 90 grams of crack cocaine, which authorized a sentence of 210 to 262 months' imprisonment under the guidelines. *Id*. at 235. But at sentencing, the judge found by a preponderance of the evidence that the defendant had possessed a substantial, additional amount of crack cocaine, which increased the defendant's sentencing guidelines range and ultimately resulted in a sentence of 360 months' imprisonment. *Id*. Accordingly, the defendant's sentence was increased on the basis of facts not found beyond a reasonable doubt by the jury or admitted by the defendant, in violation of *Apprendi* and the Sixth Amendment. *Id*.

In fashioning a remedy for the unconstitutional, mandatory application of the sentencing guidelines, the Court considered and rejected imposing a requirement that the jury make all factual findings relevant to the guidelines. It reasoned that such a requirement would fundamentally remake the manner by which jury trials are administered. Instead, the Court chose a more limited remedy of rendering the sentencing guidelines advisory. To do so, the Court severed and excised two statutory provisions:

> the provision that requires sentencing courts to impose a sentence within the applicable Guidelines range (in the absence of circumstances that justify a departure), see [18 USC 3553(b)(1)], and the provision that sets forth standards of review on appeal, including *de novo* review of departures from the applicable Guidelines range, see [18 US 3742(e)]. [*Id*. at 259.]

The Court reasoned that this remedy not only caused less disruption to the criminal justice system than the suggested alternative but was also most consistent with the sentencing guidelines' goal of increasing sentencing uniformity. *Id*. at 249-258, 264-265. Post-*Booker*, federal trial courts remain required to calculate and consult the sentencing

17

guidelines range, but they have the discretion to sentence outside the guidelines. *Id*. at 259. And on appellate review, sentences are reviewed for reasonableness. *Id*. at 264.

This Court reached a similar conclusion regarding Michigan's sentencing guidelines scheme in *Lockridge*. Because the sentencing guidelines caused a defendant's minimum sentence to increase on the basis of facts found by a preponderance of the evidence by the judge at sentencing and not beyond a reasonable doubt by a jury, this Court held that the scheme violated *Alleyne* and the Sixth Amendment. *Lockridge*, 498 Mich at 374, 387-389. Like the United States Supreme Court, this Court chose to render the sentencing guidelines advisory. *Id*. at 391 (agreeing to "*Booker*-ize the Michigan sentencing guidelines"). Specifically, this Court held that the mandatory "shall" language in MCL 769.34(2) directing trial courts to impose a minimum sentence within the guidelines range would be replaced with the permissive "may" and that "the requirement in MCL 769.34(3) that a trial court that departs from the applicable guidelines range must articulate a substantial and compelling reason for that departure" was excised.[8] *Id*. In a footnote summarizing this ruling, the Court also indicated that "[t]o the extent that any part of MCL 769.34 or another statute refers to use of the sentencing guidelines as mandatory or refers to departures from the guidelines, that part or statute is also severed or struck down as necessary." *Id*. at 365 n 1. However, as in the federal court, Michigan trial courts remain required to calculate the sentencing guidelines range and take them into consideration. *Id*.

---

[8] This language reflects the version of the provisions that was in effect at the time. See MCL 769.34(2) and (3), as amended by 2002 PA 666. Both provisions have since been amended. See 2020 PA 395.

18

at 392.  This Court also summarily adopted the "reasonableness" standard from *Booker* as the relevant standard of review for sentences.  *Id*.

## B.  CONSTITUTIONAL CHALLENGE TO MCL 769.34(10)

*Lockridge* fundamentally changed Michigan's sentencing jurisprudence.  Like most watershed cases, it was followed by a series of cases that sought to further refine its holdings and application.  See, e.g., *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017) (wherein this Court defined the "reasonableness" standard for appellate sentence review as "whether the trial court abused its discretion by violating 'the principle of proportionality' set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), 'which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender' "); *People v Barnes*, 502 Mich 265, 274; 917 NW2d 577 (2018) (wherein this Court determined that *Lockridge* would only be given prospective application on collateral review).  However, until today, this Court has never addressed whether the directive in MCL 769.34(10) that appellate courts must affirm within-guidelines sentences survived the severance remedy in *Lockridge*.

The Court of Appeals has done so in *People v Schrauben*, 314 Mich App 181; 886 NW2d 173 (2016).  The central issue in *Schrauben* concerned whether the trial court erred by declining to sentence the defendant to an intermediate sentence, as required by the statutory language in MCL 769.34(4).  *Id*. at 193-194.  The Court held that because MCL 769.34(4) referred to the sentencing guidelines as mandatory, *Lockridge* rendered its

provisions advisory only. *Id*. at 195-196. Accordingly, the trial court was allowed to choose not to impose an intermediate sentence, and the Court further reasoned that it was required by MCL 769.34(10) to affirm the sentence the trial court did impose because it was within the defendant's calculated sentencing guidelines range. *Id*. at 196. In a footnote, the Court added, "Notably, *Lockridge* did not alter or diminish MCL 769.34(10) . . . ." *Id*. at 196 n 21. This footnote has since been cited repeatedly in the Court of Appeals for the proposition that *Lockridge* did not invalidate MCL 769.34(10), and it has remained untouched for the past eight years. See, e.g., *People v Willis*, 322 Mich App 579, 594; 914 NW2d 384 (2018); *People v Jackson*, 320 Mich App 514, 527; 907 NW2d 865 (2017), reversed on other grounds 504 Mich 929 (2019).

Today, the lead opinion reverses *Schrauben* and holds that MCL 769.34(10) was necessarily struck down by *Lockridge*. I respectfully disagree. The lead opinion first reasons that *Lockridge*'s statement striking down "any part of MCL 769.34" that "refers to the use of the sentencing guidelines as mandatory" necessarily struck down MCL 769.34(10) because MCL 769.34(10) uses the mandatory term "shall" in directing that the appellate court "shall affirm" a within-guidelines sentence. But this Court actually stated that "[t]o the extent that any part of MCL 769.34 or another statute refers to use of the sentencing guidelines as mandatory or refers to departures from the guidelines, that part or statute is also severed or struck down *as necessary*." *Lockridge*, 498 Mich at 365 n 1 (emphasis added). The lead opinion does not address this important qualifier.

Although MCL 769.34(10) uses mandatory language as applied to the review of appeals, it does not refer to the mandatory nature of the sentencing guidelines or sentencing departures. Because of this, its excision is not necessary to cure the Sixth Amendment

20

error at issue in *Lockridge*. Compare with *Lockridge*, 498 Mich at 364-365 (wherein this Court struck down a statutory provision because it referred to "the requirement . . . that a sentencing court that departs from the applicable guidelines range must articulate a substantial and compelling reason for that departure"). Recall that the constitutional infirmity of the mandatory sentencing guidelines, as this Court emphasized, was that they "*require*[d] judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables . . . that *mandatorily* increase the floor of the guidelines minimum sentence range . . . ." *Lockridge*, 498 Mich at 364. By rendering the guidelines advisory, judicial fact-finding no longer *mandatorily* increased the minimum sentence range, and so the Sixth Amendment violation was cured. *Id*.; see also *Apprendi*, 530 US at 481; *Booker*, 543 US at 233. But nothing in MCL 769.34(10) causes judicial fact-finding to increase the statutorily permitted maximum or the minimum of a defendant's sentence. The sentencing guidelines remain advisory, and MCL 769.34(10) does not render their use mandatory;[9] it affects only how appellate challenges to sentences are handled. Because MCL 769.34(10) operates without infringing a defendant's Sixth Amendment rights, *Lockridge* did not strike down MCL 769.34(10) in order to effectuate its remedy. See *Lockridge*, 498 Mich at 365 n 1.[10]

---

[9] The lead opinion argues that "the guidelines become effectively mandatory any time a defendant's minimum sentence is consistent with the guidelines," *ante* at 31, but that is not true. That the Court of Appeals must affirm a within-guidelines sentence does not render the sentencing guidelines mandatory. The trial court remains able to choose whether to sentence a defendant within or outside the sentencing guidelines range. Further, this situation does not create a presumption of unreasonableness for departure sentences.

[10] Notably, although the United States Supreme Court excised the appellate standard of review provisions of the federal sentencing guidelines, 18 USC 3742(e), in *Booker*, it did so because of those provisions' "critical cross-references" to the provision establishing the

The lead opinion presumes that by limiting the scope of appeal, MCL 769.34(10) creates an incentive for trial courts to impose within-guidelines sentences and therefore violates this Court's chosen remedy in *Lockridge*. This argument is steps removed from the Sixth Amendment violation at issue in *Lockridge*. Further, to the extent that MCL 769.34(10) might create an incentive for trial courts to impose within-guidelines sentences, that incentive is not so substantial as to remove all discretion from the trial courts. A departure sentence is reviewed by an appellate court for an abuse of discretion, a heavily deferential standard of review. *Steanhouse*, 500 Mich at 471. Such a deferential standard of review is unlikely to control a trial court's sentencing decision. Further, any marginal incentive to issue within-guidelines sentences by MCL 769.34(10) is consistent with the Legislature's purpose in creating the sentencing guidelines because it encourages uniformity and proportionality of sentences. See *People v Smith*, 482 Mich 292, 302; 754 NW2d 284 (2008).[11]

_____

mandatory nature of the guidelines, 18 USC 3553(b)(1); it did not determine that having different standards of appellate review for within- and out-of-guidelines sentences was unconstitutional. See also *Booker*, 543 US at 260 (explaining that the Sentencing Reform Act continued to control "appeals from sentencing decisions," including 18 USC 3742(a), which limited the grounds on which a defendant could file an appeal depending on whether the sentence was within the guidelines range).

[11] To the extent that defendant argues that MCL 769.34(10)'s requirement that appellate courts affirm within-guidelines sentences infringes his state constitutional right to an appeal, Const 1963, art 1, § 20, this Court has held that the constitutional right to an appeal does not "mandate[] review of the trial court's exercise of discretion in sentencing in order to comport with due process of law," *People v Coles*, 417 Mich 523, 542; 339 NW2d 440 (1983), overruled on other grounds by *Milbourn*, 435 Mich at 635. Justice WELCH contends that this holding was dictum because the Court did grant a limited power of review over the trial court's sentencing decisions. But it is difficult to see how the Court's discussion of the authority for this power of review is irrelevant to the decision; i.e., in

22

This conclusion is further bolstered by the United States Supreme Court's decision in *Rita v United States*, 551 US 338, 352-356; 127 S Ct 2456; 168 L Ed 2d 203 (2007), where the Court condoned the use of greater scrutiny for departure sentences. In that case, the Court held that appellate courts could properly apply a "presumption of reasonableness" to within-guidelines sentences. *Id*. at 347. In so doing, the Court expressly addressed and rejected the argument that the application of a presumption of reasonableness to within-guidelines sentences would create an improper incentive for trial courts to impose within-guidelines sentences. The Court first reflected on the importance and values of a consistent guidelines system, and continued:

> [The defendant] may be correct that the presumption will encourage sentencing judges to impose Guidelines sentences. But we do not see how that fact could change the constitutional calculus. Congress sought to diminish unwarranted sentencing disparity. It sought a Guidelines system that would bring about greater fairness in sentencing through increased uniformity. The fact that the presumption might help achieve these

establishing appellate review, it seems germane whether this review stems from and is shaped by constitutional requirements.

In addition, other existing caselaw already provides that MCL 769.34(10) does not prohibit a defendant with a within-guidelines sentence from raising arguments of constitutional error. *People v Conley*, 270 Mich App 301, 316-317; 715 NW2d 377 (2006). The same conclusion was reached in *State v Delbosque*, 195 Wash 2d 106, 125; 456 P3d 806 (2020) (en banc), where the court upheld a similar statute against a challenge based on a constitutional right to appeal in criminal matters. The court held that the constitutional provision was not violated "because '[w]hen the sentence is within the presumptive sentence range then as a matter of law there can be no abuse of discretion.' " *Id*. at 126, quoting *State v Ammons*, 105 Wash 2d 175, 183; 713 P2d 719 (1986). In concluding that MCL 769.10(34) violates the constitutional right to appeal, Justice WELCH has not explained how an otherwise constitutional within-guidelines sentence can constitute an abuse of discretion subject to appellate review where the Legislature clearly indicated that such sentences are not an abuse of discretion by barring such review. In any event, given this Court's decision in *Coles*, there is no need to address this subject further in the present case.

23

congressional goals does not provide cause for holding the presumption unlawful as long as the presumption remains constitutional. And, given our case law, we cannot conclude that the presumption itself violates the Sixth Amendment. [*Id*. at 354.]

See also *id*. at 352 (explaining that even if the standard "increases the likelihood" that a within-guidelines sentence is imposed, the Sixth Amendment is not violated). The Court also emphasized that the presumption of reasonableness for within-guidelines sentences "does not *require* the sentencing judge to impose that sentence," and "[s]till less does it *prohibit* the sentencing judge" from imposing a departure sentence. *Id*. at 353. Therefore, the purported incentives to impose a within-guidelines sentence created by their preferential appellate treatment did not violate the Sixth Amendment.

The Court made similar remarks in *Gall v United States*, 552 US 38; 128 S Ct 586; 169 L Ed 2d 445 (2007), wherein it rejected a federal circuit court of appeals' requirement that departure sentences be justified on appeal in proportion to the deviation from the recommended sentence range. *Id*. at 47. Specifically, the Court held that extraordinary circumstances need not exist to justify a departure sentence and that, although an appellate court could generally consider the deviation and extent of deviation from the guidelines range, no "rigid mathematical formula" could be applied to determine the justification required for such deviation. *Id*. The Court reasoned that the standards being applied in that federal circuit came "too close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range." *Id*. In so holding, the Court's focus was on the subversion of the standard of appellate review established in *Booker*, not any of the potential "incentives" created by applying greater appellate scrutiny to departure sentences. In fact, the Court in *Gall* repeatedly stated that appellate courts can

24

and should apply closer scrutiny to sentences outside the guidelines range, stating that it was "uncontroversial that a major departure should be supported by a more significant justification than a minor one," *id*. at 50, and that sentencing courts "must give serious consideration to the extent of any departure from the Guidelines," *id*. at 46.

Like the appellate standard approved in *Rita*, MCL 769.34(10) does not legally *require* or *mandate* that the trial court impose a within-guidelines sentence, nor does it override the deferential standard of review provided to trial courts like the standard disavowed in *Gall*.  While MCL 769.34(10) may create an incentive to impose within-guidelines sentences, trial courts retain the ultimate sentencing discretion.  "[G]reater fairness in sentencing through increased uniformity" does not violate the Sixth Amendment.  *Rita*, 551 US at 354.  See also *Booker*, 543 US at 264 (rejecting the argument that the remedy in *Booker* would create substantial sentencing discrepancies, reiterating the value of the sentencing guidelines, and stating that sentencing courts remain required to "consult those Guidelines and take them into account when sentencing"); *Gall*, 552 US at 47, 50 (noting the importance of the guidelines to sentencing decisions and stating that, when reviewing a sentence on appeal, "a major departure should be supported by a more significant justification than a minor one").

The lead opinion also argues that its conclusion that *Lockridge* required the excision of MCL 769.34(10) is supported by this Court's decision in *Steanhouse*.  There, this Court held that appellate courts reviewing sentences post-*Lockridge* should assess the reasonableness of a sentence by determining whether the trial court's sentence was consistent with the principle of proportionality as expressed in *Milbourn*.  *Steanhouse*, 500 Mich at 471-472.  In *Milbourn*, this Court considered how to assess whether a trial court

abused its sentencing discretion in the context of the judicial sentencing guidelines (i.e., the precursor to the legislative sentencing guidelines at issue in *Lockridge*). *Milbourn*, 435 Mich at 634. The Court reasoned that the trial courts appropriately exercised their discretion by assuring that the sentence imposed was proportionate to "the nature of the offense and the background of the offender." *Id*. at 651. As stated, the *Steanhouse* Court adopted this proportionality principle to appellate review of sentences imposed under the legislative sentencing guidelines. *Steanhouse*, 500 Mich at 472-473.

In adopting that standard, this Court rejected the lower court's argument that such a standard could not be reconciled with the United States Supreme Court's opinion in *Gall*. Recall that in *Gall*, the Court held that a federal circuit's requirement that departure sentences be justified on appeal in proportion to their deviation from the recommended sentence range came "too close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range." *Gall*, 552 US at 47. This Court rejected the argument that defining "reasonableness" by the *Milbourn* proportionality standard created a similar presumption of unreasonableness for departure sentences, but expressly disavowed any dicta in our prior proportionality caselaw that implied that departures from the sentencing guidelines range were more likely to be unreasonable. *Steanhouse*, 500 Mich 474-475. In that context, this Court then reiterated its statement from *Milbourn* that " 'the key test is whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines' recommended range[.]' " *Id*. at 475, quoting *Milbourn*, 435 Mich at 661.

The lead opinion claims that if this Court believed that departure and within-guidelines sentences should be treated differently on appeal, it would not have included the

"or adheres to" language from *Milbourn*. But in doing so, the lead opinion ignores the context of the *Milbourn* quotation as used in *Steanhouse*.[12] This Court used that quotation in the context of its response to claims that the proportionality standard would create an unlawful presumption of unreasonableness for departure sentences. *Steanhouse*, 500 Mich at 475. The purpose of this language was to emphasize that departure sentences should be reviewed for reasonableness as informed by the principle of proportionality—as opposed to departure sentences being assumed to be unreasonable or an abuse of discretion. While the specific words "or adheres to" could have been omitted and the same purpose achieved, there is no indication in *Steanhouse* that the quotation was anything more than a response to the argument regarding an unreasonableness presumption, let alone a holding or even an implication that MCL 769.34(10) did not survive *Lockridge* and within-guidelines sentences should also be reviewed for reasonableness.[13] In fact, the Court explicitly stated

[12] In taking this approach, the lead opinion improperly reads *Lockridge* and *Steanhouse* as though they were statutes rather than judicial opinions, from which the lines must be read within the context of the entire opinion and case. See *Brown v Davenport*, 596 US ___, ___; 142 S Ct 1510, 1528; 212 L Ed 2d 463 (2022) ("This Court has long stressed that 'the language of an opinion is not always to be parsed as though we were dealing with [the] language of a statute.' . . . We neither expect nor hope that our successors will comb these pages for stray comments and stretch them beyond their context—all to justify an outcome inconsistent with this Court's reasoning and judgments . . . .") (citation omitted).

[13] Similarly to *Steanhouse*, when this Court made its statement in *Milbourn* that "the key test is whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines' recommended range," it was responding to the dissent's repeated statements that a trial court should only impose departure statements " 'on pain of reversal.' " *Milbourn*, 435 Mich at 661. The quotation at issue emphasized that where a trial court departed from the judicial sentencing guidelines, the question on appeal was not the extent of the departure or the failure to adhere to the guidelines but instead whether the sentence was proportionate. *Id*. Of course, as the lead opinion identifies, *Milbourn* also reasoned that a within-guidelines sentence may be "disproportionately severe or lenient" because the sentencing guidelines "may not be a perfect embodiment of the principle of proportionality . . . ." *Id*. at 661. This may have

27

that "[b]ecause both defendants received departure sentences, we do not reach the question whether MCL 769.34(10) . . . survives *Lockridge*." *Id*. at 471 n 14. As the lead opinion says, "*Steanhouse* meant what it said," *ante* at 29, and it said that it made no decision as to MCL 769.34(10)'s continued applicability.[14] And as Justice WELCH observes, the viability

---

contributed to the inclusion of the words "or adheres to" in the quotation at issue. But notably, the judicial sentencing guidelines at issue in *Milbourn*, unlike the legislative sentencing guidelines at issue in *Lockridge*, did not contain an appellate bar to review of within-guidelines sentences. Accordingly, *Milbourn* offers no guidance on the continued viability of MCL 769.34(10). And, as discussed earlier, there is no indication that this Court's choice not to excise those three specific words from the *Milbourn* quotation reflected a belief that within-guidelines sentences must be reviewed for reasonableness on appeal in contradiction to MCL 769.34(10).

[14] The lead opinion also argues that not excising MCL 769.34(10) creates a bifurcated system of review wherein defendants who received within-guidelines sentences receive no appellate review and defendants who received departure guidelines sentences receive appellate review. The lead opinion asserts that the United States Supreme Court in *Booker* rejected an analogous bifurcated review as a remedy to the federal sentencing guidelines' constitutional infirmity. In *Booker*, the Court rejected a proposed remedy under which the sentencing guidelines would be rendered advisory only when the guidelines required the trial court to find a sentencing-enhancing fact. *Booker*, 543 US at 265-266. The Court determined that this proposed remedy was incompatible with Congress's intent, reasoning that it "would impose mandatory Guidelines-type limits upon a judge's ability to *reduce* sentences, but it would not impose those limits upon a judge's ability to *increase* sentences." *Id*. at 266. The Court opined that such "one-way lever[s] are [not] compatible with Congress' intent" and that it "believe[d] that Congress would not have authorized a mandatory system in some cases and a nonmandatory system in others, given the administrative complexities that such a system would create." *Id*. (quotation marks and citation omitted). This proposed remedy rejected in *Booker* is not analogous to the situation at hand. As stated, MCL 769.34(10) does not create a system wherein the sentencing guidelines are mandatory in some cases but discretionary in others; the trial court is always free to depart or adhere to the sentencing guidelines as it sees fit. Further, when the Legislature enacted MCL 769.34(10) it created a bifurcated system of appeal, so the fact that certain defendants would receive reasonableness review of their sentences and others would not is seemingly consistent with the Legislature's intent.

28

of MCL 769.10(34) was simply not before the Court in *Lockridge* or *Steanhouse*, because both cases involved sentences that were outside the guidelines.

The lead opinion also argues that its conclusion is further justified because "the Court of Appeals has attempted to apply MCL 769.34(10)" and "struggled with [its] literal interpretation . . . ." *Ante* at 30. The lead opinion refers specifically to the Court of Appeals decision in *People v Conley*, 270 Mich App 301, 316; 715 NW2d 377 (2006), wherein the Court considered a defendant's challenge that the trial court had considered his refusal to admit guilt when imposing a within-guidelines sentence in violation of his constitutional right against self-incrimination. The Court acknowledged that MCL 769.34(10) directs appellate courts to affirm a within-guidelines sentence, but it reasoned that "a statutory provision . . . cannot authorize action in violation of the federal or state constitutions" and so interpreted MCL 769.34(10) to be inapplicable to claims of constitutional error. *Id*. The lead opinion claims that *Conley* "failed to recognize that the statute's mandatory nature *creates* this problem." *Ante* at 30. But the *Conley* Court identified the mandatory language of MCL 769.34(10) as the issue. *Conley*, 270 Mich App at 316 ("Read literally in isolation, this language [of MCL 769.34(10)] might seem to preclude this Court from granting relief on the basis of the trial court's error in considering Conley's refusal to admit guilt because it is undisputed that Conley was sentenced within the sentencing guidelines range and this error does not involve the scoring of the guidelines or the consideration of inaccurate information."). The *Conley* Court recognized that statutes should not be declared unconstitutional unless a constitutional interpretation is not possible, and it reasoned that because MCL 769.34 generally concerned statutory rules related to the sentencing guidelines, it was reasonable to conclude that MCL 769.34(10) was not meant to address

29

constitutional claims of error. *Id*. at 317. This reflects the general principle that statutes must yield to constitutional requirements but must still be applied when doing so does not run afoul of the constitution. Cf. *Bonner v City of Brighton*, 495 Mich 209, 223; 848 NW2d 380 (2014) (explaining that to strike a statute down in all applications through a facial challenge, a plaintiff must establish that there is "no set of circumstances" in which the law could be constitutionally applied) (quotation marks and citations omitted). The resulting interpretation that applies MCL 769.34(10) to require the affirmance of within-guidelines sentences except where constitutional error has occurred appears to have functioned reasonably well over the past 17 years. There is no support for holding that MCL 769.34(10) is inconsistent with this Court's holding in *Lockridge*.

In sum, MCL 769.34(10)'s requirement that appellate courts affirm within-guidelines sentences does not violate the Sixth Amendment because it does not require judicial fact-finding that increases or decreases a defendant's sentence. *Lockridge*'s statement striking down "as necessary" all statutes that refer "to the use of the sentencing guidelines as mandatory or refer[] to departures from the guidelines," *Lockridge*, 498 Mich at 365 n 1, did not affect MCL 769.34(10) because it was not necessary to cure the Sixth Amendment violation at issue in *Lockridge*. Further, while MCL 769.34(10) may encourage trial courts to sentence within a defendant's sentencing guidelines range, this encouragement is consistent with the Legislature's purpose in enacting the sentencing guidelines because it encourages uniformity and proportionality of sentences. The remainder of the caselaw cited by the lead opinion does not establish either that MCL 769.34(10) is unconstitutional or that it is incompatible with the *Lockridge* remedy.

Accordingly, I agree with the Court of Appeals' application of MCL 769.34(10) to affirm defendant's within-guidelines sentence.

## III. CONCLUSION

Because I believe that a judicial reliability assessment is not required for first-time-in-court identifications, I disagree with the majority's application of *Biggers* to Byrd's identification but agree with its ultimate conclusion that defendant is not entitled to relief on that ground. I also disagree with the conclusion that MCL 769.34(10) is inconsistent with this Court's holding in *Lockridge* and must be struck down. Instead, I would have affirmed the Court of Appeals' application of MCL 769.34(10) to affirm defendant's sentence.

Elizabeth T. Clement
Brian K. Zahra
David F. Viviano

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                              No. 162373

DAMETRIUS BENJAMIN POSEY,

      Defendant-Appellant.

---

ZAHRA, J. (*concurring in part and dissenting in part*).

I join the separate opinion authored by Chief Justice CLEMENT. Specifically, I agree that MCL 769.34(10) does not violate the Sixth Amendment. I also agree with Chief Justice CLEMENT that the majority opinion unduly and improperly expands the scope of protection afforded a defendant with regard to in-court identifications. I write separately to further emphasize that the action sanctioned by a majority of this Court in the instant case runs afoul of established precedent. I would not create a new constitutional right for defendants to exclude highly relevant in-court testimony under the auspices of due process.[1] The unanimous decision of the Court of Appeals should be affirmed in full.

---

[1] In the past two terms, a majority of this Court has effectuated monumental and consequential changes in Michigan criminal law jurisprudence, which I can only describe as alarming. See, e.g., *People v Gafken*, 510 Mich 503; 990 NW2d 826 (2022) (reversing a trial court's evidentiary decision and a unanimous Court of Appeals opinion and vacating murder convictions on the basis of a duress defense never previously recognized in American jurisprudence); *People v Guyton*, ___ Mich ___; ___ NW2d ___ (2023) (Docket No. 163700) (reversing a trial court's discretionary decision and a unanimous Court of Appeals opinion and vacating a guilty plea for

armed robbery as "involuntary and unknowing" where the defendant had received a within-guidelines sentence calculated without any enhancement for habitual-offender status, the exact bargain the defendant negotiated when pleading guilty); *People v Yarbrough*, ___ Mich ___; ___ NW2d ___ (2023) (Docket No. 161513) (reversing a trial court decision on the administration of voir dire, reversing a unanimous Court of Appeals opinion, and vacating a conviction for gruesome criminal sexual conduct, concluding that the denial of multiple opportunities for the defendant to use peremptory challenges, although nonconstitutional, was unreviewable structural error); *People v Parks*, 510 Mich 225; 987 NW2d 161 (2022) (reversing a trial court's sentencing decision and a unanimous Court of Appeals opinion and vacating a judgment for first-degree premeditated murder, holding for the first time in Michigan jurisprudence that a life sentence without the possibility of parole for an adult, 18-year-old offender constitutes "cruel or unusual punishment"); *People v Stovall*, 510 Mich 301, 359-360; 987 NW2d 85 (2022) (ZAHRA, J., dissenting) (noting that vacation of sentences for the most heinous crimes in law will "exhaust precious judicial resources" and subject the families of victims to "to a whole new trauma—the prospect that their loved-ones' killers will be released from incarceration"; explaining that, in that case, "the majority, again reading into our state Constitution, [made] the astounding proclamation that our trial courts no longer have any discretion to sentence a juvenile convicted of second-degree murder to life *with the possibility of parole*" despite incorrigibility or the cruelty of the crime; noting that in *People v Taylor*, 510 Mich 112; 987 NW2d 132 (2022), a "bare majority" also "conjure[d] a presumption against life without parole for juveniles," rewriting a finely balanced statute on the topic and "drastically limit[ing] the discretion sentencing courts have traditionally held to impose a sentence"; and recognizing that in *People v Boykin*, 510 Mich 171; 987 NW2d 58 (2022), the majority required "trial courts to consider the mitigating qualities of youth when sentencing a defendant to a term of years under [applicable statutes] despite no constitutional, statutory, or precedential basis to do so," thereby "invad[ing] the role of the Legislature" and ignoring careful policy choices made by the actual, elected Legislature).

These cases are extraordinary and creative expansions of constitutional law in favor of the accused, all of which undermine Michigan's longstanding public policy in favor of finality of criminal judgments. See *People v Carpentier*, 446 Mich 19, 29; 521 NW2d 195 (1994) ("[B]oth the Michigan judiciary singularly, and the citizenry whose collective rights and protections it is obligated to protect, have a compelling interest in championing the finality of criminal judgments."); *Edwards v Vannoy*, 593 US ___, ___; 141 S Ct 1547, 1554; 209 L Ed 2d 651 (2021) (explaining that "the principle of finality" is "essential to the operation of our criminal justice system") (quotation marks and citation omitted); *Mackey v United States*, 401 US 667, 691; 91 S Ct 1160; 28 L Ed 2d 404 (1971) (Harlan, J., concurring in part) ("No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation on issues already resolved.").

2

A majority of this Court rewrites the law of criminal procedure for in-court identification in a way that will have a substantial negative impact on our criminal justice system for years to come. There is no dispute in this case that neither the prosecution nor the police took any action to force, pressure, compel, or influence the witness's testimony in this case. The police, by all accounts, performed a regular photo lineup prior to the trial, and the prosecution called the witnesses to the stand in the regular course of trial. There is no evidence of abnormality in the administration of the trial, judicial oversight, jury observation, or cross-examination. Defendant does not allege any form of prosecutorial misconduct. Instead, defendant objects to a witness's in-court identification, which conflicted with the witness's prior statement of identification.

For the first time in the history of Michigan, this Court holds that certain in-court identifications, lacking any form of government coercion, pressure, or misconduct, cannot be admitted for jury consideration. To do so, the majority concludes that the prosecution calling a witness for in-court testimony, without more, is unnecessarily suggestive. Under this new rule, if the government does not pursue and obtain an identification of the defendant before trial, that witness is barred from providing on-point testimony on a perpetrator's identification at trial unless the identification is otherwise "reliable."[2] Moving forward, if a

_____

[2] This is true even if the witness may have been subject to intimidation, which is difficult to prove and altogether too common, or if an abused victim suffering from post-traumatic stress disorder has trouble clearly identifying the assailant prior to trial. See, e.g., Davis, Smith, and Henley, *Victim/Witness Intimidation in the Bronx Courts: How Common is it, and What are its Consequences?* (1990), pp 13, 20 (concluding that, in the Bronx Criminal Court in New York City, 36% of witnesses had been directly threatened, and among those who had not been threatened directly, 57% feared reprisals); O'Malley, *Witness Intimidation in the Digital Age*, The Prosecutor (July/August/September 2014), p 20 ("According to a 2009 field survey, 86 percent of participating law enforcement agencies reported the existence of some form of code

3

witness did not identify the defendant in recorded pretrial statements or lineups, the identification is subject to exclusion under the Due Process Clause.[3] Of course, no such rule applies to witnesses who change their prior testimony and refuse to identify the defendant at trial,[4] which is a common occurrence in certain prosecutions, such as criminal sexual conduct

---

of silence in their communities, and 47 percent identified the 'stop snitching' phenomenon as key. Fear of reprisal has made solving crimes considerably more difficult. Forty-five percent of respondents indicated a decrease in case clearance rates, 24 percent cited a decrease in overall trust in the agency, and 78 percent reported a decreased willingness of witnesses to testify. This is consistent with statements by prosecutors, police officers and victim/witness advocates that intimidation is widespread, increasing, and seriously affects the prosecution of violent crimes.").

[3] The majority opinion states that the Due Process Clause bars certain "first time" in-court identifications. To do so, it must conclude that in-court testimony creates suggestive circumstances warranting judicial prescreening. Such a holding would naturally extend to all in-court identifications in which the prosecution failed to obtain consistent identifications prior to trial through nonsuggestive methods, such as a lineup. This is exactly what defendant argues. Defendant's Supplemental Brief on Appeal (April 12, 2022), p 10 (stating that "[i]n-court identification is always unnecessary" and noting that " 'the prosecution could easily have arranged a pretrial lineup' " that could have been used instead) (citation omitted). There is little basis to distinguish this case from cases in which prior identifications of the defendant conflict with pretrial lineup identifications. In both cases, the prosecution did not confirm a consistent identification using nonsuggestive methods, and in both cases, the witness identified the defendant in the purportedly suggestive atmosphere of the courtroom. Yet all trials without improper state conduct are necessary, whether or not they include the highly relevant identifications of which the majority opinion disapproves. And all such trials are not unconstitutionally suggestive, as thoroughly explained in this opinion.

[4] Such a reversal occurred in this case, where one of the witnesses identified the defendant in a pretrial photo lineup but declined to identify defendant in person at trial.

cases.[5]  This is a double standard that will have serious consequences in the administration of criminal justice.[6]

The Court's decision deprives juries of highly relevant information that can be foundational to a proper determination of truth.  The Founders of our nation entrusted the prudence and morals of jurors to review in-court testimony and make determinations of guilt or innocence.  Yet a majority of this Court apparently does not trust this foundational process of criminal adjudication, takes up the position of fact-finder, and incorporates its own view of

---

[5] Most sexual abuse is not reported.  See National Sexual Violence Resource Center, *Statistics About Sexual Violence* (2015), p 2 ("Rape is the most under-reported crime; 63% of sexual assaults are not reported to police.") (citation omitted), available at <https://www.nsvrc.org/sites/default/files/publications_nsvrc_factsheet_media-packet_statistics-about-sexual-violence_0.pdf> (accessed July 18, 2023) [https://perma.cc/K3RJ-K4SA].  Even when the abuse is reported, due to the inherent challenges of proving the crime and often victim reluctance to cooperate, the ultimate conviction rate is extraordinarily low.  See United States Department of Justice, *Felony Defendants in Large Urban Counties, 2009—Statistical Tables* (December 2013), p 22 ("The probability that a defendant would eventually be convicted of the original felony charge" was the lowest "for those charged with rape (35%) and assault (33%)."), available at <https://bjs.ojp.gov/content/pub/pdf/fdluc09.pdf> (accessed July 18, 2023) [https://perma.cc/8J86-BC7C]; Rape, Abuse, & Incest National Network, *The Criminal Justice System: Statistics* (reporting that 2.5% of criminal sexual assaults will result in prison time), <https://www.rainn.org/statistics/criminal-justice-system> (accessed July 21, 2023) [https://perma.cc/8J83-37VD].

[6] The very fact that there are no apparent concerns with defense witnesses changing their testimony from prior identifications, in terms of the ability of the jury to weigh credibility, routine trial practice, and centuries of American law, itself demonstrates that the Court's rule is entirely novel.  While constitutional protections for the accused are fundamental to a fair and civilized trial, the new evidentiary rule expressed in the majority opinion is simply not grounded in longstanding interpretations of constitutional law.  I do not doubt the importance of our Constitution and the civil liberties expressed in our Bill of Rights.  See *ante* at 5 n 9 (CAVANAGH, J., concurring in part) (discussing the importance of the United States Constitution).  But engineering novel constitutional theories that undermine the administration of public justice is by no means a commendable exercise.

credibility into the Due Process Clause.  According to the majority, the Constitution mandates that a court, not the jurors who observed the witness and reviewed the evidence firsthand, must decide what relevant evidence is valuable for determining culpability.  But no such mandate is contained in the rules of evidence, let alone the Constitution.

For centuries, criminal trials have been conducted by summoning witnesses to testify and subjecting their statements to cross-examination.  At the time the Constitution was ratified, there was no right to criminal discovery, let alone a right to certain pretrial processes for confirming inculpatory testimony.  Witnesses the prosecution believed would support the conviction would be called the day of trial, and whatever testimony they would produce would be considered by the trier of fact.[7]  Even today, there is "no general constitutional right to discovery in a criminal

---

[7] See, e.g., Old Bailey Proceedings Online, *Trial of Saunders Alexander, Lyon Abrahams, and Sarah Lazarus* (December 1775) <https://www.oldbaileyonline.org/browse.jsp?div=t17751206-46> (accessed July 19, 2023, Version 8.0, Reference No. t17751206-46) (calling numerous witnesses at a burglary trial, many of whom could not identify the defendant—one of them believed the defendant was the culprit, one confirmed the defendant was the culprit, and none of the identifications was confirmed with a prior identification method); Old Bailey Proceedings Online, *Trial of Edward Parrot* (June 1783) <https://www.oldbaileyonline.org/browse.jsp?div=t17830604-68> (accessed July 19, 2023, Version 8.0, Reference No. t17830604-68) (a witness identified the defendant as the perpetrator and explained the complete number of times he had seen the defendant in his life, not providing any prior identification whether objective or suggestive to the police or otherwise); 4 Blackstone, Commentaries on the Laws of England, pp **351, 358 (stating that rules for civil jury trials apply to criminal trials and rejecting the argument that a witness should be excluded because the witness's testimony is not corroborated, reasoning, "Must these [acts] therefore escape unpunished?  Neither, indeed, is the bare denial of the person accused equivalent to the positive oath of a disinterested witness"); 3 Blackstone, Commentaries on the Laws of England, p *370 (explaining that "[a]ll witnesses" that are not "infamous" or conflicted are competent to be received for the jury to "judge of their credibility"; stating that a witness "is sufficient evidence to jury of any single fact"); 2 Hale, History of the Pleas of the Crown, pp 276-282 (reasoning that there are but "two kinds" of objections that can be made of a witness: (1) credibility, which

6

case,"[8] and out of concern of spoilation of evidence and witness intimidation, criminal discovery is significantly limited in many jurisdictions.[9] When greater criminal pretrial discovery rights were recognized in the twentieth century, it was done so to prevent governmental suppression of

---

is "left to the jury," and (2) competence, such as infamy, mental illness, or infancy, and not including prior inconsistent statements); 2 Hale, History of the Pleas of the Crown, pp 291-293 (stating that discrepancies in evidence at trial can serve to acquit the defendant upon proof, but not indicating that it serves to exclude specific testimony); Langbein, Lerner, and Smith, *History of the Common Law: The Development of Anglo-American Legal Institutions* (Boston: Aspen Publishing, 2009), pp 242-243 (noting the history of in-court witness testimony and identifications); Mathews & Malek, *Disclosure*, p 8 (laying out the extent of pretrial discovery and process in English common law courts at the time of the founding, which did not include unenumerated pretrial rights to procedural disclosures, discovery, or confirmation of evidence or witness testimony); Norton, *Discovery in the Criminal Process*, 61 J Crim L & Criminology 11, 12-13 (1970) (stating that at the time of the founding, there was generally no pretrial right for the disclosure or examination of evidence, but prosecutors were expected to provide defendants with prior inconsistent statements of a witness to allow the defendant to conduct cross-examination); see also *People v Carey*, 125 Mich 535; 84 NW 1087 (1901) (discussing various witnesses who testified to the defendant's identity, noting one identified the defendant without relying upon a pretrial procedure to secure identity, and mentioning that witnesses who testified in favor of the defendant had changed their position); 1 McCormick, Evidence (8th ed), § 33 (explaining that under the common law, a primary method of attacking and undermining a witness's credibility was to point out that the witness "previously made statements inconsistent with his present testimony"); *id*. at § 10 (reasoning that, if based on personal knowledge, witness testimony was generally admissible given that the "common law model assumes that the lay witness can articulate the relevant primary sensory data and that the lay jurors are then competent to decide what inferences to draw from the data"); *Perry v New Hampshire*, 565 US 228, 237-238; 132 S Ct 716; 181 L Ed 2d 694 (2012) (describing the history and principles of constitutional rights for criminal defendants and noting that the examination of suggestive identifications derived from *Stovall v Denno*, 388 US 293; 87 S Ct 1967; 18 L Ed 2d 1199 (1967), abrogated in part on other grounds by *Griffith v Kentucky*, 479 US 314 (1987)).

[8] *Weatherford v Bursey*, 429 US 545, 559; 97 S Ct 837; 51 L Ed 2d 30 (1977).

[9] *United States v Neal*, 611 F3d 399, 401 (CA 7, 2010) ("Discovery in criminal prosecutions is limited . . . ."); *United States v Presser*, 844 F2d 1275, 1286 n 12 (CA 6, 1988) ("[I]n most [federal] prosecutions, the *Brady* [*v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963)] rule, Rule 16 [of the Federal Rules of Criminal Procedure,] and the Jencks Act [18 USC 3500], exhaust the universe of discovery to which the defendant is entitled.").

valuable exculpatory evidence.  Further, the rights were recognized in an interest of allowing the defendant to effectively present evidence to a jury and cross-examine witnesses testifying before them, not to prevent the jury from considering the evidence altogether.[10]  Other constitutional protections were recognized for *government-led* interrogations of the defendant[11] and misconduct by *government* actors at trial, so as to prevent government abuse and interference with the proper administration of justice.[12]  But the Supreme Court of the United States has never

---

[10] See *Jencks v United States*, 353 US 657, 667; 77 S Ct 1007; 1 L Ed 2d 1103 (1957) (explaining that production of documents which could demonstrate inconsistencies or conflict with in-court testimony must be produced to the defendant, noting that "[e]very experienced trial judge and trial lawyer knows the value for impeaching purposes of statements of the witness recording the events before time dulls treacherous memory"); *Gordon v United States*, 344 US 414; 73 S Ct 369; 97 L Ed 447 (1953) (exploring the value of inconsistent statements identifying the defendant for the purpose of allowing effective cross-examination); *Brady*, 373 US at 87-88 (holding that "suppression by the prosecution" of evidence of another individual admitting to the crime implicated the Due Process Clause, explaining that the prosecution cannot be the "architect" on evidence presented to a jury); *United States v Bagley*, 473 US 667, 678; 105 S Ct 3375; 87 L Ed 2d 481 (1985) ("The constitutional error, if any, in this case was the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination."); see also *Norris v Schotten*, 146 F3d 314, 334-335 (CA 6, 1998) (explaining that the Constitution is not implicated by mere contradiction or inconsistent statements in the record when not suppressed by the government, as "there would be no need for a jury if trials did not contain such inconsistencies").

[11] *Miranda v Arizona*, 384 US 436, 468; 86 S Ct 1602; 16 L Ed 2d 694 (1966) ("At the outset, if a person *in custody* is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent.") (emphasis added); *Maine v Moulton*, 474 US 159, 176; 106 S Ct 477; 88 L Ed 2d 481 (1985) ("Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.").

[12] *Darden v Wainwright*, 477 US 168, 180, 181; 106 S Ct 2464; 91 L Ed 2d 144 (1986) (analyzing the improper comments made by the prosecution to the jury, including referring to the defendant as an "animal," and concluding that it did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process") (quotation marks and citations omitted).

held that relevant testimony of a prosecution witness must be excluded under the Due Process Clause simply because of a prior inconsistent statement or the lack of a consistent statement using structured methods of identification, when no government coercion or action to create the identification took place. Historically, not only in Michigan but throughout the nation, such prior inconsistent evidence was left to be ferreted out through cross-examination and the adversary process. The prosecution, like all parties before a court, must call witnesses and subject them to standard methods of cross-examination in the regular order of court.

The Supreme Court of the United States has also repeatedly warned that the Constitution's due-process protections extend in a very limited manner into the rules of evidence, especially when the complaint is solely over alleged prejudice to the defendant's case and involves no government misconduct. As the Supreme Court explained in *Marshall v Lonberger*, the Due Process Clause does not require that courts "engage in a finely-tuned review of the wisdom of state evidentiary rules[.]"[13] "Judges are not free, in defining 'due process,' to impose on law enforcement officials their personal and private notions of fairness and to disregard the limits that bind judges in their judicial function."[14] Instead, courts are to "determine only whether the action complained of violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and

---

[13] *Marshall v Lonberger*, 459 US 422, 438 n 6; 103 S Ct 843; 74 L Ed 2d 646 (1983).

[14] *Dowling v United States*, 493 US 342, 353; 110 S Ct 668; 107 L Ed 2d 708 (1990) (quotation marks, citations, and brackets omitted), quoting *Rochin v California*, 342 US 165, 170; 72 S Ct 205; 96 L Ed 183 (1952).

9

decency."[15]   The Supreme Court has repeated this fundamental axiom again,[16] again,[17] and

again,[18] and has repeatedly rejected requests to impose constitutional requirements on debatable

questions of factual credibility.[19]   "Our primary guide in determining whether the principle in

---

[15] *Id*. (quotation marks, citations, and ellipsis omitted), quoting *Mooney v Holohan*, 294 U S 103, 112; 55 S Ct 340; 79 L Ed 791 (1935), and *Rochin*, 342 US at 173.

[16] *Spencer v Texas*, 385 US 554, 564; 87 S Ct 648; 17 L Ed 2d 606 (1967) ("But it has never been thought that such cases establish this Court as a rule-making organ for the promulgation of state rules of criminal procedure.  And none of the specific provisions of the Constitution ordains this Court with such authority.").

[17] *Dowling*, 493 US at 352 ("We, therefore, have defined the category of infractions that violate 'fundamental fairness' *very narrowly*.") (emphasis added).

[18] *Montana v Egelhoff*, 518 US 37, 43; 116 S Ct 2013; 135 L Ed 2d 361 (1996) (opinion of Scalia, J.); see also *Patterson v New York*, 432 US 197, 201-202; 97 S Ct 2319; 53 L Ed 2d 281 (1977) ("Among other things, it is normally within the power of the State to regulate procedures under which its laws are carried out" and "its decision in this regard is not subject to proscription under the Due Process Clause unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.") (quotation marks and citations omitted); *Snyder v Massachusetts*, 291 US 97, 105; 54 S Ct 330; 78 L Ed 674 (1934) (Cardozo, J.) (explaining that state rules of procedure do not "run foul of the Fourteenth Amendment because another method may seem to our thinking to be fairer or wiser or to give a surer promise of protection to the prisoner at the bar"), overruled on other grounds by *Malloy v Hogan*, 378 US 1 (1964).

[19] See, e.g., *Spencer*, 385 US at 557, 562-564 (introduction of a prior conviction of murder during a murder trial, during a guilt stage but intended solely for the purpose of a sentencing enhancement, did not violate due process); *Marshall*, 459 US at 428-429, 438 (introduction of a defendant's prior conviction of attempted murder at the guilt stage for a sentencing enhancement alone did not violate due process); *Dowling*, 493 US at 344-345, 352-353 (introduction of evidence of the defendant breaking into a woman's house after the crime in question, despite the defendant being acquitted of that separate criminal conduct, did not violate due process, noting that the jury can properly weigh credibility); *Patterson*, 432 US at 201-205 (refusing to hold that placing the evidentiary burden on the defendant to prove heat of passion in a murder prosecution violated due process, despite that being the rule for federal prosecutions); *Egelhoff*, 518 US at 40, 43-51 (concluding that exclusion of evidence of the defendant's extreme drunkenness for purposes of proving that the defendant lacked the requisite *mens rea*, a required element of proof

question is fundamental is, of course, historical practice."[20]  Yet the Supreme Court has never indicated that highly relevant in-court identifications are subject to exclusion under the Due Process Clause or any other constitutional provision simply because the witness made a prior inconsistent statement or did not make a prior consistent statement.  The United States from its legal founding has never required pretrial procedures to confirm a witness's testimony solely to ensure that an in-court identification is not inconsistent with any prior identification, or lack thereof.  And, until today, Michigan has never required such a process.[21]  In all, criminal defendants have *never* had a historical right to subject inculpatory statements from in-court witnesses to any confirmation process prior to trial when no government misconduct occurred.[22]  An exclusionary rule for in-court identifications that conflict with pretrial identifications has

_____

for the prosecution, for a murder prosecution did not violate due process); *Estelle v McGuire*, 502 US 62, 68-70; 112 S Ct 475; 116 L Ed 2d 385 (1991) (holding that repeated abuse of a child prior to the events in question could be admitted without due-process concerns to convict a defendant of murder, despite the defendant not contesting whether the death was accidental); *Kahler v Kansas*, 589 US ___; 140 S Ct 1021, 1030-1037; 206 L Ed 2d 312 (2020) (examining the history of the insanity defense to determine there is no constitutional right to a criminal defendant's presenting evidence to prove the *M'Naghten* test [see *Daniel M'Naghten's Case*, (HL 1843) 10 Cl Fin 200 (8 Eng Rep 718), 722 (1843)]).

[20] *Egelhoff*, 518 US at 43; accord *Kahler*, 589 US ___; 140 S Ct at 1028 ("The question is whether a rule of criminal responsibility is so old and venerable—so entrenched in the central values of our legal system—as to prevent a State from ever choosing another.").

[21] Although attempting to bolster the analysis of the majority opinion, Justice CAVANAGH's concurring opinion (henceforth "the concurring opinion," as it is the only concurrence that does not also partially dissent) also fails to cite a single case in the history of Michigan or from the Supreme Court of the United States in which a relevant and on-point in-court identification was excluded on the basis of due process simply because it was inconsistent with a prior identification.

[22] See notes 7, 8 through 12, 19, 27, and 35 of this opinion.

simply no basis in our country's history and tradition.[23]  It certainly does not rank as something

so fundamental to our principles as a country and the existence of a free society that all state

governments are forever barred from choosing another process.[24]

It is striking that the majority opinion in no way acknowledges, let alone addresses this

foundational due-process jurisprudence, and instead creates for criminal defendants a

constitutional right to consistent witness identifications.  In fact, the majority opinion completely

ignores the established standard under Due Process Clause jurisprudence, which relies on the

history and tradition of the country to identify unenumerated fundamental rights.[25]  Absent some

government action that exhibits elements of coercion, abuse, or misconduct,[26] the Constitution

---

[23] See generally *Egelhoff*, 518 US at 43-45 and *Kahler*, 589 US ___; 140 S Ct at 1027-1028; *Dowling*, 493 US at 353.

[24] See *Duncan v Louisiana*, 391 US 145, 148; 88 S Ct 1444; 20 L Ed 2d 491 (1968) (requiring that a right under the Due Process Clause be "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions") (citation omitted); *Kahler*, 140 S Ct at 1028 ("The question is whether a rule of criminal responsibility is so old and venerable—so entrenched in the central values of our legal system—as to prevent a State from ever choosing another."); see also *Dobbs v Jackson Women's Health Org*, 597 US ___; 142 S Ct 2228, 2248; 213 L Ed 2d 545 (2022) ("On occasion, when the Court has ignored the [a]ppropriate limits imposed by respect for the teachings of history, . . . it has fallen into the freewheeling judicial policymaking that characterized discredited decisions such as *Lochner* v. *New York*, 198 U. S. 45 [25 S Ct 539; 49 L Ed 937] (1905).") (quotation marks, citation, and brackets omitted).

[25] See, e.g., *Egelhoff*, 518 US at 43; *Kahler*, 589 US at ___; 140 S Ct at 1028, 1030-1037 (examining the history of the insanity defense to determine there is no constitutional right to the *M'Naghten* test); *McDonald v Chicago*, 561 US 742, 767-787; 130 S Ct 3020; 177 L Ed 2d 894 (2010) (reviewing the history of the right to bear arms to conclude that it is "deeply rooted in this Nation's history and tradition") (quotation marks and citation omitted).

[26] When the behavior of a government officer violates the Due Process Clause, the Court does not condition relief on the subjective intent of the officer.  Compare *Smith v Phillips*, 455 US 209, 219; 102 S Ct 940; 71 L Ed 2d 78 (1982) (asserting that prosecutorial actions that constitute

leaves the admission of evidence where it belongs: local rules, the prudence and on-the-ground

expertise of trial judges, and the jury.

In the case of in-court identifications, the Supreme Court has held that in certain instances,

police conduct to produce an identification can be so suggestive and so unnecessary to justify

exclusion absent some other demonstrations of reliability. But the holdings and basic reasoning

of these cases do not control situations in which witnesses *on their own* changed their mind after

a prior identification, recollected their memories, and provided an in-court identification in

conflict with a prior statement.[27] Identifications of the defendant are central points of fact for

the jury to consider, and of course, defense counsel has every opportunity to cross-examine the

---

misconduct do not require an inquiry into subjective intent of the prosecutor), with *Mooney v Holohan*, 294 US 103, 110, 112-113; 55 S Ct 340; 79 L Ed 791 (1935) (holding that a due-process violation occurs when the prosecution introduces fabricated evidence and knows that it is fabricated). The focus of the Supreme Court's due-process inquiry is government actions that fall outside the normal and acceptable course of conduct under the history, traditions, and principles of the United States. See pp 8-10, 16-17 & nn 13 through 18, and 20 of this opinion (discussing the standard for due-process violations). There is no constitutional right to prevent the admission of contested evidence, subject to impeachment and credibility concerns.

[27] *Stovall*, 388 US at 301-302 (examining the use of police interrogation method where they bring the defendant singly in a "show up" to the witness for identification, noting that this police confrontation was "widely condemned," but the circumstances required its use); *Simmons v United States*, 390 US 377, 382-383; 88 S Ct 967; 19 L Ed 2d 1247 (1968) (reviewing the decision by police to show witnesses photographs of only the defendant and another suspect and noting that "improper employment of photographs *by police* may sometimes cause witnesses to err in identifying criminals") (emphasis added); *Neil v Biggers*, 409 US 188, 195, 198-201; 93 S Ct 375; 34 L Ed 2d 401 (1972) (reviewing a "showup" arranged by the police to identify the defendant and analyzing this "suggestive confrontation[]" created by the government); *Manson v Brathwaite*, 432 US 98; 97 S Ct 2243; 53 L Ed 2d 140 (1977) (considering the suggestive "confrontations" created by the police and a witness identification using a single photo provided by the police).

witness to bring out inconsistencies and doubt as to credibility.[28]  As was understood by the Founders at the time of the ratification of the Constitution, the manner of ensuring the reliability of in-court testimony absent government misconduct was, as the Supreme Court described it in the context of confrontation rights, by "subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."[29]  Cross-examination, not inferred constitutional presumptions, is considered "the greatest legal engine ever invented for the discovery of truth."[30]

The Supreme Court in *Perry v New Hampshire* was asked to address the exact argument made by defendant here: whether suggestive circumstances underlying an identification, not as a result of government misconduct, can produce a due-process violation under the *Stovall* line

---

[28] See *Herring v United States*, 555 US 135, 141; 129 S Ct 695; 172 L Ed 2d 496 (2009) (explaining that aggressive and unnecessary applications of exclusionary rules impose a "costly toll upon truth-seeking and law enforcement objectives" and risk "letting guilty and possibly dangerous defendants go free—something that offends basic concepts of the criminal justice system") (quotation marks and citations omitted); *United States v Payner*, 447 US 727, 734; 100 S Ct 2439; 65 L Ed 2d 468 (1980) ("Our cases have consistently recognized that unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury."); *Manson*, 432 US at 112-113 (expressing similar concerns in the context of unnecessarily suggestive police confrontations of witnesses); *Dowling*, 493 US at 353 (rejecting a due-process challenge to potentially irrelevant and prejudicial evidence by explaining that "the jury . . . remained free to assess the truthfulness and the significance of [the] testimony").

[29] *Maryland v Craig*, 497 US 836, 845; 110 S Ct 3157; 111 L Ed 2d 666 (1990).

[30] *Lilly v Virginia*, 527 US 116, 124; 119 S Ct 1887; 144 L Ed 2d 117 (1999) (quotation marks and citation omitted); see also *Craig*, 497 US at 846 (explaining the foundations of the Confrontation Clause and explaining that having in-person witness testimony that identifies criminal acts done by the defendant, with the "combined effect of these elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the trier of fact— . . . ensur[es] that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings").

of cases. In an 8-1 decision authored by Justice Ginsburg, the Court resoundingly rejected that conclusion. In *Perry*, the Court mentioned police or government "arranged circumstances" and "improper conduct" no fewer than 18 separate times.[31] It emphatically and unambiguously stated that "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification [the right recognized in the *Stovall* line of cases] when the identification was *not procured under unnecessarily suggestive circumstances arranged by law enforcement*."[32] The Court reviewed all the existing cases in the *Stovall* line and reiterated that "the Court has linked the due process check, not to suspicion of eyewitness testimony generally, *but only to improper police arrangement of the circumstances surrounding an identification*."[33] It is confounding that a majority of this Court works around what can only be

---

[31] *Perry*, 565 US 228.

[32] *Id*. at 248 (emphasis added).

[33] *Id*. at 242 (emphasis added). *Perry*'s analysis, like the analysis in all of the *Stovall* line of cases, implicates both out-of-court identifications and in-court identifications. See *Simmons*, 390 US at 383-384 ("Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification."); *Biggers*, 409 US at 198 ("While the phrase [irreparable misidentification] was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, . . . it serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself."). In *Perry*, 565 US at 234, 236, the witness identified the defendant out of court and provided in-court testimony on the identification. See *id*. at 244 (rejecting the argument that courts can rationally distinguish between different forms of identification lacking police arranged circumstances, explaining that "[m]ost eyewitness identifications involve some element of suggestion" and, "[i]ndeed, all in-court identifications do"). Neither identification was excluded. That conclusion is at odds with the holding of the majority opinion that merely calling a witness and inquiring as to the identity

described as on-point and controlling precedent from the Supreme Court of the United States. There is no distinction made in the Court's reasoning in *Perry*, or the precedents underlying and supporting its conclusion, between pretrial suggestive circumstances and in-court testimony involving no intentional government suggestion. Nor could it. It would be deeply counterintuitive to conclude that witnesses could be subject to innumerable suggestive circumstances prior to trial but could have their testimony excluded solely because they were present in-person at trial, "without the taint of improper state conduct."[34]

---

or characteristics of the perpetrator, without any government-arranged coercion, amounts to improper state conduct.

Notably, the Court in *Perry* rejected many of the same arguments this Court hears regarding purported scientific studies. *Id*. at 244-245 (noting studies from the American Psychological Association purporting to show the unreliability of identification but reiterating that the "fallibility of eyewitness evidence does not, *without the taint of improper state conduct*, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness") (emphasis added). It expressly refuted arguments, which are repeated in the concurring opinion, that preferred social studies and appellate perceptions of credibility justify exclusion of highly relevant evidence under the Due Process Clause. *Id*. at 245 ("We have concluded in other contexts [in addition to witness identifications] that the potential unreliability of a type of evidence does not alone render its introduction at the defendant's trial fundamentally unfair.") (collecting sources); see *ante* at 3 n 5 (CAVANAGH, J., concurring in part) (relying upon scientific studies cited by the solo dissent in *Perry*). And as the Iowa Supreme Court aptly observed in response to similar arguments, "the judiciary is not in a good position to judge social values or social science. When social science is disputed, the institutional parameters of the judiciary are amplified. It is the legislature that is structured to assess the merits of competing policies and ever-changing social science assertions." *State v Doolin*, 942 NW2d 500, 515 (Iowa, 2020) (quotation marks and citation omitted).

[34] *Perry*, 565 US at 245.

The Due Process Clause has a very narrow reach into evidentiary issues. Pretrial processes to ensure that all witnesses have consistent in-court testimony have never been part of the American tradition or criminal practice; the Supreme Court has never extended due-process exclusions of suggestive identifications outside of police confrontations; and the Supreme Court in *Perry* explicitly held that the pretrial judicial screening in the *Stovall* line of cases does not apply outside the context of "improper police arrangement[s]."[35] Nonetheless, a majority of this Court persists in a decision that cannot be reconciled with established United States Supreme Court jurisprudence.

---

[35] *Id*. at 242. The Supreme Court has developed an entire line of cases on the Due Process Clause involving the defendant's personal presentation at trial. It has held that trying a defendant in shackles or jail garb, without a special need, is both unnecessary and violative of the defendant's fundamental rights. See *Deck v Missouri*, 544 US 622, 626-629; 125 S Ct 2007; 161 L Ed 2d 953 (2005) (explaining the storied constitutional tradition for such a rule); *Estelle v Williams*, 425 US 501; 96 S Ct 1691; 48 L Ed 2d 126 (1976). Notably, despite reviewing numerous cases regarding the defendant's presentation, the Court has *never* held that the defendant's mere presence in a courtroom as the accused, whether or not witnesses provide inculpatory testimony, implicates due-process concerns. Compare *Holbrook v Flynn*, 475 US 560, 568-569; 106 S Ct 1340; 89 L Ed 2d 525 (1986) (holding that having special security arrangement where guards were strategically placed to have uniformed officers sit in the front row of the trial court gallery was not "the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial"); *Mendoza v Berghuis*, 544 F3d 650, 655 (CA 6, 2008) (concluding that the Due Process Clause did not, nor necessarily "should," apply to the defendant's claim that the jury merely suspected that he was in shackles because brown paper was used to conceal both counsels' tables); *United States v Martin*, 964 F2d 714, 718-722 (CA 7, 1992) (holding that the plain, unmarked prison jumpsuit that the defendant and two other codefendants wore did not violate the Due Process Clause). This is especially true when the defendant himself has a constitutional right to *attend* the trial in person. See *Illinois v Allen*, 397 US 337, 338; 90 S Ct 1057; 25 L Ed 2d 353 (1970).

Federal courts after *Perry* have routinely held that exclusion of in-court identification under due-process concerns occurs only if government or police action was involved.[36] The majority opinion is in direct conflict with these federal precedents.

Federal courts have similarly held that in-court trials, on their own and without government misconduct, do not create unnecessarily suggestive circumstances so as to require

[36] See, e.g., *United States v Whatley*, 719 F3d 1206, 1216 (CA 11, 2013) (explaining that "*Perry* makes clear that, for those defendants who are identified under suggestive circumstances not arranged by police, the requirements of due process are satisfied in the ordinary protections of trial" and rejecting arguments that being the only African American attending trial and not being identified in a lineup before trial violated the Constitution); *United States v Vines*, 9 F4th 500, 507 (CA 7, 2021) (providing that "[w]here the suggestive nature of an identification process is the result of circumstances unrelated to improper state conduct, due process does not require the exclusion of the evidence" and concluding that a police officer showing the victim the defendant's Facebook page, which the victim referenced, and asking for an identification did not involve police misconduct under *Perry*); *United States v Correa-Osorio*, 784 F3d 11, 19-21 (CA 1, 2015) (explaining that those identifications made under suggestive circumstances prior to trial do not implicate due process if "the police did not arrange the identification" and even if the court were to examine the identification at trial, there is no due process violation for being in person at a trial); *Walden v Shinn*, 990 F3d 1183, 1198 (CA 9, 2021) ("If the police did not arrange suggestive circumstances leading the witness to identify a particular person as the perpetrator, the inquiry ends.") (quotation marks, citation, and brackets omitted); *United States v Thomas*, 849 F3d 906, 910-911 (CA 10, 2017) (explaining that *Perry* requires "improper conduct by law enforcement—be it by police officers or the prosecution" and the rule applies to both pretrial and in-court identifications); *United States v Seary-Colón*, 997 F3d 1, 10-11 (CA 1, 2021) (holding that a suggestive identification that occurred without police involvement did not implicate due process for an out-of-court and in-court identification); *Howard v Warden*, 519 F Appx 360, 369 (CA 6, 2013) ("The Supreme Court, however, expressly rejected this argument [that suggestive circumstances not created by police warrant due-process scrutiny] in *Perry* when it made clear that the general reliability of an identification is not a reason to exclude it unless the procedure used to procure the identification is first proven to be unduly suggestive due to police misconduct.").

judicial prescreening and exclusion of in-court identifications under *Stovall* and *Perry*.[37] The majority opinion is in direct conflict with these federal rulings.

The concerns animating the Supreme Court's *Stovall* line of cases are that of a police officer, as a symbol of authority, approaching a witness in order to pressure a statement through suggestive methods, outside of a courtroom, judicial oversight, rules of criminal procedure, and cross-examination. These concerns are vital to the American justice system, going to the heart of the Constitution's bar against the government creating false evidence against the accused.[38]

---

[37] See, e.g., *United States v Davis*, 103 F3d 660, 670 (CA 8, 1996) ("There is no constitutional entitlement to an in-court line-up or other particular methods of lessening the suggestiveness of in-court identification, such as seating the defendant elsewhere in the room.") (quotation marks and brackets omitted), quoting *United States v Domina*, 784 F2d 1361, 1369 (CA 9, 1986); *Whatley*, 719 F3d at 1216 ("[T]he Supreme Court rejected the argument that the Due Process Clause requires judicial prescreening of all identifications obtained under suggestive circumstances and expressly disapproved the idea that in-court identifications would be subject to prescreening . . . ." and rejecting arguments that being the only African American attending trial and not being identified in a lineup before trial violated the Constitution); *Thomas*, 849 F3d at 910 (stating that "[n]either the question presented to the Court [in *Perry*] nor its holding is confined to pretrial identifications" and rejecting arguments that the lack of prior identification of the defendant, the passage of time, and the defendant being the only African American at the defense table triggered due-process concerns); *Correa-Osorio*, 784 F3d at 20 (concluding that "all the safeguards *Perry* stamped sufficient to protect a defendant's due-process rights" are met when an in-court, in-person identification is made); *Lee v Foster*, 750 F3d 687, 691 (CA 7, 2014) (explaining that conflict-prone testimony may not be "especially convincing" but that does not mean it is unconstitutional and noting that "a defendant's mere presence at the defense table is not enough to establish a violation of due process") (quotation marks and citations omitted); *United States v Hughes*, 562 F Appx 393, 398 (CA 6, 2014) (in-court identification of the defendant as the accused and as the only African American man sitting at the defense table did not trigger due-process concerns).

[38] See *Jackson v City of Cleveland*, 925 F3d 793, 815 (CA 6, 2019) ("The Due Process Clause of the Fourteenth Amendment is also violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury.") (quotation marks and citations omitted); *Mooney*, 294 US at 112 ("It is a requirement that

Yet this situation is markedly disconnected from standard in-court identifications, on the record, under oath, and in open court before a judge, a fact-finder, and onlooking public, which lack any element of government-arranged suggestion. Such testimony has been provided in American courtrooms without exclusion or interference for centuries. Trials afford criminal defendants substantial rights, all of which were contemplated and recognized in the Constitution at its founding. Defendants have the right to know the charges against them to develop a defense; they have a right to confront and cross-examine their accusers; they have a right to counsel to assist in their defense; they have the right to call witnesses to contradict inculpatory evidence; they have the right to an impartial jury; they have the right to an impartial judge; they have a right to a public trial; and they are guaranteed the impartial administration of the law.[39] Yet, by concluding that a witness's presence in court, without additional government action or misconduct, can create unconstitutionally suggestive circumstances for that witness's testimony, a majority of the Court holds that the very foundations of due process, such as the presence of the accused, a judge and jury, and a public trial, in fact violate due process.[40] This is a basic

_____

cannot be deemed to be satisfied by mere notice and hearing if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured.").

[39] See *Perry*, 565 US at 245-246 (explaining that "the jury, not the judge, traditionally determines the reliability of evidence" and "safeguards" already built into the Constitution); see also *Whatley*, 719 F3d at 1216 ("*Perry* makes clear that, for those defendants who are identified under suggestive circumstances not arranged by police, the requirements of due process are satisfied in the ordinary protections of trial."); and *Hughes*, 562 F Appx at 398 (noting the same).

[40] The concurring opinion's assertion that "it is beyond any reasonable doubt that a first-time trial identification is at least *as suggestive* as a pretrial showup," *ante* at 21 (CAVANAGH, J.,

contradiction at the heart of the majority opinion that runs afoul of centuries of trial practice and Supreme Court precedent.

It is difficult to see how this decision will be administered. If the witness does not give a consistent identification prior to trial, their in-court identification is subject to a serious risk of exclusion. To avoid constitutional concerns, the prosecution in this state is now required to obtain a consistent identification of the defendant prior to trial using court-approved, nonsuggestive methods.[41] What is the temporal scope of such a rule? Can the prosecution repeatedly ask a witness to identify the culprit up to trial, seeking a pretrial identification of the defendant? If not, how many times can the prosecution attempt to obtain a different identification? Eventually, asking a witness to repeatedly provide an identification in and of itself may become suggestive. What if the witness gives different identifications at different times? Must a court score the number and strength of identifications?[42] And what if the witness came to a decision on identification after an inconsistent statement but prior to trial? What is certain is that prosecution witnesses will be subject to substantially greater scrutiny if they

---

concurring in part), is not only inaccurate and overstated, it also perfectly illustrates the majority's distrust of foundational due-process guarantees which have effectively served to determine guilt for centuries.

[41] This Court adopts the *Stovall* standard for in-court identifications. Thus, unnecessarily suggestive identifications can still be admitted if they are sufficiently "reliable" under the totality of the circumstances, considering the manner and content of the testimony and balancing the testimony against the "the corrupting effect of the suggestive identification itself." *Manson*, 432 US at 114 (considering factors such as the amount of detail in the identification, witness confidence, and time lag between the events and identification). Such analysis is a very weak basis upon which to build a successful prosecution.

[42] See note 3 of this opinion.

provide testimony in conflict with prior statements, whether they are victims of long-term abuse or witnesses willing to stand before the court, the public, and their God to provide testimony under the penalty of perjury.[43] The same will undoubtedly not be true for defense witnesses.[44]

---

[43] There are innumerable circumstances in which the prosecution will not obtain consistent identifications pretrial, as noted in the above analysis. The witness might not have identified the defendant, and the prosecution might reasonably not want to repeatedly ask the witness for follow-up identifications. The witness might not have provided clear identifications, but might have provided statements on the perpetrator's appearance that could be helpful for a jury to consider. In line with centuries of practice, the prosecution might simply choose to call a witness at trial for relevant testimony, without performing extensive pretrial confirmation processes. See, e.g., *Whatley*, 719 F3d at 1216 (explaining that although the defendant "had never been identified in a line-up or array of photographs before trial" and witnesses gave conflicting identifications, his right to due process was not violated); *Correa-Osorio*, 784 F3d at 22 (stating that "no pretrial ID appears in the record" but noting that, in the federal circuit court's decades of experience, "nothing odd went down here"). Further, the prosecution might want to elicit testimony on the witness's *inability* to identify the defendant at trial to ensure that the jury is provided a complete picture of the evidence and to forestall an attempt by the defense to paint the prosecution as intentionally hiding valuable evidence from the jury. The implication in the concurring opinion that there is "no evidence" that such identifications occur and are proper, relevant, and helpful for a jury's determination of guilt simply strains credulity. See *ante* at 7 (CAVANAGH, J., concurring in part) (stating arguments also made by defendant that such identifications have little use and value, and the only trustworthy and sufficient identifications are those derived from nonsuggestive pretrial processes). It is entirely proper for a prosecutor to ask a victim or witness at trial what they saw and what they could tell as to the identity of the perpetrator, even if the witness had not previously identified the defendant. And if the witness previously did not identify the defendant, the *defense* will have a strong incentive to bring out that same testimony at trial. The claim set forth in the concurring opinion that there is no reason to admit such evidence constitutes a rejection of basic relevance standards and an appellate micromanagement of trial strategy that has no basis in either the Michigan or United States Constitution. *Id*.

The prosecution and the jury will have an interest in eliciting a witness's description of a crime, in addition to direct inquiries as to identification. For instance, in this case the prosecution asked basic questions about the witness's knowledge of the facts at issue including identification, showed no prior knowledge that the witness would identify defendant, and explicitly pointed out the witness's prior misidentification immediately after defendant's identification. If, during the course of any standard prosecutorial questioning, a witness identifies the defendant in conflict

Given the seriousness of the departure from established law in the majority opinion and its abject failure to fully consider the history of American criminal practice, Supreme Court precedent on the Due Process Clause, and the *Perry* decision, additional review of this issue in federal court may be warranted, whether in this case or another. Until then, victims and the residents of Michigan will bear the costs of this erroneous decision.

In sum, I agree in full with the separate opinion authored by Chief Justice CLEMENT. For the reasons stated in that separate opinion, as supplemented by this opinion, I would affirm

---

with a pretrial identification, does that warrant a mistrial? That may be a prudent course of action given that, under the majority opinion, the witness might have provided an identification under the unnecessarily suggestive circumstances of courtroom testimony. Further, it is hard to see how providing a detailed description of the perpetrator so that the jury could easily identify the defendant would not constitute unnecessarily suggestive circumstances, but merely stating the defendant's name in addition would. Answers obtained from a showup are not constitutional simply because the police limited questions and answers to what the perpetrator looked like. This lays bare the folly of the majority opinion's expansion of the Due Process Clause and *Stovall* to standard in-court examinations, which involve no improper government conduct and has been practiced without judicial interference for centuries.

The concurring opinion wants to have it both ways when it states that the majority opinion is *merely* prohibiting "identifications" but that a prosecutor "cannot indirectly produce the functional equivalent of an identification of the defendant as the perpetrator." *Ante* at 8 n 13 (CAVANAGH, J., concurring in part). To be very clear: if the prosecution elicits testimony from a witness and that witness identifies the defendant, explicitly or functionally, or inculpates the defendant by name in the course of that testimony, under the holding of the majority opinion, that is improper government action potentially requiring exclusion of the testimony and reversal of the conviction on appeal. The subjective intentions of the prosecutor would not change that result, see note 26 of this opinion, as the concurring opinion understands.

[44] In fact, this majority may conclude that a defendant is constitutionally *entitled* to provide such evidence. See, e.g., *Gafken*, 510 Mich 503 (holding for the first time in American jurisprudence that criminal defendants have a right to a duress defense for forms of murder, mentioning— without material analysis—the constitutional right to present a defense).

defendant's conviction. I dissent from the decision to reverse defendant's sentence. The unanimous decision of the Court of Appeals should be affirmed in full.

Brian K. Zahra